UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Teeda Barclay, Erin Ovsak, and Nicole
Nordick, *individually and on behalf of all
others similarly situated*,

        Plaintiffs,

v.

ICON Health & Fitness, Inc. and
NordicTrack, Inc.,

        Defendants.

File No. 19-cv-2970 (ECT/DTS)

**OPINION AND ORDER**

---

Karl L. Cambronne, Bryan L. Bleichner, and Christopher P. Renz, Chestnut Cambronne PA, Minneapolis, MN; Nathan D. Prosser, Hellmuth & Johnson, PLLC, Edina, MN; W.B. Markovits, Terence R. Coates, and Justin C. Walker, Markovits, Stock & DeMarco, LLC, Cincinnati, OH, for Plaintiffs Teeda Barclay, Erin Ovsak, and Nicole Nordick.

Caitlinrose H. Fisher, X. Kevin Zhao, and Lawrence M. Shapiro, Greene Espel PLLP, Minneapolis, MN, for Defendants ICON Health & Fitness, Inc. and NordicTrack, Inc.

---

       Plaintiffs allege that NordicTrack treadmills each of them purchased cannot achieve or maintain the continuous horsepower Defendants represented the treadmills were capable of. Plaintiffs have asserted several claims on their own behalf and on behalf of proposed nationwide and Minnesota-specific classes of persons who also purchased NordicTrack treadmills. Defendants raise several issues in two motions. Defendants' first motion seeks to compel arbitration of Plaintiffs' claims individually pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 3, 4, and Federal Rule of Civil Procedure 56. ECF No. 28. With their second motion, Defendants seek dismissal of some or all of Plaintiffs' claims for lack of

personal jurisdiction, lack of subject-matter jurisdiction, and for failure to state a claim upon which relief can be granted, all pursuant to Federal Rule of Civil Procedure 12. ECF No. 23. With their Rule 12 motion, Defendants also ask that Plaintiffs' allegations regarding their proposed nationwide class be stricken from the operative complaint. *Id.* Defendants' motions will be granted in part. There is not subject-matter jurisdiction over Plaintiffs' request for prospective injunctive relief. Claims asserted by two of the three Plaintiffs, Teeda Barclay and Nicole Nordick, are arbitrable as a matter of law. With respect to the third Plaintiff, Erin Ovsak, discovery is necessary to determine whether her claims are arbitrable.[1] Once that discovery is completed, the Parties also will have the opportunity to further address Utah law governing whether Ovsak is bound to arbitrate her claims. Defendants' motions will be denied in all other respects, at least for the time being.

I

*Plaintiffs and Defendants are of diverse citizenship.* Plaintiffs are Minnesota citizens. Second Am. Compl. ¶ 14 [ECF No. 22]. Defendant ICON Health & Fitness owns Defendant NordicTrack. *Id.* ¶ 28. Both ICON and NordicTrack are incorporated under Utah law, and each maintains its principal place of business in Utah. *Id.* ¶¶ 28, 29.

---

[1] There was a fourth Plaintiff—a California citizen named Larry Schwartz—who asserted claims under California law on behalf of himself and a proposed class of persons in California who purchased a NordicTrack treadmill. Second Am. Compl. ¶¶ 14, 71, 212–287 [ECF No. 22]. Defendants moved to dismiss Schwartz's California-law claims for lack of personal jurisdiction under Rule 12(b)(2). Defs.' Mot. to Dismiss [ECF No. 23]; Defs.' Mem. in Supp. of Mot. to Dismiss at 6–10 [ECF No. 25]. In response, Schwartz voluntarily dismissed his claims pursuant to Rule 41(a)(1)(A)(i). Not. of Voluntary Dismissal [ECF No. 42]. Defendants' Rule 12(b)(2) motion to dismiss Schwartz's claims will therefore be denied as moot.

*Plaintiffs purchased NordicTrack treadmills.*   ICON, Plaintiffs allege, "is the world's largest manufacturer and marketer of fitness equipment." *Id.* ¶ 28.   ICON sells treadmills under the NordicTrack brand. *Id.* ¶ 29; Cox Decl. ¶ 4 [ECF No. 33].   Barclay, Ovsak, and Nordick each purchased a NordicTrack treadmill.   Barclay "purchased a NordicTrack 6.5 S treadmill online through Amazon.com on or about June 3, 2019[.]" Second Am. Compl. ¶ 16.   Barclay "paid over $500" for the treadmill and planned to use the treadmill for exercise in her Coon Rapids, Minnesota home.  *Id.* ¶¶ 16, 18.  Ovsak "purchased a NordicTrack Commercial 2950 treadmill online directly from Defendants' website on or about February 13, 2016," paying more than $2,000 and planning to use the treadmill "for ordinary use" in her Breckenridge, Minnesota home. *Id.* ¶¶ 19, 21.  Nordick "purchased a NordicTrack T7.5 S treadmill online through NordicTrack.com on or about January 22, 2019," paying more than $1,500 and planning to use the treadmill for exercise "in her home located just outside Breckenridge, Minnesota." *Id.* ¶¶ 22, 24.

*In purchasing their treadmills, Plaintiffs relied on Defendants' representations concerning the treadmills' continuous horsepower ratings.*  Continuous horsepower is "a measurement of [a] motor's ability to maintain and continuously produce power over an extended period of time without exceeding the current rating of the motor." *Id.* ¶ 41.  Put another way, continuous horsepower is the "minimum horsepower delivered [by the treadmill's motor] at all points during a workout."  *Id.* ¶ 44 (quotation and emphasis omitted).  Each Plaintiff alleges that, before purchasing her NordicTrack treadmill, she read content on NordicTrack's website describing the treadmill's continuous horsepower rating. *See id.* ¶¶ 17, 20, 23.  Each alleges that Defendants' representations regarding the

3

treadmills' continuous horsepower ratings were "a material factor" in her purchasing decision and that she "would not have purchased" the treadmill "or would have paid less but for" these representations.  *Id.*

*Plaintiffs allege that Defendants' representations concerning the treadmills' continuous horsepower ratings were false.*  This is the core allegation underlying Plaintiffs' claims.  Specifically, Plaintiffs allege that "NordicTrack consistently and prevalently advertises and markets that the [t]readmills [it sold to Plaintiffs] operate at a continuous horsepower [or "CHP"] of between 2.6 CHP and 4.25 CHP," but that "*all* NordicTrack treadmills operate in household use well below NordicTrack's continuous horsepower representations and maintain similar continuous horsepower regardless of the misrepresented CHP."  *Id.* ¶ 7.  Plaintiffs allege that Defendants base their treadmills' continuous horsepower ratings "on an inflated laboratory testing power draw (amperage) not possible in household use."  *Id.* ¶ 48.  Because "[m]ost electrical outlets in American homes are equipped with the standard 15-amps . . . and have an accompanying 120-volt circuit," *id.* ¶ 34, and not the "inflated laboratory testing power draw," *id.* ¶ 48, Plaintiffs allege that the continuous horsepower Defendants advertised cannot be achieved in a household setting and is therefore "false and misleading," *id.*

*Plaintiffs assert claims in ten separate counts, two on behalf of a proposed nationwide class, and eight on behalf of a proposed Minnesota class.*  The two proposed classes consist of "[a]ll persons" either in the United States or Minnesota "who purchased a NordicTrack treadmill, during the maximum period of time permitted by law, for personal, family, or household purposes, and not for resale."  *Id.* ¶¶ 69–70.  On behalf of

4

themselves and the proposed nationwide class, Plaintiffs allege claims for breach of express warranty (Count 1), *id.* ¶¶ 93–104, and breach of express warranty under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.* (Count 2), *id.* ¶¶ 105–124.  On behalf of themselves and the proposed Minnesota class, Plaintiffs allege claims for breach of express warranty in violation of Minn. Stat. § 336.2-313 (Count 3), *id.* ¶¶ 125–137, breach of implied warranty in violation of Minn. Stat. § 336.2-314 (Count 4), *id.* ¶¶ 138–151, breach of warranty under the Magnuson-Moss Warranty Act (Count 5), *id.* ¶¶ 152–162, violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.* (Count 6), *id.* ¶¶ 163–173, violation of the Minnesota Consumer Fraud Act, Minn. Stat. § 325F.68, *et seq.* (Count 7), *id.* ¶¶ 174–178, violation of the Minnesota False Statement in Advertising Act, Minn. Stat. § 325F.67 (Count 8), *id.* ¶¶ 179–185, violation of the Minnesota Unlawful Trade Practices Act, Minn. Stat. § 325D.13 (Count 9), *id.* ¶¶ 186–201, and negligent misrepresentation (Count 10), *id.* ¶¶ 202–211.  Plaintiffs seek many remedies.  These include "compensatory, exemplary, and statutory" damages, restitution, disgorgement, attorneys' fees, injunctive relief, declaratory relief, pre- and post-judgment interest, and "any such other and further relief the Court deems just and equitable[]" (though it's hard to hypothesize what that might be).  *Id.* at 61, ¶¶ 3–10.

