UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Teeda Barclay, Nicole Nordick, and
Jay Ovsak, *individually and on behalf of all
others similarly situated*,

        Plaintiffs,

v.

Icon Health & Fitness, Inc. and
NordicTrack, Inc.,

        Defendants.

File No. 19-cv-2970 (ECT/DTS)

**OPINION AND ORDER**

---

Karl L. Cambronne, Bryan L. Bleichner, and Christopher P. Renz, Chestnut Cambronne PA, Minneapolis, MN; Nathan D. Prosser, Hellmuth & Johnson, PLLC, Edina, MN; Wilbert B. Markovits, Terence R. Coates, and Justin C. Walker, Markovits, Stock & DeMarco, LLC, Cincinnati, OH, for Plaintiffs Teeda Barclay, Nicole Nordick, and Jay Ovsak.

X. Kevin Zhao, Lawrence M. Shapiro, and Aaron P. Knoll, Greene Espel PLLP, Minneapolis, MN, for Defendants Icon Health & Fitness Inc. and NordicTrack, Inc.

---

Jay Ovsak bought a NordicTrack treadmill and then signed up for an exercise app called iFit to use with it. When he signed up, iFit's Terms of Use did not include an arbitration provision, but they did allow the app to change the terms "without notice" to him, and they provided that his "continued use" of the site would constitute acceptance of any modified terms. The company later used this modification clause to add an arbitration provision to the Terms of Use.

In this lawsuit, Ovsak claims that Defendants—who sold him the treadmill—misrepresented the treadmill's continuous horsepower rating and that the misrepresentations caused him to pay more than he otherwise would have. Ovsak's two co-Plaintiffs, who raised similar claims, were previously ordered to submit their claims to arbitration. Defendants have now moved to compel arbitration of Ovsak's claims. The Parties primarily dispute whether Ovsak assented to the later-added arbitration clause and whether applying that arbitration clause to his claims would be unconscionable.

Defendants' motion to compel arbitration will be denied. On two of the primary legal issues presented, Defendants have the better argument. As a matter of contract formation, Utah law (the applicable law in this case) appears to allow the unilateral-modification arrangement that Defendants used to add the arbitration clause to the iFit Terms of Use. And because the Parties agreed to delegate arbitrability questions to an arbitrator, it is inappropriate to decide here whether applying the arbitration clause to Ovsak's claims would be unconscionable. Nonetheless, the relevant Terms of Use provide that Jay could not assent to the updated Terms of Use that included the arbitration clause unless he used the iFit website or its downloadable applications after the clause was added on March 1, 2018. Defendants, who have the burden of proof, have not provided sufficient evidence to conclude that he did so. Because the Parties have already conducted discovery on these issues, no additional discovery will be ordered.

I

The prior order compelling arbitration in this case contains a description of Plaintiffs' allegations and substantive claims. Order Compelling Arbitration at 2–8

("October 15 Order") [ECF No. 53]. Plaintiffs have since filed a Third Amended Complaint, *see* ECF No. 80, but most of their factual allegations remain the same. This order will focus on the factual and procedural background relevant to the present motion.

A

The substantive claims in this case concern treadmills that Defendant ICON Health & Fitness, Inc.—"the world's largest manufacturer and marketer of fitness equipment"— sells under the NordicTrack brand. Third Am. Compl. ¶¶ 25–26. When it sells a treadmill, ICON allegedly represents that the treadmill can achieve a certain continuous horsepower rating, which is "a measurement of [a] motor's ability to maintain and continuously produce power over an extended period of time." *Id.* ¶ 38; *see id.* ¶¶ 47–58. According to Plaintiffs, the continuous horsepower ratings that ICON gives consumers are false. *Id.* ¶ 7. Defendants allegedly base their treadmills' continuous horsepower ratings "on an inflated laboratory testing power draw (amperage) not possible in household use," *id.* ¶ 45, so when a treadmill is transferred to the household setting, it operates "well below" the represented rating, *id.* ¶¶ 7, 35.

Plaintiffs Teeda Barclay, Nicole Nordick, and Jay Ovsak purchased NordicTrack treadmills.[1] *Id.* ¶¶ 16, 19, 22. Before doing so, each Plaintiff allegedly read content on NordicTrack's website describing the treadmill's continuous horsepower rating. *Id.* ¶¶ 17, 20, 23. Plaintiffs claim that Defendants' representations regarding the treadmills' continuous horsepower ratings were "a material factor" in their purchasing decisions and

---

[1]   As discussed below, Plaintiffs' identities have changed over time, but these are the three current Plaintiffs.