*After purchasing their NordicTrack treadmills, Barclay and Nordick signed up as members of ICON's iFit service, and the iFit "Terms of Service" then in effect included an arbitration clause.*  iFit is "a brand operated by ICON" that "connect[s] people with fitness coaches."  Am. Brammer Decl. ¶ 3 [ECF No. 45].  "Many individuals [who] purchase NordicTrack treadmills also register for iFit memberships . . . [to] access iFit's training

support technology while they exercise." *Id.* ¶ 4. Barclay registered as an iFit member on June 18, 2019. *Id.* ¶ 17; Barclay Decl. ¶ 5 [ECF No. 38]. Nordick registered as an iFit member on March 4, 2019. Am. Brammer Decl. ¶ 16; Nordick Decl. ¶ 5 [ECF No. 39]. The record contains no evidence showing precisely how Barclay or Nordick registered as an iFit member. The record does show the same four possible registration methods were available on the dates Barclay and Nordick registered. Am. Brammer Decl. ¶¶ 8, 20–22. They could have registered using iFit's mobile application. *Id.* ¶ 8. They could have registered on the iFit.com website's registration page. *Id.* ¶ 20. They could have "unlocked and activated [one of] ICON's Bluetooth-equipped treadmills on iFit.com[.]" *Id.* ¶ 21. Or they could have registered by setting up one of "ICON's touchscreen-equipped treadmills on their embedded console touchscreen[.]" *Id.* ¶ 22. Each of these methods would have required Barclay and Nordick to "click a box" that read either "CREATE ACCOUNT," "PLACE ORDER," "START TRIAL," or "NEXT." *Id.* ¶¶ 8, 20, 21, 22. Adjacent to (either immediately below or left of) each of these boxes appeared a statement alerting the registrant that by clicking on the box, she agreed to the hyperlinked iFit "Terms of Use," among other contracts. *Id.* When Barclay and Nordick registered as iFit members, the iFit Terms of Use included the following arbitration provision:

> You acknowledge and agree that ICON may, at its sole discretion, require you to submit any disputes arising from the use of these Terms of Use or the ICON Sites, including disputes arising from or concerning their interpretation, violation, invalidity, non-performance, or termination, to final and binding arbitration under the Rules of Arbitration of the American Arbitration Association applying Utah law.

Am. Brammer Decl., Ex. 7 at 9–10 [ECF No. 45-7].  The Terms of Use defined "ICON" to include "its[] affiliates, partners, licensors, subsidiaries, and/or related companies."  *Id.* at 1.  The iFit Terms of Use also included a class-action waiver providing that an iFit member "may only resolve disputes with us on an individual basis" and not "as a plaintiff or a class member in a class, consolidated, or representative action."  *Id.* at 9.

*Ovsak did not register as an iFit member, but her spouse did.*  Erin Ovsak's husband, Jay Ovsak, became an iFit member on March 25, 2016.  Am. Brammer Decl. ¶ 15; Ovsak Decl. ¶ 5 [ECF No. 40].  As with Barclay and Nordick, the record lacks evidence showing how Jay registered as an iFit member.  The record shows two possible methods.  First, Jay might have registered through iFit's mobile application, following the process described in the preceding paragraph.  Am. Brammer Decl. ¶ 8.  Second, Jay might have registered through the iFit.com website.  *Id.* ¶ 19.  If Jay registered through the website, then he would have been required to click a box that read, "Purchase for $X," where "X" was the purchase price.  Am. Brammer Decl. ¶ 19, Ex. 9 [ECF No. 45-9].  Directly beneath the "Purchase for $X" button would have appeared a statement that read: "By clicking submit, you agree to the Terms Of Service. View our Privacy Policy."  *Id.*  Both the phrases "Terms Of Service" and "Privacy Policy" were in blue font, and the Terms of Service phrase hyperlinked directly to the iFit Terms of Use in effect at that time.  *Id.*  When Jay registered as an iFit member, the then-effective iFit Terms of Use contained no arbitration provision, but they did contain a modification clause.  *See id.*, Ex. 4 at 2 [ECF No. 45-4].  That modification clause provided:

> We expressly reserve the right to change these Terms of Use from time to time without notice to you. You acknowledge and agree that it is your responsibility to review this site and these Terms of Use from time to time and to familiarize yourself with any modifications. Your continued use of this site after such modifications will constitute acknowledgement of the modified Terms of Use and agreement to abide and be bound by the modified Terms of Use.

*Id.* ICON modified the Terms of Use in effect when Jay Ovsak registered multiple times, and in March 2018, ICON added the arbitration provision in effect when Barclay and Nordick became iFit members. *Id.*, Ex. 6 at 10 [ECF No. 45-6]; *compare with id.*, Ex. 7 at 9–10.

## II

## A

Defendants' motions raise two threshold issues: (1) whether there is a lack of subject-matter jurisdiction over parts of Plaintiffs' claims, and (2) whether Plaintiffs agreed to arbitrate their claims. Defendants argue that "the Court need not, and should not, reach any arguments contained in [Defendants'] motion to dismiss until [the] motion to compel arbitration is fully resolved." Defs.' Mem. in Supp. of Mot. to Compel Arbitration at 1 n.1 [ECF No. 30]; *see also* Defs.' Mem. in Supp. of Mot. to Dismiss at 2 n.1 [ECF No. 25]. In other words, Defendants argue that their motion to compel arbitration should be decided before any questions of subject-matter jurisdiction. No authority is cited to support this argument, and the better approach, it seems, is to address Defendants' challenges to subject-matter jurisdiction before addressing Defendants' motion to compel arbitration.

There is no question that jurisdiction must come first when a court's jurisdiction over the *entire* action is in question. A federal court must always assure itself of its jurisdiction before proceeding to the merits of an action. *See Ashley v. U.S. Dep't of Interior*, 408 F.3d 997, 1000 (8th Cir. 2005) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)). Though a decision whether to compel arbitration is not exactly the "merits" of the underlying dispute, it does require a court to interpret contractual language and issue an order that binds the parties. *See generally Sadler v. Green Tree Servicing, LLC*, 466 F.3d 623, 625 (8th Cir. 2006) (describing the arbitrability inquiry). Moreover, the Federal Arbitration Act ("FAA") only allows a party to seek an order compelling arbitration from a district court that "would have jurisdiction . . . of the subject matter of a suit arising out of the controversy between the parties." 9 U.S.C. § 4. Unsurprisingly, then, courts faced with both a question of jurisdiction over the entire case and a question of arbitration address jurisdiction first. *See Gaming World Int'l, Ltd. v. White Earth Band of Chippewa Indians*, 317 F.3d 840, 847 (8th Cir. 2003) (addressing subject-matter jurisdiction before deciding whether a district court properly granted a motion to compel arbitration); *see also*, *e.g.*, *Mejia v. Uber Techs., Inc.*, 291 F. Supp. 3d 1314, 1317 (S.D. Fla. 2018) (raising the issue of standing *sua sponte* and dismissing the action without addressing a pending motion to compel arbitration).

The wrinkle here is the nature of Defendants' jurisdictional arguments: Defendants argue that there is not subject-matter jurisdiction over, not the entire case, but discrete aspects of it. Defendants say Plaintiffs lack standing to seek injunctive relief. Defs.' Mem. in Supp. of Mot. to Dismiss at 12. Defendants next argue that Plaintiffs lack standing to

assert any claims with respect to treadmill models they did not purchase.  *Id.* at 14.  And third, Defendants argue that there is not subject-matter jurisdiction over Plaintiffs' claims under the Magnuson-Moss Warranty Act because the action has fewer than 100 named plaintiffs.  *Id.* at 17.  To reiterate, then, each of Defendants' jurisdictional arguments concerns only a portion of the case, so Defendants implicitly agree that there is subject-matter jurisdiction over at least part of the case.  Neither the Supreme Court nor the Eighth Circuit, it appears, have addressed what to do in this precise scenario.