3

that they either "would not have purchased" their treadmill or would have paid less for it but for these misrepresentations.  *Id.*

After purchasing their NordicTrack treadmills, each Plaintiff signed up for a membership with iFit, a "brand operated by ICON" that "connect[s] people with fitness coaches."  Am. Brammer Decl. ¶ 3 [ECF No. 45].  "Many individuals [who] purchase NordicTrack treadmills also register for iFit memberships . . . [to] access iFit's training support technology while they exercise."  *Id.* ¶ 4.  Barclay registered as an iFit member on June 18, 2019.  *Id.* ¶ 17; Barclay Decl. ¶ 5 [ECF No. 38].  Nordick registered on March 4, 2019.  Am. Brammer Decl. ¶ 16; Nordick Decl. ¶ 5 [ECF No. 39].  Any of the four possible registration methods available to Barclay and Nordick on those dates would have required them to "click a box" that read either "CREATE ACCOUNT," "PLACE ORDER," "START TRIAL," or "NEXT."  Am. Brammer Decl. ¶¶ 8, 20–22.  Adjacent to the box would have appeared a statement alerting the registrant that by clicking on the box, she agreed to the hyperlinked iFit "Terms of Use," among other contracts.  Ovsak became an iFit member on March 25, 2016.  Am. Brammer Decl. ¶ 15; *see* Jay Ovsak Decl. ¶ 6 [ECF No. 95].  He may have registered through iFit's mobile application, following the same process as Barclay and Nordick.  *See* October 15 Order at 7.  Or he may have registered through the iFit website, which would have required him to click a box that read, "Purchase for $X," where "X" was the purchase price.  Am. Brammer Decl. ¶ 19, Ex. 9 [ECF No. 45-9].  Directly beneath the "Purchase for $X" button would have appeared a statement that read: "By clicking submit, you agree to the Terms of Service. View our Privacy Policy."  *Id.*  The phrases "Terms of Service" and "Privacy Policy" were both in blue font,

and the Terms of Service phrase hyperlinked directly to the iFit Terms of Use in effect at that time. *Id.*

When Barclay and Nordick registered in 2019, the iFit Terms of Use included the following arbitration provision:

> You acknowledge and agree that ICON may, at its sole discretion, require you to submit any disputes arising from the use of these Terms of Use or the ICON sites, including disputes arising from or concerning their interpretation, violation, invalidity, non-performance, or termination, to final and binding arbitration under the Rules of Arbitration of the American Arbitration Association applying Utah law.

Am. Brammer Decl., Ex. 7 at 9–10 ("January 2019 Terms of Use") [ECF No. 45-7]. These Terms of Use defined "ICON" to include "its[] affiliates, partners, licensors, subsidiaries, and/or related companies," *id.* at 1, and included a class-action waiver providing that an iFit member "may only resolve disputes with us on an individual basis" and not "as a plaintiff or a class member in a class, consolidated, or representative action," *id.* at 9.

When Ovsak registered in 2016, the then-effective Terms of Use contained no arbitration provision, but they did include a modification clause. *See id.*, Ex. 4 ("2015 Terms of Use") [ECF No. 45-4]. That modification clause provided:

> We expressly reserve the right to change these Terms of Use from time to time without notice to you. You acknowledge and agree that it is your responsibility to review this site and these Terms of Use from time to time and to familiarize yourself with any modifications. Your continued use of this site after such modifications will constitute acknowledgment of the modified Terms of Use and agreement to abide and be bound by the modified Terms of Use.

*Id.* at 2.  ICON later modified the Terms of Use that were in effect when Ovsak registered multiple times, and in March 2018, ICON added the arbitration provision in effect when Barclay and Nordick became iFit members.  *Id.*, Ex. 6 at 10 ("2018 Terms of Use") [ECF No. 45-6]; *compare with* January 2019 Terms of Use at 9–10.

B

After several initial amendments not relevant here, Barclay, Nordick, and then-Plaintiff Erin Ovsak—Jay Ovsak's spouse—filed a Second Amended Complaint on March 16, 2020.  ECF No. 22; *see generally* ECF Nos. 1, 21.[2]  (From here on, Erin and Jay will be referred to by their first names to minimize confusion.)  On April 30, 2020, Defendants moved, as relevant here, to compel arbitration of all three Plaintiffs' claims.  ECF No. 28. On October 15, 2020, the motion to compel was granted in part and denied in part.  October 15 Order at 40.  The motion was granted with respect to Barclay and Nordick because, "[a]s a matter of law, [they] agreed to arbitrate disputes with Defendants."  *Id.* at 24.  Those two Plaintiffs were accordingly ordered "to submit their claims to arbitration."  *Id.* at 40.[3]

---

[2]    There was a fourth Plaintiff—a California citizen named Larry Schwartz.  Second Am. Compl. ¶ 14.  Defendants moved to dismiss Schwartz's claims for lack of personal jurisdiction under Rule 12(b)(2).  Defs.' Mot. to Dismiss [ECF No. 23].  In response, Schwartz voluntarily dismissed his claims pursuant to Rule 41(a)(1)(A)(i).  ECF No. 42. Defendants' motion to dismiss Schwartz's claims was therefore denied as moot.  October 15 Order at 2 n.1.

[3]    On July 22, 2021, Barclay filed a notice and accompanying exhibit showing that an arbitrator had dismissed her arbitration claim, "finding [her] claims to be outside the scope of the iFit arbitration provision."  ECF Nos. 109, 109-1.  Nordick's arbitration evidently remains pending.