There is a plausible argument based on the text of the FAA and mere practicality that Defendants' jurisdictional arguments do not preclude reaching the motion to compel arbitration first.  The textual argument goes like this: the FAA only requires that a district court entertaining a motion to compel "would have jurisdiction . . . of the subject matter of *a suit arising out of the controversy between the parties*."  9 U.S.C. § 4 (emphasis added).  If Defendants prevailed on all of their jurisdictional arguments, a justiciable "controversy between the parties" would remain over which there would be subject-matter jurisdiction.  *Id.*  And if the Article III baseline and the FAA are both satisfied, any lack of jurisdiction over parts of Plaintiffs' claims for relief should have no bearing on a district court's power to compel arbitration of the dispute as a whole.  The practical point is that a federal district court's lack of subject-matter jurisdiction over a part or parts of a claim says nothing about whether those aspects of a claim may be arbitrable.  State courts may compel arbitration, too.  And in some cases (including this one, as will be discussed later), the arbitrator has responsibility to decide whether a claim falls within the scope of an arbitration agreement.  In these circumstances, a federal court's determination that it lacks subject-matter

10

jurisdiction over a claim may not preclude an arbitrator from deciding the claim is arbitrable.

Notwithstanding these points, the surer course is to address Defendants' jurisdictional arguments before Defendants' motion to compel arbitration.  For starters, the statutory argument outlined above has not been raised or addressed by the Parties, and research has not unearthed an example of another court endorsing it.  Second, the same reasons federal courts decide a challenge to subject-matter jurisdiction over an entire case before deciding a motion to compel arbitration support first addressing Defendants' challenges to subject-matter jurisdiction here.  Just as it is not possible for a federal court to compel arbitration of an entire case over which it lacks subject-matter jurisdiction, it is difficult to understand how a federal court might compel arbitration over specific claims or parts of claims over which it lacks judicial power in the first place.  Finally, it bears noting that at least two district courts faced with a similar scenario have addressed jurisdiction first.  *See Miller v. Time Warner Cable Inc.*, No. 16-cv-00329-CAS (ASx), 2016 WL 7471302, at *4 (C.D. Cal. Dec. 27, 2016) (holding that a plaintiff lacked standing to seek injunctive relief before addressing whether the plaintiff should be compelled to arbitrate her damages claim); *Main v. Gateway Genomics, LLC*, No. 15-cv-2945 (AJB/WVG), 2016 WL 7626581, at *8–9 (S.D. Cal. Aug. 1, 2016) (same).

B

1

Defendants argue that Plaintiffs lack standing to seek injunctive relief.  When a plaintiff seeks injunctive relief, "the 'injury in fact' element of standing requires a showing

11

that the plaintiff faces a threat of ongoing or future harm." *Park v. Forest Serv. of U.S.*, 205 F.3d 1034, 1037 (8th Cir. 2000); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 101–05, 107 n.8 (1983) (stating that the threat of future injury must be "real and immediate"). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974). ICON argues that Plaintiffs lack standing because they claim no intent to purchase treadmills again. Defs.' Mem. in Supp. at 13. Although Plaintiffs repeatedly claim that they "would not have purchased the Treadmills absent Defendants' representations" about the treadmills' horsepower, Second Am. Compl. ¶¶ 12, 99, 118, 133, 184, 198, 210, they say nothing about purchasing treadmills in the future.

Courts are split over whether such intent is required. Some conclude that there can be no threat of injury unless the plaintiff has specific plans to purchase the product in the future. *See, e.g.*, *Kelly v. Cape Cod Potato Chip Co.*, 81 F. Supp. 3d 754, 763 (W.D. Mo. 2015). If the injury is being fooled by misleading sales practices, the analysis goes, then a plaintiff who isn't going to buy anything faces no threat of suffering the injury again. *See id.* Courts on the other side of the split typically focus on policy concerns: they observe that depriving plaintiffs who avoid a given product because of the deceptive sales practices surrounding it of standing would "denigrate" consumer-protection statutes, likely preventing plaintiffs from ever obtaining injunctive relief in this type of case. *Belfiore v. Procter & Gamble Co.*, 94 F. Supp. 3d 440, 445 (E.D.N.Y. 2015); *see also Yeldo v. MusclePharm Corp.*, 290 F. Supp. 3d 702, 713–14 (E.D. Mich. 2017). For these courts, a

defendant's continuing deceptive trade practices are themselves an ongoing injury sufficient to confer Article III standing to seek injunctive relief. *See Leiner v. Johnson & Johnson Consumer Cos.*, 215 F. Supp. 3d 670, 672–73 (N.D. Ill. 2016).

Resolving this question comes down to choosing one of these approaches. To better honor the Supreme Court's requirement that a threat of future harm be "real and immediate," *Lyons*, 461 U.S. at 105, it seems that there must be *some* plausible prospect of future interactions between Plaintiffs and Defendants, even if there need not be specific plans to purchase again. Otherwise, it is difficult to see how the allegedly deceptive practices that occurred at the time Plaintiffs purchased their treadmills will affect them at all going forward. It is true that Plaintiffs allege that ICON's violations are continuing, but this does not change the fact that all of Plaintiffs' purchases occurred in the past. So the better answer is that Plaintiffs lack standing to seek injunctive relief.[2]

---

[2]     Defendants have one additional argument on this point: that there is no realistic threat of future injury because the Plaintiffs now know not to believe what ICON tells them. Defs.' Mem. in Supp. of Mot. to Dismiss at 13. Although some courts have accepted this argument, *see Kelly*, 81 F. Supp. 3d at 762–63 (holding that a plaintiff lacked standing to seek injunctive relief because the plaintiff was "now aware of Defendants' alleged deception" in marketing potato chips), others have not, *see Le v. Kohls Dep't Stores, Inc.*, 160 F. Supp. 3d 1096, 1111 (E.D. Wis. 2016) (reasoning that the plaintiff's "realistic fear that [a] misleading marketing scheme will likely continue to cause economic harms to consumers" was sufficient to confer standing even though the plaintiff now "recognize[d]" the deception). This argument seems better directed to whether Plaintiffs are entitled to injunctive relief on the merits, not whether they have standing. *See*, *e.g.*, *Indep. Glass Ass'n, Inc. v. Safelite Grp., Inc.*, No. 05-cv-238 (ADM/FLN), 2005 WL 3079084, at *2 (D. Minn. Nov. 16, 2005) (concluding that a plaintiff had not shown a threat of future harm— a requirement to obtain injunctive relief under the relevant statute—in part because the plaintiff was aware of the challenged conduct and was "likely to be vigilant in the future").

2

Defendants next argue that Plaintiffs lack standing to assert any claims concerning treadmill models that they did not purchase. Each of the three remaining Plaintiffs alleges she purchased a single treadmill model different from the model purchased by either of the other two Plaintiffs; in other words, Plaintiffs collectively allege they purchased three different treadmill models. Second Am. Compl. ¶¶ 16–24. The operative complaint, however, identifies 24 different models for which ICON made "similar horsepower misrepresentations." *Id.* ¶ 1 n.1.

Rather than a standing issue, the distinction between product types may instead create an issue for the typicality of Plaintiffs' claims or the adequacy of their representation, which is better resolved at class certification. At least one court in this District has endorsed this approach. *See Johannessohn v. Polaris Indus., Inc.*, No. 16-cv-3348 (PJS/LIB), 2017 WL 2787609, at *5 (D. Minn. June 27, 2017); *cf. Hudock v. LG Elecs. U.S.A., Inc.*, No. 16-cv-1220 (JRT/FLN), 2017 WL 1157098, at *2 (D. Minn. Mar. 27, 2017) (stating that "standing questions may be postponed when class certification is 'logically antecedent' to standing"). Given the general rule that "[a] putative class action can proceed as long as one named plaintiff has standing," *In re SuperValu, Inc.*, 870 F.3d 763, 768 (8th Cir. 2017), this approach seems most appropriate.

If this were an issue of Plaintiffs' standing, Defendants are correct that some courts have applied a rigid rule that a plaintiff lacks standing to assert claims related to products that the plaintiff herself did not buy. *See*, *e.g.*, *Kelly*, 81 F. Supp. 3d at 763 (holding that a plaintiff had standing to challenge an allegedly false "all natural" label on four different

14

flavors of chips that she purchased, but not on twelve other flavors that she did not purchase); *Ferrari v. Best Buy Co.*, No. 14-cv-2956 (MJD/FLN), 2015 WL 2242128, at *7–*8 (D. Minn. May 12, 2015) (adopting report and recommendation) (holding that a plaintiff who had purchased one model of LCD television could not challenge the same marketing representation on a different model); *Chin v. General Mills, Inc.*, No. 12-cv-2150 (MJD/TNL), 2013 WL 2420455, at *3–4 (D. Minn. June 3, 2013) (holding that a plaintiff who had purchased one variety of Nature Valley granola bars lacked standing to challenge misrepresentations on another variety that he had not purchased).  Most courts follow a more nuanced approach, however, asking whether "the products and alleged misrepresentations are substantially similar."  *Brown v. Hain Celestial Grp., Inc.*, 913 F. Supp. 2d 881, 890 (N.D. Cal. 2012) (collecting cases and describing this as the "majority" approach).  Under the reasoning of this more nuanced approach, Plaintiffs have plausibly alleged standing.  Although it is true, as Defendants point out, that their treadmill models have many different features, *see* Defs.' Mem. in Supp. at 16, only one feature—continuous horsepower—matters for purposes of Plaintiffs' claims.  *See Brown*, 913 F. Supp. 2d at 892 (holding that plaintiffs had standing in part because "common misrepresentations [were] the crux of [their] case"); *see also Wagner v. Gen. Nutrition Corp.*, No. 16-CV-10961, 2017 WL 3070772, at *5-*6 (N.D. Ill. July 19, 2017) (holding that a plaintiff had standing regarding dietary supplements that were "materially the same" as the supplements he purchased); *Cox v. Chrysler Grp.*, No. 14-CV-7573 (MAS/DEA), 2015 WL 5771400, at *15 (D.N.J. Sept. 30, 2015) (holding that plaintiffs had standing to bring products-liability claims for vehicle models that they did not purchase because the challenged

15

"sunroof [was] the common denominator" across vehicles).   Any differences among treadmill models do not appear to be material, so they are not a basis to find that Plaintiffs lack Article III standing under this approach.