6

The answer was more complicated for Erin because she never became an iFit member.  And when Jay, her spouse, became an iFit member, the iFit Terms of Use did not contain an arbitration provision.  That raised three questions: (1) whether Jay agreed to the Terms of Use in effect when he registered for iFit; (2) whether Jay was bound by the arbitration provision that ICON later added pursuant to the modification provision in those Terms of Use; and (3) whether Erin bound herself to the arbitration provision "by using the iFit service through Jay's membership."  *Id.* at 26.

The October 15 Order resolved one of these questions but left the other two open.  First, "[a]s a matter of law, Jay agreed to be bound by the iFit Terms of Use in effect when he registered as an iFit member" because the registration procedures in place at that time were "sufficient to manifest [his] assent" under applicable law.  *Id.* at 26–27.  Second, although the unilateral modification provision in the iFit Terms of Use to which Jay assented was "valid," applicable law provided "no obvious answer to whether Defendants must have given Jay notice of the arbitration provision to bind him to arbitrate."  *Id.* at 27, 30–31.  That issue was left open for the time being.  *Id.* at 31.  Third, the record contained insufficient evidence to decide whether Erin bound herself to the arbitration clause through her use of Jay's membership.  *Id.* at 31–33.  So, with respect to Erin's claims, the motion to compel was denied without prejudice and the Parties were ordered to "conduct limited expedited discovery regarding whether Erin . . . [was] bound to arbitrate her claims."  *Id.* at 40.

When discovery was complete, Defendants moved to dismiss Erin's claims for lack of standing or, in the alternative, to compel arbitration.  ECF No. 64.  In response to that

motion, the Parties stipulated that Plaintiffs could file a Third Amended Complaint that replaced Erin with Jay as a Plaintiff, and their stipulation was approved.  ECF Nos. 76, 78. Plaintiffs then filed the Third Amended Complaint, ECF No. 80, and Defendants filed the present motion to compel arbitration of Jay's claims.  ECF No. 82.

II

A motion to compel arbitration is analyzed either as a motion to dismiss under Federal Rule of Civil Procedure Rule 12(b)(6) or as a motion for summary judgment under Rule 56, depending on how the motion is presented.  *Seldin v. Seldin*, 879 F.3d 269, 272 (8th Cir. 2018); *City of Benkelman v. Baseline Eng'g Corp.*, 867 F.3d 875, 881 (8th Cir. 2017).   Here, because "matters outside the pleadings" have been presented and considered, the motion "must be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d); *see also City of Benkelman*, 867 F.3d at 882.  If a genuine dispute of material fact concerning "the making of the arbitration agreement" exists, then a federal district court "shall proceed summarily to the trial thereof."  9 U.S.C. § 4.

The Federal Arbitration Act ("FAA") provides that

> [a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.  The Supreme Court's "cases place it beyond dispute that the FAA was designed to promote arbitration.   They have repeatedly described the [FAA] as 'embod[ying] [a] national policy favoring arbitration[.]'"  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011) (quoting *Buckeye Check Cashing, Inc. v. Cardegna*,

546 U.S. 440, 443 (2006)).  Of course, "a party cannot be required to submit to arbitration

any dispute which [s]he has not agreed . . . to submit."  *United Steelworkers of Am. v.*

*Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960).  When the making of the

agreement for arbitration is at issue, the Eighth Circuit "has refined this inquiry to asking

1) whether the agreement for arbitration was validly made and 2) whether the arbitration

agreement applies to the dispute at hand[.]"  *MedCam, Inc. v. MCNC*, 414 F.3d 972, 974

(8th Cir. 2005).  Though courts "presume that parties have *not* authorized arbitrators to

resolve" these "gateway questions, . . . parties are free to authorize arbitrators to resolve"

them, provided such authorization is based on neither "silence nor ambiguity" in the

arbitration agreement itself.  *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1416–17 (2019)

(citations and quotations omitted).

### III

There is one overarching issue in this motion: did Jay and ICON enter into a valid

agreement to arbitrate?  The Parties agree, consistent with the prior order in this case, that

a court—not an arbitrator—must resolve this preliminary question.  *See* October 15 Order

at 20.  As the Parties seeking to compel arbitration, Defendants "carr[y] the burden to prove

a valid and enforceable agreement."  *Shockley v. PrimeLending*, 929 F.3d 1012, 1017 (8th

Cir. 2019).  "To determine whether a valid agreement to arbitrate exists," a federal court

ordinarily "look[s] to the forum state's contract law[.]"  *Northport Health Servs. of Ark.,*

*LLC*, 930 F.3d 1027, 1030 (8th Cir. 2019) (citing *Barker v. Golf U.S.A., Inc.*, 154 F.3d 788,

791 (8th Cir. 1998)).  If the contract in question includes a choice-of-law provision,

however, then the state law chosen by that provision controls unless a "persuasive reason

9

[is] advanced" that might justify setting aside the provision. *Barker*, 154 F.3d at 791; *see also Donaldson Co. v. Burroughs Diesel, Inc.*, 581 F.3d 726, 731–36 (8th Cir. 2009). The prior order concluded, based on a choice-of-law provision in the iFit Terms of Use, that Utah law applies. *See* October 15 Order at 21; Am. Brammer Decl., Ex. 7 at 10. Neither Party challenges that conclusion now, and Utah law will accordingly be applied. *See* Defs.' Mem. in Supp. at 8 n.4 [ECF No. 84]; Pls.' Mem. in Opp'n at 4 [ECF No. 94].