3

Finally, Defendants argue that there is not subject-matter jurisdiction over Plaintiffs' claim under the Magnuson-Moss Warranty Act ("MMWA"), which "provides a federal cause of action for state law express and implied warranty claims."  *Browe v. Evenflo Co.*, No. 14-cv-4690 (ADM/JJK), 2015 WL 3915868, at *5 (D. Minn. June 25, 2015) (quotation omitted).  Defendants rely on a sentence in the statute providing that "[n]o claim shall be cognizable" if "the action is brought as a class action, and the number of named plaintiffs is less than one hundred."  15 U.S.C. § 2310(d)(3).   According to Defendants, this 100-plaintiff requirement is jurisdictional, and because there are now only three named plaintiffs, it is not satisfied.  Defs.' Mem. in Supp. of Mot. to Dismiss at 17.  Plaintiffs do not contest that this numerosity requirement is jurisdictional,[3] but they respond that they need not satisfy it because they have alleged an alternative source of subject-matter jurisdiction: the Class Action Fairness Act ("CAFA"), *see* 28 U.S.C. § 1332(d)(2).  Pls.' Mem. in Opp. to Mot. to Dismiss at 13–17 [ECF No. 43].  There is no serious question or dispute that at this stage there is subject-matter jurisdiction over this case under CAFA. *See* Second Am. Compl. ¶ 14 and at 61 ¶¶ 4–7.

---

[3]      Courts, including this one, have consistently treated the numerosity requirement as jurisdictional, *see, e.g.*, *Loff v. Am. Arms, Inc.*, No. 00-cv-1139 (MJD/JGL), 2002 WL 29502, at *1 (D. Minn. Jan. 4, 2002), and it appears in the statute alongside another familiar jurisdictional requirement: amount in controversy.  *See* 15 U.S.C. § 2310(d)(3)(A)–(B).

There is a split of authority on whether Plaintiffs asserting CAFA jurisdiction must also meet the MMWA's jurisdictional requirements, but Plaintiffs' argument is more consistent with the statute as a whole. The MMWA authorizes jurisdiction in two alternative venues: (1) "any court of competent jurisdiction in any State or the District of Columbia"; and (2) "an appropriate district court of the United States." 15 U.S.C. § 2310(d)(1)(A)–(B). The 100-named-plaintiff limitation applies to the second category, but not the first. *See id.* § 2310(d)(3) (providing restrictions for "a suit brought under paragraph (1)(B) of this subsection"). By the statute's plain text, federal courts fall in both categories. They fall in the first category because federal courts are "in"—*i.e.*, within the boundaries of—states and the District of Columbia. Had a different preposition been used in describing the first category—"of," for example—then the statute's text would not be susceptible to this interpretation. A federal court is not a court "of" any state. In other words, if a federal court has some other source of subject-matter jurisdiction, then it may be a "court of competent jurisdiction" under the MMWA. The second category is limited to federal courts. If the MMWA is a plaintiff's *sole* basis for asserting federal jurisdiction, then that plaintiff needs to meet the MMWA's extra jurisdictional requirements. A number of courts in other jurisdictions have followed this general analysis. *See Kuns v. Ford Motor Co.*, 543 F. App'x 572, 574 (6th Cir. 2013); *Carpenter v. PetSmart, Inc.*, 441 F. Supp. 3d 1028, 1039 n.3 (S.D. Cal. 2020); *Gelis v. Bayerische Motoren Werke Aktiengesellschaft*, No. 17-cv-07386, 2018 WL 6804506 (WHW), at *7 (D.N.J. Oct. 30, 2018); *Keegan v. Am. Honda Motor Co.*, 838 F. Supp. 2d 929, 954 (C.D.

Cal. 2012) (collecting cases reaching this result); *Brothers v. Hewlett-Packard Co.*, No. C-06-02254 (RMW), 2007 WL 485979, at *8 (N.D. Cal. Feb. 12, 2007).

The main counterargument is that reading the phrase "any court of competent jurisdiction in any State" to include federal district courts reads out the provision authorizing suit in "an appropriate district court of the United States." 15 U.S.C. § 2310(d)(1).  Defendants cite a number of courts that have treated the 100-named-plaintiff threshold as a limitation that applies *whenever* a plaintiff brings a MMWA claim in federal district court.[4]  Defs.' Mem. in Supp. of Mot. to Dismiss at 17–18; Defs.' Letter [ECF No. 51]; *see, e.g.*, *Floyd v. Am. Honda Motor Co.*, 966 F.3d 1027, 1031–35 (9th Cir. 2020); *MacDougall v. Am. Honda Motor Co.*, No. 17-CV-01079 (AJG/DFM), 2017 WL 8236359, at *4 (C.D. Cal. Dec. 4, 2017); *Ebin v. Kangadis Food Inc.*, No. 13-CV-2311 (JSR), 2013 WL 3936193, at *1 (S.D.N.Y. July 26, 2013).  But these courts do not consider—at least not explicitly—whether a federal court could ever be a "court of competent jurisdiction in any State."  Although § 2310(d)(1) may have functionally drawn a distinction between state courts and federal courts when the MMWA was first passed in 1975, CAFA's passage thirty years later significantly expanded federal jurisdiction over class actions that would otherwise have remained in state courts.  *See generally* Mary K. Kane, 7A *Federal Practice and Procedure* § 1756.2 (3d. ed. Oct. 2020 Update) (describing

---

[4]     The parties do not cite a case in which the Eighth Circuit or District of Minnesota has weighed in on this question, and research has not revealed one.  In the only case from the District that cites the MMWA's jurisdictional limitations, Judge Michael J. Davis held that the court lacked jurisdiction both because there was no diversity jurisdiction and because there were fewer than 100 named plaintiffs.  *See Loff*, 2002 WL 29502, at *1.

the circumstances of CAFA's passage). Given this statutory development, the better answer is that once plaintiffs have satisfied CAFA, the MMWA's additional requirements do not apply.

III

A

A motion to compel arbitration is analyzed either as a motion to dismiss under Federal Rule of Civil Procedure Rule 12(b)(6) or as a motion for summary judgment under Rule 56, depending on how the motion is presented. *Seldin v. Seldin*, 879 F.3d 269, 272 (8th Cir. 2018); *City of Benkelman v. Baseline Eng'g Corp.*, 867 F.3d 875, 881 (8th Cir. 2017). Here, because "matters outside the pleadings" have been presented and considered, the motion "must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d); *see also City of Benkelman*, 867 F.3d at 882. If a genuine dispute of material fact concerning "the making of the arbitration agreement" exists, then a federal district court "shall proceed summarily to the trial thereof." 9 U.S.C. § 4.

The FAA provides that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. The Supreme Court's "cases place it beyond dispute that the FAA was designed to promote arbitration. They have repeatedly described the [FAA] as 'embod[ying] [a] national policy favoring arbitration[.]'" *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011) (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006)). Of course, "a party cannot be required to submit to arbitration

19

any dispute which [s]he has not agreed . . . to submit." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960).  When the making of the agreement for arbitration is at issue, the Eighth Circuit "has refined this inquiry to asking 1) whether the agreement for arbitration was validly made and 2) whether the arbitration agreement applies to the dispute at hand[.]" *MedCam, Inc. v. MCNC*, 414 F.3d 972, 974 (8th Cir. 2005).  Though courts "presume that parties have *not* authorized arbitrators to resolve" these "gateway questions, . . . parties are free to authorize arbitrators to resolve [those] questions," provided such authorization is based on neither "silence nor ambiguity" in the arbitration agreement itself. *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1416–17 (2019) (citations and quotations omitted).