Utah, like most states, follows the "basic" rule that "a contract is not formed unless there is a meeting of the minds." *Lebrecht v. Deep Blue Pools & Spas, Inc.*, 374 P.3d 1064, 1069 (Utah Ct. App. 2016) (quoting *Sackler v. Savin*, 897 P.2d 1217, 1220 (Utah 1995)). There must be "an offer, an acceptance, and consideration," *Cea v Hoffman*, 276 P.3d 1178, 1185 (Utah Ct. App. 2012), showing the parties' mutual assent "to the 'integral features of the agreement,'" *LD III, LLC v. BBRD, LC*, 221 P.3d 867, 872 (Utah Ct. App. 2009) (alteration omitted) (quoting *Prince, Yeates & Geldzahler v. Young*, 94 P.3d 179, 183 (Utah 2004)). An offeree signals acceptance of an offer by "manifest[ing] . . . assent to [the] offer, such that an objective, reasonable person is justified in understanding that a fully enforceable contract has been made." *Cal Wadsworth Constr. v. City of St. George*, 898 P.2d 1372, 1376 (Utah 1995); *see Com. Union Assocs. v. Clayton*, 863 P.2d 29, 34–37 (Utah Ct. App. 1993) (noting that parties can demonstrate mutual assent through conduct). For the acceptance to be effective, however, an offeree must have "some form of actual or constructive notice" of the contract's essential terms." *Mitchell v. Wells Fargo Bank*, 280 F. Supp. 3d 1261, 1285 n.22 (D. Utah 2017).

Defendants argue that Jay agreed to arbitrate based on a two-step logical progression: (1) he assented to the 2015 Terms of Use, and (2) although those Terms did not contain an arbitration provision, they included a modification provision that allowed ICON to add an arbitration provision later, which it then did in the 2018 Terms of Use. Defs.' Mem. in Supp. at 1–2. Plaintiffs respond with two legal arguments and one factual argument. The legal arguments are that (1) Jay could not have assented to the arbitration clause in the 2018 Terms of Use because he did not receive personal notice of it, and (2) applying the arbitration clause to Jay's claims would be unconscionable. Pls.' Mem. in Opp'n at 1.[4] The factual argument is that Jay never became bound by the 2018 Terms of Use because there is no evidence that he used the iFit site after the 2018 Terms of Use were posted. *Id.* at 8, 15.

### A

Plaintiffs' first and primary argument is that, notwithstanding the terms of the modification provision, which allowed modifications "without notice" to Jay, ICON could not effectively modify the iFit Terms of Use to include an arbitration provision without providing Jay personal notice of that provision. In their view, the generalized notice effected by posting the updated terms to the iFit website was insufficient as a matter of law. *See* Pls.' Mem. in Opp'n at 4–9.

Under Utah law, the general rule is that "[a] valid modification of a contract"—just like the original contract—"requires a meeting of the minds of the parties, which must be

---

[4] Plaintiffs do not seek reconsideration of the conclusion that Jay assented to iFit's 2015 Terms of Use, including the unilateral modification provision.

spelled out, either expressly or impliedly, with sufficient definiteness." *Mardesich v. Sun Hill Homes LC*, 392 P.3d 950, 954 (Utah Ct. App. 2017) (quoting *Westmont Residential LLC v. Buttars*, 340 P.3d 183, 187 (Utah Ct. App. 2014)); *see also Scott v. Majors*, 980 P.2d 214, 218 (Utah Ct. App. 1999). The question here is whether the Parties could agree ahead of time that posting updated iFit Terms of Use online, coupled with Jay's continued use of the iFit site, would show the Parties' mutual assent to the modification "with sufficient definiteness." *Mardesich*, 392 P.3d at 954. The prior order noted conflicting Utah authorities on this question and permitted the Parties to address it in greater detail in a new round of briefing. October 15 Order at 31. Neither the additional briefing nor independent research has revealed any previously unknown, on-point authorities.

The most relevant case remains *Margae, Inc. v. Clear Link Technologies, LLC*, No. 2:07-CV-916 TC, 2008 WL 2465450 (D. Utah June 16, 2008). There, like here, the parties entered into a contract containing a modification clause that permitted the defendant to modify the agreement "at any time by notifying [the plaintiff] *or* by posting a new agreement on [the defendant's website]." *Id.* at *2 (emphasis added). There, like here, the contract did not contain an arbitration clause when the parties first formed it, but the defendant later used the modification clause to add one. *Id.* at *3. The court, applying Utah law, rejected the plaintiff's argument "that it did not assent to or receive notice of the" modified agreement. *Id.* at *6. The court reasoned that the plaintiff had not "agree[d] that actual notice of changes to the contract was required, so it should have monitored to determine whether any amendments had been posted." *Id.* The court never hinted that Utah common law required additional notice of the arbitration provision. Absent any

persuasive contrary guidance, Utah law seems to hold parties in this situation to the plain terms of their agreement. *See Zions Mgmt. Servs. v. Record*, 305 P.3d 1062, 1071 (Utah 2013) (recognizing that, under Utah law, courts are not to "rewrite an unambiguous contract," and enforcing unambiguous contract terms though they may "cause substantial delay, expense, duplication of effort, and risk of inconsistent results [and] unnecessary procedural difficulties[]" (internal quotation marks and citation omitted)).