B

Here, the Parties agree that the issue of whether a valid arbitration agreement was made between Plaintiffs and Defendants is an issue for judicial determination.  Defs.' Mem. in Supp. of Mot. to Compel Arbitration at 9–21; Pls.' Mem. in Opp'n to Mot. to Compel Arbitration at 20–29 [ECF No. 36].  As the parties seeking to compel arbitration, ICON and NordicTrack "carr[y] the burden to prove a valid and enforceable agreement." *Shockley v. PrimeLending*, 929 F.3d 1012, 1017 (8th Cir. 2019).  "To determine whether a valid agreement to arbitrate exists," a federal court ordinarily "look[s] to the forum state's contract law[.]" *Northport Health Servs. of Arkansas, LLC v. Posey*, 930 F.3d 1027, 1030 (8th Cir. 2019) (citing *Barker v. Golf U.S.A., Inc.*, 154 F.3d 788, 791 (8th Cir. 1998)).  If the contract in question includes a choice-of-law provision, however, then the state law chosen by that provision controls unless a "persuasive reason [is] advanced" that might

20

justify setting aside the provision.  *Barker*, 154 F.3d at 791; *see also Donaldson Co. v. Burroughs Diesel, Inc.*, 581 F.3d 726, 731–36 (8th Cir. 2009) (applying Mississippi law based on contract's choice-of-law provision to determine whether contract's arbitration provision could be enforced by a non-signatory).

Defendants argue that Utah law governs the question of whether there is a valid arbitration agreement because the relied-on iFit terms of use contain a Utah choice-of-law provision.  Defs.' Mem. in Supp. of Mot. to Compel Arbitration at 9–10; Am. Brammer Decl., Ex. 7 at 10.  Defendants add, however, that whether Utah law is applied doesn't really matter because, in their view, "[t]he elements of contract formation are foundational common-law principles widely adopted in the United States."  Defs.' Mem. in Supp. of Mot. to Compel Arbitration at 9 n.3.  "Plaintiffs do not agree that Utah law . . . applies, but agree with Defendants that the issue of applicable law need not be resolved at this point given that the basic contract law at issue is the same however the choice-of-law issue is resolved."  Pls.' Mem. in Opp'n to Mot. to Compel Arbitration at 15 n.2.[5]  Consistent with these views, the Parties cite several cases from jurisdictions other than Utah to support their arguments.  In view of the choice-of-law provision and the absence of any argument that some other state's law controls, Utah law will be applied here.  Of course, that doesn't preclude reliance on other jurisdictions' persuasive precedents, but Utah law should matter most and come first.

---

[5]    Plaintiffs do not challenge the validity of the Utah choice-of-law clause.  If they were going to challenge the clause's validity, this was the time to do it.

Utah, like most states, follows the "basic" rule that "a contract is not formed unless there is a meeting of the minds." *Lebrecht v. Deep Blue Pools & Spas, Inc.*, 374 P.3d 1064, 1069 (Utah Ct. App. 2016) (quoting *Sackler v. Savin*, 897 P.2d 1217, 1220 (Utah 1995)). There must be "an offer, an acceptance, and consideration," *Cea v. Hoffman*, 276 P.3d 1178, 1185 (Utah Ct. App. 2012), showing the parties' mutual assent "to the 'integral features of the agreement,'" *LD III, LLC v. BBRD, LC*, 221 P.3d 867, 872 (Utah Ct. App. 2009) (alteration omitted) (quoting *Prince, Yeates & Geldzahler v. Young*, 94 P.3d 179, 183 (Utah 2004)). An offeree signals acceptance of an offer by "manifest[ing] . . . assent to [the] offer, such that an objective, reasonable person is justified in understanding that a fully enforceable contract has been made." *Cal Wadsworth Const. v. City of St. George*, 898 P.2d 1372, 1376 (Utah 1995); *see Com. Union Assocs. v. Clayton*, 863 P.2d 29, 34–37 (Utah Ct. App. 1993) (noting that the parties can demonstrate mutual assent through conduct). For the acceptance to be effective, however, an offeree must have "some form of actual *or constructive* notice" of the contract's essential terms. *Mitchell v. Wells Fargo Bank*, 280 F. Supp. 3d 1261, 1285 n.22 (D. Utah 2017) (emphasis added). This rule is "no less applicable on the Internet." *Koch Indus., Inc. v. Does*, No. 2:10CV1275DAK, 2011 WL 1775765, at *9 (D. Utah May 9, 2011) (appearing to apply Utah law). Even without *actual* notice of a contract's terms, an internet user may be bound by it as long as she received "[r]easonably conspicuous notice" of the terms. *Id.* (quoting *Specht v. Netscape Commc'ns. Corp.*, 306 F.3d 17, 35 (2d Cir. 2002)); *accord Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74–76 (2d Cir. 2017). If a user's actions "demonstrat[e] that they have at least constructive knowledge of the terms of [an] agreement," a court can "infer acceptance" of

22

the terms.  *Hines v. Overstock.com, Inc.* 380 F. App'x 22, 24–25 (2d Cir. 2010) (applying both New York and Utah law and treating the two as essentially interchangeable).  Utah courts have not elaborated on exactly what type of notice is required to form a valid online contract, but the appropriate question seems to be whether the website or application gives the user enough information to "discover[]" the terms of the contract "by proper diligence." *Rappleye v. Rappleye*, 99 P.3d 348, 356 (Utah Ct. App. 2004) (citation omitted) (defining "[c]onstructive notice" in a different legal context).  This is a fact-dependent inquiry. Generally, a user does not manifest assent to a website's terms of use just by using the website.  *See Hines*, 380 F. App'x at 24.  Nor is it enough when the terms are buried in a "hyperlink at the bottom of the page."  *Koch Indus.*, 2011 WL 1775765, at *9; *cf. Mitchell*, 280 F. Supp. 3d at 1283–84 (concluding that there was insufficient evidence to compel arbitration when it was uncertain whether a plaintiff "had an opportunity to see [a website's] terms prior to accepting them" (internal quotation marks omitted)).  Instead, at least according to courts in other jurisdictions, a user typically must either "affirmatively acknowledge" the terms by, for example, clicking or checking a box, or else be confronted by an "explicit textual notice" that continuing to use the website will constitute agreement to the terms.  *Engen v. Grocery Delivery E-Servs. USA Inc.*, 453 F. Supp. 3d 1231, 1237 (D. Minn. 2020) (collecting cases and quoting *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014)).

1

Start with Barclay and Nordick and clarifying the Parties' positions with respect to them.  Defendants do not argue that Barclay or Nordick agreed to arbitrate disputes when

23

either purchased her treadmill; rather, Defendants argue that Barclay and Nordick agreed to arbitration when they registered as iFit members. Defs.' Mem. in Supp. of Mot. to Compel Arbitration at 11–13; Defs.' Reply Mem. at 3–8. Defendants do not present evidence showing how either Barclay or Nordick *actually* registered as iFit members; instead, Defendants have introduced evidence showing all of the ways Barclay and Nordick *might* have registered, *see* Am. Brammer Decl. ¶¶ 8, 20–22, and argue that, regardless of how Barclay and Nordick registered, Barclay and Nordick agreed to arbitrate disputes because every possible registration method was sufficient to manifest Barclay and Nordick's assent to arbitration, Defs.' Mem. in Supp. of Mot. to Compel Arbitration at 11–13; Defs.' Reply Mem. at 3–8. Barclay and Nordick do not seem to challenge Defendants' evidence but argue instead that the sign-up methods Defendants describe are insufficient to show Barclay and Nordick's assent to arbitrate disputes concerning their prior treadmill purchases. Pls.' Mem. in Opp'n to Mot. to Compel Arbitration at 20–26.