Applying that principle here, ICON did not need to provide Jay with any more notice of the arbitration provision than it did, at least as a matter of contract formation. The plain terms of the modification clause authorized ICON to change the Terms of Use "without notice" to Jay. 2015 Terms of Use at 2. It gave Jay the "responsibility to review [the] site and [the] Terms of Use from time to time and to familiarize [him]self with any modifications." *Id.* And it said that his "continued use of the site after such modifications [would] constitute acknowledgement of the [modifications] and agreement to abide and be bound by" them. *Id.*

Plaintiffs raise several arguments in response to this reasoning. First, they argue that *Margae* should not apply because the parties in that case were sophisticated corporate entities and the court distinguished its facts from other cases "involv[ing] a corporation unilaterally changing its relationship with consumers via changes to a website." *Margae*, 2008 WL 2465450, at *7; *see* Pls.' Mem. in Opp'n at 9. But as Defendants correctly point out, these facts played no role in the court's contract-formation discussion; the court only cited them to support its conclusion that the contract was not unconscionable under Utah law. *See Margae*, 2008 WL 2465450, at *6–7. Plaintiffs identify no persuasive reason to

believe that the status of the Parties or the nature of the contract in this case impacts the question whether Utah law required additional notice of the arbitration provision as a matter of contract formation, setting aside any potential contract defenses.

Second, Plaintiffs point to *Daniel v. eBay, Inc.*, 319 F. Supp. 3d 505 (D.D.C. 2018), in which another federal district court admittedly reached the opposite conclusion. When the plaintiff in that case registered as an eBay user, the company's user agreement did not contain an arbitration clause, but eBay later added one pursuant to a modification provision that allowed it to amend the user agreement "at any time by posting the amended terms on [its] site." *Id.* at 508. The court, simultaneously applying Texas, Utah, and Louisiana law, concluded that a "party cannot agree to a newly-added arbitration clause" under such circumstances "without personal notice of that provision." *Id.* at 512.

There is reason to believe that the *Daniel* court's conclusion rested on a flawed interpretation of Utah law. Specifically, the only case it cited for support was *McCoy v. Blue Cross & Blue Shield of Utah*, 20 P.3d 901 (Utah 2001). In *McCoy*, an insurer issued a policy containing a unilateral modification clause, with any modifications taking effect "thirty (30) days after written notice thereof has been given to the [s]ubscriber." *McCoy v. Blue Cross & Blue Shield of Utah*, 980 P.2d 694, 695 (Utah Ct. App. 1999), *aff'd*, 20 P.3d 901 (Utah 2001).[5] Under the terms of the contract, notice was "deemed to have been given to and received by the [s]ubscriber when deposited in the United States Mail . . . and

---

[5]     The relevant text of the modification provision appears in the opinion of the Utah Court of Appeals but not in the Utah Supreme Court's opinion affirming it.

addressed to the [s]ubscriber[.]" *Id.* When the plaintiff-subscriber first enrolled in the policy, it did not contain an arbitration provision, but the insurer added one later. *McCoy*, 20 P.3d at 903. When a dispute between the two ended up in court, the insurer was unable to produce evidence that it had sent notice of the policy changes to the plaintiff specifically, as opposed to evidence that it had sent a notice to a mailing list of subscribers generally. *See id.* On that basis, the Utah Supreme Court held that the insurer could not invoke the later-added arbitration provision. *Id.* at 905. In other words, the notice requirement in the case came, not from Utah common law, but from the terms of the parties' contract. The insurer lost because of a failure of proof: it could not point to evidence in the record "establish[ing] compliance" with those terms. *McCoy*, 980 P.2d at 698. In short, the *Daniel* court's reading of *McCoy*—as requiring notice above and beyond that required under the terms of the contract at issue—is not the best one. And the court in *Daniel* did not cite or acknowledge *Margae*.[6]

Third, Plaintiffs point to the *McCoy* court's statement that the Utah Uniform Arbitration Act "requires more than an inference of agreement between the particular parties to arbitrate future disputes," *McCoy*, 20 P.3d at 905, as well as that statute's definitions of the terms "knowledge" and "notice," Utah Code Ann. §§ 78B-11-102, -103.

---

[6] Plaintiffs cite two other cases that also rely on *McCoy*. *See Campos v. Bluestem Brands, Inc.*, No. 3:15-CV-00629-SI, 2015 WL 5737601 (D. Or. Sept. 30, 2015); *Mason v. Midland Funding LLC*, No. 1:16-CV-02867-LMM-RGV, 2018 WL 9439879 (N.D. Ga. Sept. 5, 2018), *aff'd in part and rev'd in part*, 815 F. App'x 320 (11th Cir. 2020). Those cases do not support Plaintiffs' position because—like *McCoy* itself—they involved questions of evidentiary sufficiency.