As a matter of law, Barclay and Nordick agreed to arbitrate disputes with Defendants.[6] Each of the four possible iFit registration methods described in Defendants' submissions would have required Barclay and Nordick to "click a box" that read either "CREATE ACCOUNT," "PLACE ORDER," "START TRIAL," or "NEXT." Am. Brammer Decl. ¶¶ 8, 20, 21, 22. Adjacent to each of these boxes would have appeared a

---

[6]    It bears repeating that the Terms of Use in effect when Barclay and Nordick registered as iFit members defined "ICON" to include "its[] affiliates, partners, licensors, subsidiaries, and/or related companies." Am. Brammer Decl., Ex. 7 at 2. In other words, the Terms of Use governed, not merely Barclay and Nordick's relationship with ICON resulting from their iFit registration, but also NordicTrack. Plaintiffs, at the very least, have given no reason to question this conclusion.

statement alerting Barclay and Nordick that by clicking on the box, she agreed to the hyperlinked iFit "Terms of Use," among other contracts. *Id.* Any of these processes would have provided Barclay and Nordick reasonably conspicuous notice of the iFit Terms of Use (and the arbitration provision within them). The "clicking-means-assent" statement and hyperlink to the Terms of Use were clear, conspicuous, adjacent to each other, and not buried at the bottom of the page. *Koch Indus.*, 2011 WL 1775765, at *9. Any of these processes would have given Barclay and Nordick enough information to discover and review the Terms of Use by proper diligence. *Rappleye*, 99 P.3d at 356. Each of the iFit registration methods describes what many federal courts have called a "hybridwrap" agreement: a process in which a user is prompted "to manifest their assent to particular terms by engaging in some dual-purpose action, such as creating an account, . . . executing a purchase order, . . . or downloading an application." *Nicosia v. Amazon.com, Inc.*, 384 F. Supp. 3d 254, 266 (E.D.N.Y. 2019) (collecting cases). Federal courts generally give effect to such agreements "where the button required to perform the action manifesting assent (*e.g.*, signing up for an account or executing a purchase) is located directly next to a hyperlink to the terms and a notice informing the user that, by clicking the button, the user is agreeing to those terms." *Id.*; *see also* 2 E-Commerce and Internet Law, 21.03[2] Express and Implied Assent: Click-Through and Browsewrap Agreements at n.5 (April 2020) (collecting cases). There is no reason to think Utah law might require a different result. *See Hines*, 380 F. App'x at 25 (treating New York law and Utah law as interchangeable on a similar question). And here, the evidence shows that the registration

methods that were available to Barclay and Nordick did not diverge from the basic hybridwrap layout. *See* Am. Brammer Decl., Exs. 2–12.

2

Now turn to the third Plaintiff, Erin Ovsak. Unlike Nordick and Barclay, Ovsak never became an iFit member. Defendants seek to compel Ovsak to arbitrate her claims, not through her own assent to the iFit Terms of Use, but through her spouse's assent and her alleged use and enjoyment of his membership. Defs.' Mem. in Supp. of Mot. to Compel Arbitration at 14. Ovsak's spouse is Jay Ovsak, and for clarity's sake, Erin and Jay will be referred to by just their first names from this point forward. Defendants' argument proceeds in essentially three steps: (1) Jay registered as an iFit member and assented to the then-effective iFit Terms of Use; (2) though the then-effective iFit Terms of Use contained no arbitration provision, they included a modification provision pursuant to which the at-issue arbitration provision properly was added; (3) Erin bound herself to the iFit Terms of Use and the at-issue arbitration provision by using the iFit service through Jay's membership. Erin disputes each of these points.

a

As a matter of law, Jay agreed to be bound by the iFit Terms of Use in effect when he registered as an iFit member. As with Barclay and Nordick, Defendants do not say how Jay *actually* registered as an iFit member. Instead, Defendants identify the available registration methods and argue that, no matter how Jay registered, he agreed to be bound. To recap, Jay signed up for an iFit membership on March 25, 2016, roughly three years before Barclay and Nordick. Am. Brammer Decl. ¶ 15; Ovsak Decl. ¶ 5. When Jay signed

26

up, there were two ways to become an iFit member.  First, users could register using the iFit mobile application.  The procedure for registering using the iFit mobile application was the same when Jay signed up as when Nordick and Barclay signed up.  Am. Brammer Decl. ¶ 8.  Second, users could register on iFit.com.  To register this way, users were required to click a box that read, "Purchase for $xx," where "xx" was the purchase price.  Am. Brammer Decl. ¶ 19, Ex. 9.  Directly beneath the "Purchase for $xx" button was a statement that read, "By clicking submit, you agree to the Terms Of Service. View our Privacy Policy."  *Id.*  Both the phrases "Terms Of Service" and "Privacy Policy" were in blue font, and the Terms of Service phrase hyperlinked directly to the iFit Terms of Use in effect at that time.  *Id.*  Either of these two procedures was sufficient to manifest Jay's assent for the same reasons the procedures available to Barclay and Nordick were sufficient to manifest their assent: the "clicking-means-assent" statement and the hyperlink to the Terms of Use were clear and conspicuous, and either of these procedures gave Jay enough information to discover and review the then-effective Terms of Use by proper diligence.

b

The unilateral modification provision in the Terms of Use to which Jay assented was valid and by its terms permitted Defendants to subsequently add the at-issue arbitration provision.  To recap, the modification provision read:

> We expressly reserve the right to change these Terms of Use from time to time without notice to you.  You acknowledge and agree that it is your responsibility to review this site and these Terms of Use from time to time and to familiarize yourself with any modifications.  Your continued use of this site after such modifications  will  constitute  acknowledgement  of  the

> Modified Terms of Use and agreement to abide and be bound
> by the modified Terms of Use.

Am. Brammer Decl., Ex. 4 at 2 [ECF No. 45-4].  In March 2018, pursuant to this provision,

the at-issue arbitration clause was added to the iFit Terms of Use.  *Id.*, Ex. 6 at 10 [ECF

No. 45-6]; *see also id.*, Ex. 7 at 9–10.  Importantly, Plaintiffs identify no authority holding

or suggesting that a unilateral modification provision like this might not be valid under

Utah law.

Plaintiffs nonetheless argue that Jay is not bound by the arbitration provision that

Defendants added to the Terms of Use after he registered (pursuant to the modification

provision) for two reasons.  Plaintiffs ground their first argument on a contract term that

doesn't apply.  Plaintiffs argue that the modification clause itself forbade retroactive

application of the later-added arbitration provision—*i.e.*, to a dispute that arose before the

arbitration provision was added.  Pls.' Mem. in Opp'n to Mot. to Compel Arbitration at

27–28.  To support this argument, however, Plaintiffs rely on the wrong version of the

modification clause, and their argument is defeated by the plain terms of the applicable

modification clause.  Plaintiffs assert that the modification clause "states in part that 'no

revisions to these Terms of Use will apply to any dispute between you and ICON that arose

prior to the effective date of those revisions.'"  *Id.* at 28 (citing Brammer Decl., Ex. 8 at 1

[ECF No. 32]).  The language Plaintiffs quote appeared in the Terms of Use in effect as of

September 2019, and the prohibition on retroactive application applies to revisions of

"these"—*i.e.*, the September 2019—Terms of Use.  *See* Brammer Decl. ¶ 14, Ex. 8 at 1.

Logically, the modification clause relevant to this analysis is not a modification clause from

Terms of Use that already included the arbitration provision, but rather the modification clause present in the Terms when Jay registered in March 2016 (and that remained in the Terms of Use until March 1, 2018, when the arbitration provision was added). *See* Am. Brammer Decl., Ex. 4 at 2 and Ex. 5 at 5. The relevant modification clause, by its plain terms, did not forbid revision of the iFit Terms of Use to include retroactive provisions. *Id.*

Plaintiffs' second argument—that "unilateral modification to add arbitration requires some notice to the consumer[,]" Mem. in Opp'n to Mot. to Compel Arbitration at 28—lacks support in the authorities Plaintiffs cite. But the argument may have support in Utah law. Plaintiffs cite seven cases for the proposition that the unilateral modification of a contract to add an arbitration provision requires some notice to the consumer, *see* Mem. in Opp'n to Mot. to Compel Arbitration at 28 (citing cases), but these cases are legally and factually distinguishable. They are legally distinguishable because none apply Utah law. *See Moore-Dennis v. Franklin*, 201 So. 3d 1131 (Ala. 2016) (applying Alabama law); *Rodman v. Safeway, Inc.*, No. 11-cv-03003-JST, 2015 WL 604985 (N.D. Cal. Feb. 12, 2015) (California law); *Karzon v. AT & T, Inc.*, No. 4:13-cv-2202 (CEJ), 2014 WL 51331 (E.D. Mo. Jan. 7, 2014) (Missouri law); *Versmesse v. AT & T Mobility LLC*, No. 3:13 CV 171, 2014 WL 856447 (N.D. Ind. Mar. 4, 2014) (Indiana law); *Martin v. Wells Fargo Bank, N.A.*, No. C 12-06030 SI, 2013 WL 6236762 (N.D. Cal. Dec. 2, 2013) (California law); *Schnabel v. Trilegiant Corp.*, 697 F.3d 110 (2d Cir. 2012) (Connecticut and California law); *Hudyka v. Sunoco, Inc.*, 474 F. Supp. 2d 712 (E.D. Pa. 2007) (Pennsylvania law). Factually, unlike the Terms of Use at issue here, six of the seven cases Plaintiffs cite

involved contracts that placed the burden of giving notice of modifications on the defendant or at least placed no burden on the plaintiff to track modifications. *Moore-Dennis*, 201 So. 3d at 1133; *Karzon*, 2014 WL 51331, at *1, *3; *Versmesse*, 2014 WL 856447, at *2, *5; *Martin*, 2013 WL 6236762, at * 1; *Schnabel*, 697 F.3d at 120, 123; *Hudyka*, 474 F. Supp. 2d at 714–15.   In the seventh case, *Rodman*, the contract placed responsibility on the consumer "to review the Terms and Conditions [for amendments] before submitting each order."  2015 WL 604985, at *2.  In deciding that certain amendments to that contract did not bind consumers, however, the court relied on the Ninth Circuit's "skeptical view of contracts in which online retailers have sought to alter the offer and acceptance structure by contending that assent can be inferred by a customer's continued use of a service even in the absence of notice of the terms in question."  *Id.* at *10.  No authorities are cited suggesting that Utah law shares the Ninth Circuit's skepticism regarding these arrangements.