15

Once again, however, *McCoy* concerned a question of evidentiary sufficiency, and Plaintiffs do not explain the relevance of the statutory provisions. Nothing in the Utah Uniform Arbitration Act appears to require a particular kind of notice when a party uses a modification clause to add an arbitration provision to a prior agreement.[7]

B

Plaintiffs also argue that it would be unconscionable under Utah law to apply the arbitration provision to Jay Ovsak's claims. *See* Pls.' Mem. in Opp'n at 10–12. Before reaching this argument, it is necessary to determine whether a court can even resolve it. The October 15 Order concluded that the iFit Terms of Use show a clear and unmistakable intent to delegate questions of arbitrability to an arbitrator because they incorporate by reference the Rules of the American Arbitration Association. October 15 Order at 34–35. This delegation includes questions regarding the agreement's "validity," such as unconscionability. Consumer Arbitration Rules, Am. Arbitration Ass'n, Rule 14(a); *see Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 69 n.1 (2010).

When parties agree to delegate the question of unconscionability to an arbitrator, a court's role is narrow: it may only consider whether the delegation provision itself—as opposed to the arbitration agreement more generally—is unconscionable. *Jackson*, 561 U.S. at 72; *see, e.g.*, *Parnell v. CashCall, Inc.*, 804 F.3d 1142, 1146–47 (11th Cir. 2015); *accord Shockley*, 929 F.3d at 1018. When the party opposing arbitration challenges only

---

[7]    Defendants point out that a different Utah statutory provision does require written notice to a consumer before an arbitration provision may be added, but only for certain consumer credit agreements. *See* Utah Code Ann. § 70C-4-102(2).

16

the arbitration agreement or broader contract as a whole, a court must treat the delegation provision as valid, "leaving any challenge to the validity of the [a]greement as a whole for the arbitrator." *Jackson*, 561 U.S. at 72.

Plaintiffs do not address *Jackson* and argue instead that courts always have the authority to address questions of unconscionability. *See* Pls.' Mem. in Opp'n at 11–12. Most of the cases they cite for support either did not involve delegations to an arbitrator or did not address *Jackson*. To be sure, the Eighth Circuit in *Fallo v. High-Tech Institute* concluded that the parties had delegated threshold questions of arbitrability by incorporating the rules of the American Arbitration Association, as the Parties did here. *See* 559 F.3d 874, 878 (8th Cir. 2009). And the court still went on to address the plaintiffs' unconscionability arguments. *See id.* at 878–80. But *Fallo* predated *Jackson*, and neither party in *Fallo* argued that the court lacked the authority to address unconscionability based on the scope of the plaintiffs' challenge. *See generally* Br. of Def.-Appellant, *Fallo v. High-Tech Inst., Inc.*, No. 08-2437 (8th Cir. Aug. 8, 2008); Br. of Appellees, *Fallo v. High-Tech Inst., Inc.*, No. 08-2437 (8th Cir. Sept. 8, 2008); Reply Br. of Def.-Appellant, *Fallo v. High-Tech Inst., Inc.*, No. 08-2437 (8th Cir. Sept. 26, 2008). By contrast, Eighth Circuit panels after *Jackson*, when faced with a delegation of arbitrability questions, have left the enforceability of an arbitration provision to the arbitrator. *See, e.g.*, *Wootten v. Fisher Invs., Inc.*, 688 F.3d 487, 493–94 (8th Cir. 2012).

All things considered, Plaintiffs do not seem to challenge the delegation provision here. In one sentence at the beginning of their brief, they do assert that "requir[ing] arbitration through unilateral modification without notice would render the delegation

provision unconscionable under Utah law." Pls.' Mem. in Opp'n at 1. Throughout their argument, however, they refer only to "the arbitration clause," and in substance, their arguments appear to target the unilateral modification clause and the arbitration agreement as a whole. For example, Plaintiffs argue that the "[a]pplication of the arbitration clause to Jay's claims" would be procedurally unconscionable because of the parties' disparate bargaining power and because the "arbitration clause [was] imposed through unilateral modification and website notification[.]" *Id.* at 10. They argue that applying the clause would be substantively unconscionable because "the terms are lopsided" and "the circumstances surrounding the addition of the arbitration clause cause unfair surprise." *Id.* at 11. No matter the merit of these arguments, they are not tailored to the delegation provision specifically and do not explain why it would be unconscionable for an arbitrator to decide the unconscionability question. *Jackson* seems to require something more. *See Jackson*, 561 U.S. at 72–73 (quoting a plaintiff's brief to show that he had challenged only the arbitration agreement as a whole); *see also, e.g.*, *Born v. Progrexion Teleservices, Inc.*, No. 2:20-cv-00107, 2020 WL 4674236, at *8 (D. Utah Aug. 11, 2020).