Nonetheless, a canvas of Utah authorities yields no obvious answer to whether Defendants must have given Jay notice of the arbitration provision to bind him to arbitrate. One federal district court applying Utah law seems to have rejected a notice requirement. In *Margae, Inc. v. Clear Link Techs., LLC*, the United States District Court for the District of Utah addressed whether one party may modify a contract pursuant to a unilateral modification provision without giving notice beyond posting the modified contract on the party's website.  No. 2:07-cv-916 TC, 2008 WL 2465450, at *6 (D. Utah June 16, 2008). The modification clause at issue in *Margae* permitted modifications to be made "by notifying the [other party] or by posting a new agreement on [Defendant's website]."  *Id.*

at *2.  The court determined that Utah law did not override the parties' contract to require actual notice and observed that the plaintiff "should have monitored to determine whether any amendments had been posted."  *Id.* at *6; *see also Zions Mgmt. Servs. v. Record*, 305 P.3d 1062, 1071 (Utah 2013) (recognizing that, under Utah law, courts are not to "rewrite an unambiguous contract," and enforcing unambiguous contract terms though they may "cause substantial delay, expense, duplication of effort, and risk of inconsistent results [and] unnecessary procedural difficulties[]") (quotations omitted).   However, another federal district court applying Utah law appears to have reached a different conclusion.  *Daniel v. eBay, Inc.*, 319 F. Supp. 3d 505, 511–514 (D.D.C. 2018) (applying Utah law and denying motion to compel arbitration because "[n]otice of a later-added arbitration provision is essential" and the defendant did not show that it had made "specific efforts" to notify the plaintiff of the provision); *see also McCoy v. Blue Cross and Blue Shield of Utah*, 20 P.3d 901, 905 (Utah 2001) (affirming the denial of a motion to compel arbitration because "Blue Cross's evidence failed to meet the minimum threshold of specificity" required under the Utah Arbitration Act to show Blue Cross provided notice of a later-added arbitration provision).  Because the Parties have not had an opportunity to address these authorities, they will be permitted to do so as part of the proceedings that follow the necessary discovery described in the next section.

c

If Jay was bound to arbitrate disputes, then genuine disputes of material fact warrant prompt and limited discovery, and probably a trial, as to whether Erin agreed to arbitrate disputes.  Defendants rely on the rule that "equitable estoppel doctrines may be used to

31

enforce an arbitration agreement in a case involving a non-signatory to that agreement." Defs.' Reply Mem. at 10 (citing *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637 (2020)).   Defendants assert that Erin benefitted from Jay's iFit membership and, therefore, that she is estopped from arguing that she is not bound by the at-issue arbitration provision.   Mem. in Supp. of Mot. to Compel Arbitration at 14; Reply at 9–10.   "Direct benefits estoppel applies when a nonsignatory knowingly exploits the agreement containing the arbitration clause." *Reid v. Doe Run Res. Corp.*, 701 F.3d 840, 846 (8th Cir. 2012) (quoting *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 361–62 (5th Cir. 2003)).   For Erin to be bound to arbitrate under this theory, she must have "knowingly s[ought] and obtain[ed] direct benefits from that contract; or [] s[ought] to enforce the terms of that contract or assert[] claims that must be determined by reference to that contract." *Id.* (citation and quotations omitted). Defendants contend the first situation exists here—that Erin knowingly sought and obtained direct benefits from Jay's iFit membership.   Defs.' Mem. in Supp. of Motion to Compel Arbitration at 14–15; Defs.' Reply Mem. at 10–11.

The record lacks evidence sufficient to enter summary judgment on this question. Defendants cite no specific record evidence to support this assertion in their opening brief. Defs.' Mem. in Supp. of Motion to Compel Arbitration at 14–15.   Defendants describe plausible scenarios: that Erin used iFit through Jay's membership, or that Erin "may also have created her own individual iFit account, used her household member's email address to create the 'Jay Ovsak' account, or even directed Jay [] to create an iFit account on behalf of her and the household[.]" *Id.* at 15.   But no materials in the record are cited to support

32

these assertions. Erin has filed a declaration in opposition to Defendants' motion in which she has testified that Jay registered for the iFit membership and that she "did not register or direct Jay to register," Ovsak Decl. [ECF No. 40] ¶ 5, but she does not address the assertion that she used iFit through Jay's membership, *see generally id*. The lack of evidence regarding whether or to what extent Erin directly benefitted from Jay's iFit membership is thus an "issue" regarding the "making of the arbitration agreement," and the FAA requires that this issue "proceed summarily to [] trial." 9 U.S.C. § 4. To implement this mandate, courts may order limited discovery relevant to determining whether the parties agreed to arbitrate. *See*, *e.g.*, *Traylor v. I.C. System, Inc.*, No. 11-cv-2968 (DWF/SER), 2012 WL 1883814, at *4 (D. Minn. May 22, 2012) (ordering "limited discovery directed at the issue of whether Plaintiff agreed to the Arbitration Agreement"). Therefore, prompt and limited discovery will be ordered into this question.[7]

## C

If a valid arbitration agreement was made between Plaintiffs and Defendants, then the Parties agree that the issue of whether the arbitration agreement applies to the dispute at hand is for the arbitrator to decide. In their opening brief, Defendants advanced this argument. Defs.' Mem. in Supp. of Mot. to Compel Arbitration at 13 n.6, 21–23. Plaintiffs

---

[7]     The Parties will be ordered to confer and then contact Magistrate Judge David T. Schultz to determine appropriate limitations on the duration and scope of this discovery. When that discovery is completed, and absent a voluntary resolution, Defendants may re-file their motion to compel arbitration with respect to Erin, and additional motion practice and a trial shall be scheduled to determine whether Erin agreed to arbitrate disputes.

did not dispute this contention.  *See generally* Pls.' Mem. in Opp'n to Mot. to Compel Arbitration.

The Parties' agreement on this issue only makes sense in view of binding Eighth Circuit precedent.  In *Fallo v. High-Tech Inst.*, the court addressed whether the incorporation of the American Arbitration Association's ("AAA") Rules into an arbitration agreement constituted a clear and unmistakable expression of "the parties' intent to leave the question of arbitrability to the arbitrator[.]"  559 F.3d 874, 878 (8th Cir. 2009).  The arbitration agreement at issue in *Fallo* provided that disputes "arising out of the [contract] . . . shall be settled by arbitration in accordance with the Commercial Rules of the American Arbitration Association[.]"  *Id.* at 876.  The court noted that Rule 7(a) of the Commercial Rules of the AAA provided that "arbitrators determine their own jurisdiction," and "conclude[d] that the arbitration provision's incorporation of the AAA rules . . . constitutes a clear and unmistakable expression of the parties' intent to leave the question of arbitrability to an arbitrator."  *Id.* at 877–78.  As a result, the Eighth Circuit in *Fallo* reversed the district court's determination that the parties' dispute did not fall within the scope of the arbitration agreement because the incorporation of the AAA Rules stripped the district court of the power to decide the gateway question of arbitrability.  *See id.* at 880.

Here, as in *Fallo*, the arbitration provisions incorporate the American Arbitration Association's Rules.  Am. Brammer Decl., Exs. 6, 7.[8]  The applicable rules provide that

---

[8]     It doesn't matter to the outcome of this issue, but the applicable AAA Rules in this case are the Consumer Arbitration Rules—not the Commercial Rules—because the

34

"[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." Consumer Arbitration Rules, Am. Arbitration Ass'n, Rule 14(a). Accordingly, the arbitration agreements at issue here clearly and unmistakably "express[] [] the parties' intent to leave the question of arbitrability to an arbitrator." *Fallo*, 559 F.3d at 878; *see Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) ("When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract . . . even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless.").