## C

Plaintiffs final argument is that, as a factual matter, Defendants have not identified sufficient evidence that Jay assented to the modified terms that contain the relevant arbitration clause. Recall the text of the modification provision to which Jay assented:

> We expressly reserve the right to change these Terms of Use from time to time without notice to you. You acknowledge and agree that it is your responsibility to review this site and these Terms of Use from time to time and to familiarize yourself with any modifications. *Your continued use of this site after such*

> *modifications will constitute acknowledgment of the modified*
> *Terms of Use and agreement to abide and be bound by the*
> *modified Terms of Use.*

2015 Terms of Use at 2 (emphasis added).  Plaintiffs argue that Jay did not assent to the

arbitration clause added in the 2018 Terms of Use because there is no evidence of his

"continued use of [the] site" after those Terms were posted.  *See* Pls.' Mem. in Opp'n at

11.

Evaluating this factual argument requires the resolution of two disputed issues

concerning the meaning of the modification clause.  First, is "continued use" actually

required before a modification becomes effective?  Defendants say that it is not.  In their

view, the clause authorizes modifications "without notice to [Jay]," and requiring evidence

of "continued use of th[e] site" would make the words "without notice" superfluous.  *See*

*Gillmor v. Macey*, 121 P.3d 57, 65 (Utah Ct. App. 2005) (explaining that a court should

construe a contract so as to give effect to all of its provisions).  Under this reading,

continued use of the website is not necessary to assent to modified terms, but it may provide

additional support for that assent.

Considering three factors together, the only reasonable reading of the clause

requires continued use.  (1) The text of the clause says that "continued use of th[e] site . . .

will constitute acknowledgement . . . and agreement to" the modified terms.  2015 Terms

of Use at 2.  A natural corollary to this statement (though perhaps not the only one) is that

a lack of continued use will indicate a lack of acknowledgment and agreement.

(2) Although Defendants argue that this reading makes the words "without notice"

superfluous, their reading presents the greater risk of surplusage.  If simply posting the

modified terms to the website were enough, in itself, to bind users, the last sentence of the clause would have no legal effect.  *See Gillmor*, 121 P.3d at 65.  To be sure, contracting parties sometimes adopt a "belt-and-suspenders approach" in their agreements,  *Brazil v. Auto-Owners Ins. Co.*, No. 20-2764, __ F.4th __, 2021 WL 2753227, at *3 (8th Cir. July 2, 2021) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 176–77 (2012)), but it seems implausible that the Parties did so here.  The modification clause exists to answer a yes-or-no question: is a user legally bound by a particular modification to the iFit Terms of Use?  If the answer to that question is yes as soon as the terms are posted online, the modification would not become any more binding just because the consumer continues to use the iFit website.   (3) Finally, requiring continued use is more consistent with Utah law.  Recall that a contract modification, like an original contract, requires a "meeting of the minds" in the form of an offer, acceptance, and consideration.  *Mardesich*, 392 P.3d at 954.  The modification clause is best understood as the Parties' advance agreement to a procedure that will satisfy those requirements.  By posting updated terms to the website, Defendants essentially offer the new terms to Jay.  Giving Jay the obligation to check the website functions as a form of constructive notice, ensuring that he has some opportunity to reject the new terms.  And Jay can then signal his acceptance of those terms by continuing to use the website.  *Cf. Firzlaff v. Wm. H. Reilly & Co.*, No. 2:18-cv-00915-DBB-DAO, 2021 WL 698162, at *6 (D. Utah Feb. 23, 2021) (explaining that a party's silence may constitute acceptance if the party "takes the benefit of offered services with reasonable opportunity to reject them" (quoting Restatement (Second) of Contracts § 69(a) (1981)).

20

Since continued use is required, there is another question: continued use of what? The 2015 Terms of Use provide the answer. They define "site" as "the iFit® website and any downloadable applications." 2015 Terms of Use at 1. Defendants argue that the relevant definition of "site" appears in the September 2019 Terms of Use. Those terms contain a broader modification clause that only requires continued use of "an ICON site." Am. Brammer Decl., Ex. 8 at 1 ("September 2019 Terms of Use") [ECF No. 45-8]. They define "the ICON sites" as "the ICON Health & Fitness websites" and in turn define "ICON Health & Fitness" to include ICON and "its[] affiliates, partners, licensors, subsidiaries, and/or related companies." *Id.* But as the October 15 Order noted in a slightly different context, the "relevant modification clause" in assessing whether Jay assented to the later-added arbitration clause is the one "present in the Terms when Jay registered in March 2016[.]" October 15 Order at 29. This only makes sense. That is the clause Defendants used to add the arbitration clause. By broadening the definition of "site" in later versions of the Terms of Use, Defendants essentially altered the applicable modification procedures, but Defendants cite no authority for applying those changes to retroactively alter the meaning of the modification clause as it stood when Jay agreed to it. In short, to prove that Jay assented to the later-added arbitration clause, Defendants must show that he used "the iFit® website" or one of its "downloadable applications" after the arbitration clause was added to the Terms of Use on March 1, 2018.