Plaintiffs advance two arguments that they say concern contract formation and show they did not assent to arbitrate disputes, but both arguments impermissibly challenge arbitrability. First, Plaintiffs argue that, "if [they] had read the iFit Terms of Use in detail at the time they registered, and had clearly agreed to them, no reasonable consumer would

---

arbitration agreements were "contained within a consumer agreement" as defined by the Consumer Arbitration Rules of the American Arbitration Association. Consumer Arbitration Rules, Am. Arbitration Ass'n, Rule 1 ("The parties shall have made these *Consumer Arbitration Rules* a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association . . . and . . . the arbitration agreement is contained within a consumer agreement . . . that does not specify a particular set of rules[.]"); *see also id.* ("The AAA defines a consumer agreement as an agreement between an individual consumer and a business where the business has a standardized, systematic application of arbitration clauses with customers and where the terms and conditions of the purchase of standardized, consumable goods or services are non-negotiable or primarily non-negotiable in most or all of its terms, conditions, features, or choices. The product or service must be for personal or household use. . . . Examples of contracts that typically meet the criteria for application of these Rules . . . include . . . [h]ealth and fitness club membership agreements[.]").

interpret the iFit Terms to require arbitration of a dispute relating to a prior NordicTrack treadmill purchase." Pls.' Mem. in Opp'n to Mot. to Compel Arbitration at 23. Whether "the iFit Terms [] require arbitration of a dispute relating to a prior NordicTrack treadmill purchase" sounds like an arbitrability question. As support for this first argument, Plaintiffs cite *Bossé v. New York Life Ins. Co.*, No. 19-cv-016-SM, 2019 WL5967204 (D.N.H. Nov. 13, 2019). In *Bossé*, the defendant, New York Life, sought to compel arbitration of the plaintiff Bossé's discrimination claims asserted in connection with the January 2016 termination of his agency contract under an arbitration agreement entered in 2004, when Bossé was an employee. *Id.* at \*1–\*2. The court determined "[t]here [was] not an enforceable agreement to arbitrate [Bossé's] claims." *Id.* at \*3. The court explained that Bossé's claims were "not tethered to, or related in any way, to the 2004 [agreement] or the relationship established by that agreement[.]" *Id.* at \* 6. *Bossé*'s rationale—that the absence of a relationship between an arbitration agreement and a plaintiff's claims establishes a lack of assent to contract—is incompatible with *Henry Schein*. There, the Supreme Court rejected a "wholly groundless" exception to an arbitrator's authority to decide arbitrability questions. 139 S. Ct. at 527–28. The Supreme Court reasoned:

> We must interpret the [Federal Arbitration] Act as written, and the Act in turn requires that we interpret the contract as written. When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide the arbitrability issue. That is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless.
>
> That conclusion follows not only from the text of the Act but also from precedent. We have held that a court may not "rule

36

on the potential merits of the underlying" claim that is assigned by contract to an arbitrator, "even if it appears to the court to be frivolous." *AT & T Technologies, Inc. v. Communications Workers,* 475 U.S. 643, 649–650 (1986). A court has "'no business weighing the merits of the grievance'" because the "'agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious.'" *Id.,* at 650, (quoting *Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 568 (1960)).

That *AT & T Technologies* principle applies with equal force to the threshold issue of arbitrability. Just as a court may not decide a merits question that the parties have delegated to an arbitrator, a court may not decide an arbitrability question that the parties have delegated to an arbitrator.

*Id.* at 529–30. Saying that no agreement to arbitrate exists because claims lack "some relationship to, [or] some connection with, the agreement or contract," *Bossé*, 2019 WL 5967204, at *5, would impermissibly recast the "wholly groundless" exception rejected in *Henry Schein* as a question of contract formation.[9] True, this raises the possibility of perhaps unexpected hypotheticals. Say, for example, Barclay sued Defendants after being run over by a NordicTrack delivery truck, and Defendants moved to compel arbitration of Barclay's personal injury claim under the iFit Terms of Use. Under *Henry Schein*, and because the iFit Terms delegate the arbitrability question to an arbitrator, any disconnect

---

[9]     *Bossé* understood that "*Schein* presupposes a dispute arising out of the contract or transaction—*i.e.*, some minimal relationship or connection between the contract and the dispute." 2015 WL 5967204, at * 5. This is not correct. Just the opposite, in fact. In those cases where the parties' contract delegates the arbitrability question to an arbitrator, *Henry Schein* is clear that the presence of even a "wholly groundless" (or less than minimal) connection between the arbitration clause and the asserted claims does not permit a federal court to "short-circuit the process and decide the arbitrability question [itself.]" *Schein*, 139 S. Ct. at 527–28. Requiring "some minimal relationship" as a prerequisite to contract formation would end run *Henry Schein*'s basic rule.

between the claim and the iFit Terms could not justify denying the motion to compel. Even in these perhaps unanticipated circumstances, *Henry Schein* requires the arbitrability question to be left to the arbitrator.

Second, Plaintiffs argue that the iFit Terms of Use "cannot be applied retroactively[]" because "[r]etroactive application of arbitration is often rejected where a defendant illogically claims that a *prior* dispute 'arises' out of a *subsequent* agreement." Pls.' Mem. in Opp'n to Mot. to Compel Arbitration at 25. In other words, Plaintiffs argue, if they agreed to the iFit Terms of Use, the Terms do not apply to claims arising in connection with their prior treadmill purchases. Whether Plaintiffs' claims fall outside the scope of the iFit Terms of Use (because they arose before Plaintiffs assented to the iFit Terms of Use or for any other reason) is an arbitrability question. The cases Plaintiffs cite to support this argument confirm this. In each, a court addresses the arbitrability of claims, not the formation of a contract. *Newbanks v. Cellular Sales of Knoxville, Inc.*, 548 Fed. App'x 851, 854 (4th Cir. 2013) ("The primary issue on appeal is whether the district court properly held that the Compensation Agreements' arbitration provision did not apply to FLSA and SCPWA-based claims arising before Newbanks and Walton became at-will employees of Cellular Sales. We review de novo a district court's conclusions regarding the arbitrability of a dispute[.]"); *Sec. Watch, Inc. v. Sentinel Sys., Inc.*, 176 F.3d 369, 372 (6th Cir. 1999) ("We conclude that disputes arising under the pre-1994 contracts are not governed by the ADR Clause of the 1994 Agreement."); *Austin Freight Sys., Inc. v. West Wind Logistics, Inc.*, No. 18 C 4832, 2019 WL 2088056, at *4 (N.D. Ill. May 13, 2019) (finding that a June 2016 "disputed sausage shipment" did not "fall within the scope of" an

arbitration clause limited to disputes arising out of an August 2016 agreement); *Smith v. Swift Transp., Co.*, No. 13-2247-RDR, 2013 WL 5551804, at *3 (D. Kan. Oct. 7, 2013) ("The language of the Contractor Agreement [including its arbitration clause] appears only to include those claims arising in connection with that agreement[]" and not claims arising prior to its execution). In each of these cases, the parties evidently left arbitrability questions to be decided by the court, but that is not the situation here.[10]

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1. Defendants' Motion to Dismiss [ECF No. 23] is **GRANTED IN PART** and **DENIED IN PART** as follows:

   a. The Motion is **GRANTED** to the extent it seeks dismissal of Plaintiffs' claims for injunctive relief for lack of subject-matter jurisdiction.

   b. The Motion is **DENIED** on the merits to the extent it seeks dismissal of other aspects of Plaintiffs' claims for lack of subject-matter jurisdiction.

   c. The Motion is **DENIED** as moot to the extent it seeks dismissal of Plaintiff Larry Schwartz's claims for lack of personal jurisdiction.

---

[10] If an arbitrator were to determine that Plaintiffs' claims, or any of them, fall outside the scope of the arbitration agreement, then this case would move forward, and Defendants' Rule 12(b)(6) motion to dismiss for failure to state a claim and Rule 12(f) motion to strike would be ripe for re-filing and adjudication.

     d.      The Motion is **DENIED** without prejudice in all other respects.

2.     Defendants' Motion to Compel Arbitration [ECF No. 28] is **GRANTED IN PART** and **DENIED IN PART** as follows:

     a.      The Motion is **GRANTED** to the extent it seeks to compel Plaintiffs Teeda Barclay and Nicole Nordick to submit their claims to arbitration.

     b.      The Motion is **DENIED** without prejudice to the extent it seeks to compel Plaintiff Erin Ovsak to submit her claims to arbitration.

     c.      The Parties shall confer with each other and consult with Magistrate Judge David T. Schultz to determine a schedule pursuant to which the Parties shall conduct limited expedited discovery regarding whether Plaintiff Erin Ovsak is bound to arbitrate her claims.

3.     All merits proceedings are **STAYED** pending completion of this discovery and resolution of the question whether Plaintiff Erin Ovsak is bound to arbitrate her claims.

Date:  October 15, 2020            s/ Eric C. Tostrud          
                                        Eric C. Tostrud
                                        United States District Court