Although it is somewhat close, there is not enough evidence in the record for a reasonable fact-finder to conclude that Jay more likely than not used "the iFit® website" or one of its "downloadable applications" after March 1, 2018. Defendants first point to

the life span of Jay's iFit membership.  The record shows that Jay first signed up for iFit in March 2016.  Am. Brammer Decl. ¶ 15; Jay Ovsak Decl. ¶ 6.  On March 26, 2018, about three weeks after the arbitration clause was posted, iFit sent Jay an email to notify him that his membership had expired.  First Zhao Decl., Ex. 6 [ECF No. 69-3].  Defendants argue that the persistence of Jay's membership past the time that the arbitration clause was added is enough to show his continued use of the iFit site.  But the plain meaning of "use" suggests that there is a difference between passively maintaining a membership and actually "put[ing] [it] into service or employ[ing] [it] for a purpose[.]"  *Use*, The American Heritage Dictionary                of                the                English                Language, https://www.ahdictionary.com/word/search.html?q=use (last visited July 27, 2021).  That Jay's membership may have allowed him to use the site after March 1, 2018 does not show that he did so.  Absent evidence of actual use, a reasonable fact-finder could not conclude that the mere existence of Jay's membership shows his assent to the arbitration clause.

The evidence of Jay's actual use conflicts to some degree, but not enough to create a genuine dispute of material fact.  According to Jay's declaration, he used his iFit membership "until [his] treadmill quit working in the early part of 2018."  Jay Ovsak Decl. ¶ 6.  At a deposition on January 8, 2021, Jay was not asked exactly what date his treadmill stopped working, but he testified that he had not used iFit "for three years."  First Zhao Decl., Ex. 1 at 67 [ECF No. 68-1].  When he received the email notification that his membership had expired in March 2018, he "probably ignored it" and "didn't renew" the membership.  *Id.* at 51.  According to Erin, the membership was allowed to expire because

"[t]he treadmill probably didn't work anymore." *Id.*, Ex. 2 at 57 [ECF No. 68-1].[8] This testimony does not provide sufficient evidence of Jay's continued use of the iFit site or its downloadable applications on or after March 1, 2018.

Next, Defendants point to communications that Jay had with "iconfitness.com" in January 2020, when he reached out in hopes of getting his broken treadmill fixed. First Zhao Decl., Ex. 5 [ECF No. 69-2]. But these communications, which came from Jay's email address, do not reference iFit in any way. To accept the modified terms, Jay had to use the iFit website or its downloadable applications. The undisputed record seems to show that the "iFit website" and "iconfitness.com" are different websites. *See, e.g.*, Am. Brammer Decl. ¶¶ 9–14 (referring to "iFit.com"). Indeed, Defendants' later decision to broaden the definition of "site" to include all "ICON sites" reinforces this understanding. *See* September 2019 Terms of Use at 1. The January 2020 communications are therefore insufficient to show Jay's "continued use" of the "iFit site."

In short, there is no direct or circumstantial evidence that Jay actually used iFit's website or applications at any point on or after March 1, 2018. And there is reason to believe that, if such evidence existed, Defendants would have been able to submit it. The 2018 Terms of Use warn that "other members of the [iFit] community" may be able to see "information about [the user's] use of the ICON services, including things like . . . the date, statistics, and associated location of each workout that [the user] completed." 2018 Terms

---

[8]     When asked whether she thought the treadmill "stopped working in April of 2018," Erin responded that she did not "ever recall it working past then" but also that she could not remember the last time she had used it. *Id.*

of Use at 3.  This suggests that Defendants collect and store the type of records that could show Jay's "continued use" of iFit.  For all these reasons, Defendants have not met their burden to show that Jay assented to the arbitration clause in the 2018 Terms of Use, nor have they created a genuine issue of material fact so as to warrant a summary trial under the FAA.  *See Shockley*, 929 F.3d at 1017 (explaining that the party seeking to compel arbitration has the burden to show a valid and enforceable agreement to arbitrate).

Defendants' final argument is that, if there is not yet enough evidence to show Jay's continued use of the iFit website, then additional discovery should be ordered.  Defs.' Reply Mem. at 11 n.7.  This request will be denied.  *See BOSC, Inc. v. Bd. of Cnty. Comm'rs*, 853 F.3d 1165, 1177 (10th Cir. 2017).  The Parties have already conducted one round of discovery.  The nature of Erin and Jay's use of iFit was at the heart of that discovery, and Jay was questioned concerning his use of iFit at his deposition.  *See* October 15 Order at 33; First Zhao Decl., Ex. 1 at 68–76.  Defendants have not explained what, if anything, they expect to uncover that they do not already possess.  Under these circumstances, the proper course is to deny the motion to compel arbitration.  *See Andrews v. Ring LLC*, No. 5:20-cv-00889-RGK-SP, 2020 WL 5947614, at *3–4 (C.D. Cal. Aug. 6, 2020).

## ORDER

Based on the foregoing, and on all the files, records, and proceedings in this case,

**IT IS ORDERED THAT** Defendants' Motion to Compel Individual Arbitration of Plaintiff Jay Ovsak's Claims [ECF No. 82] is **DENIED**.

Dated:  July 27, 2021                    s/ Eric C. Tostrud
                                                   Eric C. Tostrud
                                                   United States District Court