UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Teeda Barclay, Nicole Nordick, and Jay Ovsak, *individually and on behalf of others similarly situated*, | File No. 19-cv-2970 (ECT/DTS) |
| Plaintiffs, | |
| v. | **OPINION AND ORDER** |
| Icon Health & Fitness, Inc.[1] and NordicTrack, Inc., | |
| Defendants. | |

Wilbert B. Markovits, Terence Coates, and Justin C. Walker, Markovits, Stock & DeMarco, LLC, Cincinnati, OH; Karl L. Cambronne, Bryan L. Bleichner, Jeffrey D. Bores, and Christopher P. Renz, Chestnut Cambronne PA, Minneapolis, MN; and Nathan D. Prosser, Hellmuth & Johnson PLLC, Edina, MN, for Plaintiffs Teeda Barclay, Nicole Nordick, and Jay Ovsak.

Michael D. Leffel, Foley & Lardner LLP, Madison, WI; and X. Kevin Zhao, Lawrence M. Shapiro, Aaron P. Knoll, and Nicholas Scheiner, Greene Espel PLLP, Minneapolis, MN, for Defendants Icon Health & Fitness, Inc. and NordicTrack, Inc.

Plaintiffs Teeda Barclay, Nicole Nordick, and Jay Ovsak allege that NordicTrack treadmills each of them purchased cannot achieve or maintain the continuous horsepower Defendants represented the treadmills were capable of. In a Third Amended Class Action Complaint, Plaintiffs assert several claims on their own behalf and on behalf of proposed

---

[1]     Defendants ask that the Clerk be directed to update the case caption to reflect that Defendant Icon Health & Fitness, Inc. has changed its name to "iFit Health & Fitness Inc." Mem. in Supp. at 1 n.1 [ECF No. 118]. Plaintiffs have not opposed this change. Defendants' request will therefore be granted.

nationwide and Minnesota-specific classes of persons who also purchased NordicTrack treadmills. Now that questions concerning whether Barclay and Nordick must arbitrate their claims individually have been answered "no" by arbitrators, Defendants have moved to dismiss Plaintiffs' complaint. Defendants' motion will be granted in part and denied in part.

Essential background facts and procedural posture are described in two prior orders: *Barclay v. ICON Health & Fitness, Inc.*, No. 19-cv-2970 (ECT/DTS), 2020 WL 6083704 (D. Minn. Oct. 15, 2020) ("*Barclay I*"), and *Barclay v. ICON Health & Fitness, Inc.*, __ F. Supp. 3d __, No. 19-cv-2970 (ECT/DTS), 2021 WL 3164057 (D. Minn. July 27, 2021) ("*Barclay II*"). Familiarity with those orders is presumed here. To what's in those orders, add that arbitrators dismissed Plaintiffs Barclay and Nordick's arbitration claims for lack of arbitrability, and you have all you need to know to follow along with this order.

I

Defendants seek essentially to clarify that *Barclay I* dismissed Plaintiffs' claims under the Minnesota Uniform Deceptive Trade Practices Act ("MDTPA"), Minn. Stat. § 325D.43, *et seq.*, for lack of subject-matter jurisdiction. It did. The jurisdictional issue in *Barclay I* was whether Plaintiffs alleged facts showing their Article III standing to seek injunctive relief—specifically, whether Plaintiffs alleged "*some* plausible prospect of future interactions between Plaintiffs and Defendants" sufficient to show "a threat of future harm [that is] 'real and immediate.'" *Barclay I*, 2020 WL 6083704, at *5 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)). *Barclay I* concluded that Plaintiffs did not plausibly allege any relevant threat of future interactions between them and Defendants

2

and that, as a result, "Plaintiffs lack standing to seek injunctive relief." *Id.* Consequently, "Plaintiffs' claims for injunctive relief [were dismissed] for lack of subject-matter jurisdiction." *Id.* at *15. The MDTPA's only remedy is injunctive relief, Minn. Stat. § 325D.45, subd. 1, so *Barclay I* necessarily resulted in the dismissal of Plaintiffs' MDTPA claims.

Plaintiffs do not seem to dispute that *Barclay I* dismissed their MDTPA claims. Instead, Plaintiffs seek reconsideration of this holding based on a subsequent decision, *Cleveland v. Whirlpool Corp.*, No. 20-cv-1906 (WMW/KMM), 2021 WL 3173702 (D. Minn. July 27, 2021). Failing that, Plaintiffs argue that at least Ovsak has standing to seek injunctive relief based on allegations in the Third Amended Complaint showing "a plausible prospect of future interactions with NordicTrack to repair" his treadmill. Pls.' Mem. in Opp'n at 21–22 [ECF No. 122].

Article III requires an injunction-seeking plaintiff to show a threat of ongoing or future harm of the kind the requested injunction is intended to prevent, *Lyons*, 461 U.S. at 105; *see Barclay I*, 2020 WL 6083704, at *5, and the MDTPA mirrors these requirements.[2] The MDTPA says that "[a] person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it." Minn. Stat. § 325D.45, subd. 1. The MDTPA's requirement that plaintiffs show they are "likely to be damaged" seems indistinguishable from Article III's threat-of-future-harm requirement for injunctive relief. In other words, under the MDTPA, like Article III, a plaintiff cannot obtain an injunction

---

[2]    Not that it would matter if it didn't. A legislature, be it Congress or a state legislature, cannot make injunctive relief available in a federal court on a lesser showing than Article III requires. *Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997).

without showing a likelihood of future injury. And like Article III, the MDTPA requires that such future injury be the kind the requested injunction is intended to prevent. The statute makes clear that whatever future damage a plaintiff alleges is likely must result from "a deceptive trade practice" and not some other kind of activity. The MDTPA continues on, in § 325D.44, subd. 1, to identify acts constituting deceptive trade practices that may be enjoined, and there are thirteen possibilities.

Here, Plaintiffs' allegations are insufficient whether viewed from the perspective of Article III or the MDTPA. Plaintiffs identify three deceptive trade practices (from among the MDTPA's thirteen options) in their Third Amended Complaint, each based solely on Defendants' alleged misrepresentations regarding their treadmills' continuous horsepower. Third Am. Compl. ¶¶ 162–63 [ECF No. 80]. If Plaintiffs were damaged by those misrepresentations, that occurred at purchase (in the past). *See id.* ¶ 166 (alleging injuries resulting from "premium price charged to customers"). And Plaintiffs do not connect the only future interactions they allege—the possibility that NordicTrack may repair Ovsak's treadmill—to a deceptive trade practice. In other words, Plaintiffs allege no facts plausibly showing how an injunction targeting Defendants' continuous-horsepower representations might have anything to do with Defendants' possible future repairs to Ovsak's treadmill. Plaintiffs allege only that Ovsak's treadmill has "stopped working." *Id.* ¶ 21. They do not allege that the treadmill's disrepair relates to its inability to achieve a particular level of continuous horsepower or that a repair would remedy that issue.

The case on which Plaintiffs rely to seek reconsideration of this aspect of *Barclay I*, *Cleveland v. Whirlpool Corp.*, seems different. There, the plaintiff's MDTPA claim was

based on representations by the defendant Whirlpool that some dishwashers it manufactured were defect-free when (the plaintiff alleged) they were not. *Cleveland*, 2021 WL 3173702, at * 9. Importantly, the plaintiff also alleged that it was necessary to repair or replace her dishwasher but that any repair or replacement would continue to suffer from the alleged defect. *Id.* at *10. Presumably because the injunction the plaintiff sought would require remedying the alleged defect, the plaintiff's allegations of future injury associated with anticipated repair or replacement were enough. We don't have anything like that here. Plaintiffs lack Article III standing to obtain injunctive relief, and their MDTPA claims in Count 6 of the Third Amended Complaint will be dismissed for lack of subject-matter jurisdiction.

## II

Defendants argue that damages are an element of every asserted claim, that Plaintiffs do not allege facts plausibly showing that they were injured, and that "Plaintiffs' failure to plead damages is fatal to all of their claims"—both as a jurisdictional matter and on the claims' merits. Defs.' Mem. in Supp. at 8, 12 n.5 [ECF No. 118]. Plaintiffs argue that this "is a 'classic mislabeling case'—where consumers suffer damages by paying price premiums for products that are not as warranted and/or advertised." Pls.' Mem. in Opp'n at 6. Defendants do not argue that price-premium damages are unavailable as a matter of law.[3] In view of the Parties' arguments, then, the question boils down to whether Plaintiffs have alleged facts plausibly showing they suffered "price-premium" damages.

---

[3]    One case from this district holds that price-premium damages are available under Minnesota law. *Laughlin v. Target Corp.*, No. 12-cv-489 (JNE/JSM), 2012 WL 3065551, at *4 (D. Minn. July 27, 2012) ("When a complaint alleges misrepresentation or fraud that

There is a "long-standing rule that no tort claim for economic damages lies when a product is merely at risk of failing." *Penrod v. K&N Eng'g, Inc.*, 14 F.4th 671, 673 (8th Cir. 2021); *see In re Polaris Mktg., Sales Pracs., and Prod. Liab. Litig.*, 9 F.4th 793, 796–97 (8th Cir. 2021); *Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1030 (8th Cir. 2014); *O'Neil v. Simplicity, Inc.*, 574 F.3d 501, 503 (8th Cir. 2009); *Briehl v. Gen. Motors Corp.*, 172 F.3d 623, 628 (8th Cir. 1999). In *Penrod*, *Polaris*, and *Wallace*, the plaintiffs' failure to plead more than a risk of product failure was considered an Article III jurisdictional problem; "*O'Neil* and *Briehl* both held that plaintiffs failed to state a claim, without discussing standing and the requirement of injury in fact." *Polaris*, 9 F.4th at 797. The summary of *Briehl* provided by the court in *Polaris* is particularly instructive:

> [In *Briehl*], plaintiffs alleged that anti-lock brakes in their vehicles were defective because they performed in a counterintuitive way that could cause drivers to react inappropriately during emergencies. *Id.* at 626. The plaintiffs alleged economic injury on the theory that the brakes "diminished the vehicles' resale value," but they did not allege that the brakes "malfunctioned or failed." *Id.* at 628. This court concluded that the plaintiffs' "conclusory assertions" that they suffered injuries, and that the brakes were defective, were "insufficient as a matter of law to plead a claim" for economic injury. *Id.* at 629.

*In re Polaris*, 9 F.4th at 796–97.

Here, in contrast to the facts of these Eighth Circuit cases, Plaintiffs allege facts plausibly showing injury and damages. Plaintiffs allege that each of them paid a higher price to purchase a treadmill in reliance on Defendants' representations that the treadmill

---

induces a consumer to purchase a product, Minnesota courts have recognized that allegations of [price-premium] damages . . . establish a legally sufficient claim for relief."). The Parties have not addressed whether such damages may be available under Utah law.

could achieve a particular continuous horsepower rating during normal use and that the treadmills' capacity to achieve the continuous horsepower rating held benefits compared to less expensive treadmills. Third Am. Compl. ¶¶ 2, 8, 10, 11, 17, 20, 23, 47–63. Plaintiffs allege that the treadmills each of them purchased could not (and cannot) achieve the continuous horsepower during ordinary use as advertised. *Id.* ¶¶ 1, 3, 4, 7, 9, 18, 19, 21, 22, 24, 27–45. Plaintiffs allege that, had they known the machine's actual horsepower capabilities, each of them would not have purchased the treadmill or would have paid much less for the treadmill. *Id.* ¶¶ 12, 17, 20, 23. Plaintiffs have bolstered their price-premium-damages theory with allegations that continuous horsepower is something consumers and industry experts care about, *id.* ¶¶ 38–43, and that "Defendants have priced [treadmills] according to the misleading CHP associated with each model, incrementally increasing the price premium based on successively higher CHP representations," *id.* ¶ 59. These allegations plausibly show that Plaintiffs were injured.[4]

Defendants advance several arguments to show that these allegations are not sufficient, but these arguments are not persuasive. Defendants argue that Plaintiffs "nowhere . . . allege that their treadmills were not equipped with motors rated to the listed CHPs." Defs. Mem. in Supp. at 8. This argument seems implicitly to rely on Defendants' factual contention that the treadmills were tested and achieved the represented continuous horsepower ratings in a laboratory-type environment. If that understanding of the argument

---

[4]    *See Bechtel v. Fitness Equip. Servs., LLC*, 339 F.R.D. 462, 474 (S.D. Ohio 2021) (finding allegations that plaintiffs, had they known falsity of continuous horsepower representations, "would not have purchased . . . [the] treadmill or would have paid substantially less to purchase one" plausibly showed injury).

is correct, then the argument is another way of pointing out that Plaintiffs don't allege that the motors are incapable of achieving the represented continuous horsepower rating *in any setting*. This is true, but Plaintiffs do not need to allege this fact to support their theory that the purchased treadmills cannot achieve the represented continuous horsepower rating in a typical residential or similar setting where (Plaintiffs allege) Defendants knew the treadmills would be used. Defendants also point out that Plaintiffs do not "allege that their treadmills' performance was in any way deficient (e.g., they could not run at a certain speed or incline)." *Id.* at 8–9. This is true in the sense that Plaintiffs do not allege their use of the treadmills was impaired in any way. That's not Plaintiffs' theory. Plaintiffs' theory is that their treadmills' performance was deficient in comparison to the advertised continuous-horsepower rating and that their price-premium injury occurred on purchase. Plaintiffs do not—and need not—allege that each of them experienced some noticeable impairment during use to plausibly plead this theory.[5] Finally, Defendants argue that Plaintiffs' claims are comparable to *Briehl* and cases like it where plaintiffs sought to

---

[5]      Defendants cite *In re Shop-Vac Mktg. & Sales Pracs. Litig.*, NDL No. 4:12-md-2380, 2014 WL 3557189 (M.D. Pa. July 17, 2014). There, the court denied a motion to dismiss consumer-fraud and breach-of-warranty claims on standing grounds. In Defendants' view of the case, "allegations of performance deficiency were critical to the court's refusal to dismiss the[] claims." Defs.' Mem. in Supp. at 11 n.4. It is true that the plaintiffs "further alleged actual injury" by alleging that the "vacuums did not perform as promised for their intended purpose." *Shop-Vac*, 2014 WL 3557189, at *6 (emphasis added). But there isn't much question the court in *Shop-Vac* found allegations like those asserted here—that the defendants misrepresented "specifications regarding power and tank size," "that [the plaintiffs] would not have purchased the vacuums but for these misrepresentations, and that they therefore paid an unfair price"—sufficient on their own to show an economic injury. *Id.* at *5, *11 & n.14. *Shop-Vac*, then, shows that Plaintiffs have plausibly alleged damages and standing.

advance tort claims based on unmanifested defects, and courts dismissed the claims. Again, this case seems different.  Plaintiffs allege the treadmills do not (and cannot) match Defendants' continuous-horsepower representations in ordinary use.  That "defect" (if it can be called that) was manifest at purchase.  To draw an analogy, Plaintiffs don't allege that they purchased cars with unmanifested defects in their power trains; Plaintiffs allege that they purchased (and paid a premium for) cars based on representations the cars could perform at a high horsepower when, in fact, they could not.  Plaintiffs' claims will not be dismissed for a failure to plausibly plead Article III injury or damages.

III

Defendants seek dismissal of Plaintiffs' written-warranty claim under the Magnuson-Moss Warranty Act ("MMWA") on its merits.

> Under the MMWA, a warrantor creates a "written warranty" when it provides a buyer with any of three things with respect to a product: (1) a written affirmation or promise that the product's "material or workmanship is defect free"; (2) a written affirmation or promise that the product "will meet a specified level of performance over a specified period of time"; or (3) a written undertaking "to refund, repair, replace, or take other remedial action with respect to such product in the event that such product fails to meet the specifications set forth in the undertaking." *See* 15 U.S.C. § 2301(6)(A)–(B).

*Anderson v. 1399557 Ontario Ltd.*, No. 18-cv-1672 (PJS/LIB), 2019 WL 5693749, at *4 (D. Minn. Nov. 4, 2019).  Plaintiffs advance their MMWA claim under the second category.  *See* Pls.' Mem. in Opp'n at 12–14.  Defendants argue that Plaintiffs have not alleged facts plausibly showing that Defendants promised performance "over a specified period of time."  Defs.' Mem. in Supp. at 18.  Plaintiffs argue that Defendants made a "lifetime" warranty about the performance of their treadmills by advertising, not that the

treadmills would last for "a lifetime," but that the treadmills possess "continuous" horsepower.  Pls.' Mem. in Opp'n at 12–14.

At issue is § 2301(6)(A)'s temporal element.  To be a written warranty under that provision, "the warrantor's guarantee must contain language that specifically identifies the duration of the warranty."  *Kelley v. Microsoft Corp.*, No. C07-0475MJP, 2007 WL 2600841, at *5 (W.D. Wash. Sept. 10, 2007); *see Dayan v. Swiss-Am. Prods., Inc.*, No. 15 Civ. 6895 (DLI) (VMS), 2017 WL 9485702, at *11 (E.D.N.Y. Jan. 3, 2017) (collecting cases).  An "equivocal representation" about product performance over time does not suffice.  *Schechner v. Whirlpool Corp.*, 237 F. Supp. 3d 601, 616 (E.D. Mich. 2017).  In *Anderson*, Judge Schiltz reasoned persuasively that a representation of "lifetime" performance does not create a written warranty because "lifetime" is an inherently imprecise measurement and therefore not a "specified period of time."  *See Anderson*, 2019 WL 5693749, at **4–5.

Plaintiffs have not alleged facts plausibly showing a written warranty under the MMWA.  Plaintiffs do not allege in the Third Amended Complaint that Defendants promised continuous horsepower for a lifetime or for some other ascertainable duration.  As Plaintiffs describe it, continuous horsepower is a performance metric: the "measurement of the motor's ability to maintain and continuously produce power over an extended period of time without exceeding the current rating of the motor."  Third. Am. Compl. ¶ 38.  The Third Amended Complaint includes no allegations suggesting what that "extended period" might be.  It would not change things if we assumed that Plaintiffs intended this allegation to imply "lifetime" performance.  As Judge Schiltz explained in

*Anderson*: "Promising that something will last a 'lifetime' is not the same thing as promising that something will last for a 'a specified period of time.'"[6]  2019 WL 5693749, at *5.  No matter how it is reasonably understood, a promise of "continuous" performance is equivocal and lacks the specificity necessary required to be a written warranty under the MMWA.  Defendants' motion insofar as it seeks dismissal of Plaintiffs' MMWA written-warranty claims (Count 2) will be granted.

IV

A

Defendants seek the dismissal of Plaintiffs' state-law warranty claims.  Minnesota and Utah law will be applied to this aspect of Defendants' motion, though the decision to take this approach deserves some explanation.  Plaintiffs assert their state-law warranty claims on behalf of two proposed classes: one nationwide and the other limited to Minnesota citizens.  Third Am. Compl. ¶¶ 88–99 (nationwide class), 120–46 (Minnesota class).  Plaintiffs do not identify what law applies to the nationwide class's claim.  *See id.* ¶¶ 88–99.  Plaintiffs assert the proposed Minnesota class's warranty claims under Minnesota law.  *Id.* ¶¶ 120–46.

The nationwide scope of the class in Count 1 and a Utah choice-of-law clause discussed below in Part V raise questions regarding what law should apply to these claims.

---

[6]   *Anderson* is not, as Plaintiffs argue, "at odds with . . . binding Eighth Circuit precedent."  Pls.' Mem. in Opp'n at 13 n.7.  For this assertion, Plaintiffs cite *Marvin Lumber and Cedar Co. v. PPG Indus., Inc.*, 223 F.3d 873, 880 (8th Cir. 2000).  That case does not analyze an MMWA written warranty claim, so it does not address the temporal element of 15 U.S.C. § 2301(6)(A).

The Parties' submissions do not specifically address what law governs the proposed nationwide class's warranty claim.  To support their motion, Defendants rely on Minnesota and Utah warranty law and identify no relevant conflicts.  Defs.' Mem. in Supp. at 12–17. Though Plaintiffs rely on Minnesota law, they do not object specifically to the idea that Utah law might govern their claims, suggest that there is some material conflict between Minnesota and Utah law, or suggest that some other state's law might apply.  Pls.' Mem. in Opp'n at 7–12.  Cases describing the basic elements of a breach-of-warranty claim under each state's law appear to confirm their essential similarity.  *Angeles v. Medtronic, Inc.*, 863 N.W.2d 404, 421 (Minn. Ct. App. 2015) ("The elements of a breach-of-warranty claim in Minnesota are (1) the existence of a warranty, (2) breach of the warranty, and (3) causation of damages." (citing *Peterson v. Bendix Home Sys., Inc.*, 318 N.W.2d 50, 52–53 (Minn. 1982))); *Groen v. Tri–O–Inc.,* 667 P.2d 598, 604 (Utah 1983) ("A warranty is an assurance by one party to a contract of the existence of a fact upon which the other party may rely.  It is intended to relieve the promisee of any duty to ascertain the fact for himself, and it amounts to a promise to answer in damages for any injury proximately caused if the fact warranted proves untrue.").

Though there may be room to question this approach, it makes sense just to follow the Parties' lead and apply shared principles of Minnesota and Utah law here.  There is an obvious connection between Plaintiffs' claims and Minnesota law.  As will be discussed, there also is a connection between Barclay and Nordick's claims and Utah law.  And if there is a dispositive difference between Minnesota and Utah law (or the law of any other state), it hasn't been identified.

12

B

The first issue is whether Plaintiffs have plausibly alleged their state-law warranty claims. Under Minnesota and Utah law, a seller creates an express warranty by "[a]ny affirmation of fact or promise" about the sold goods, or "[a]ny description of the goods," that forms "part of the basis of the bargain." Minn. Stat. § 336.2-313(1)(a)–(b); Utah Code § 70A-2-313(1). Words like "warrant" or "guarantee" are unnecessary to create a warranty, "but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." Minn. Stat. § 336.2-313(2); Utah Code § 70A-2-313(2). Statements in advertising and promotional materials may create an express warranty. *E.g.*, *Johnson v. Bobcat Co.*, 175 F. Supp. 3d 1130, 1143–44 (D. Minn. 2016); *Boud v. SDNCO, Inc.*, 54 P.3d 1131, 1134–36 (Utah 2002). A seller's "representations [] must be interpreted as an ordinary person would understand their meaning, with any doubts resolved in favor of the user." *Hanson v. N. J & B Enters., Inc.*, No. A08-0413, 2009 WL 234104, at *4 (Minn. Ct. App. Feb. 3, 2009) (quoting *McCormack v. Hankscraft Co.*, 154 N.W.2d 488, 498 (Minn. 1967)); *State ex rel. Div. of Consumer Protection v. GAF Corp.*, 760 P.2d 310, 315 (Utah 1988) ("An affirmation of fact, a promise, or a description of the goods must be judged objectively against the meaning that a reasonable person would have taken from the statement.").[7]

---

[7]  Plaintiffs' state and federal implied-warranty claims need not be addressed separately. Plaintiffs have limited their state-law implied-warranty claims to a mislabeling theory that mirrors their express-warranty claims. *See* Third Am. Compl. ¶ 137; ECF No. 43 at 21; *see also* Minn. Stat. § 336.2-314(2)(f). "[W]hen an 'implied warranty of merchantability cause of action is based solely on whether the product in dispute conforms to the promises or affirmations of fact on the packaging of the product, the implied warranty of merchantability claim rises and falls with express warranty claims brought for the same

Plaintiffs allege facts plausibly showing each of the three essential elements of their state-law breach-of-warranty claims.  Plaintiffs plausibly allege the existence of a warranty—specifically, that Defendants warranted that NordicTrack treadmills could achieve a level of continuous horsepower during residential use.  Indeed, the bulk of the Third Amended Complaint is directed at showing this element.  Plaintiffs allege that Defendants represented "online and in numerous market outlets" that NordicTrack treadmills included motors with a particular continuous horsepower (or "CHP") rating. Third Am. Compl. ¶¶ 47–58.  For example, in online marketplaces like Amazon.com, Defendants advertised that the 6.5 S model Barclay purchased had a "Durable 2.6 CHP Motor":



---

product.'"  *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 470 (S.D.N.Y. 2020) (citation omitted) (collecting cases).  A MMWA implied-warranty claim also depends on the breach of an implied warranty under state law so, by extension, Plaintiffs' MMWA implied-warranty claim also hinges on their express warranty claims.  15 U.S.C. § 2301(7) ("The term 'implied warranty' means an implied warranty arising under State law . . ..");  *see, e.g.*, *Bollom v. Brunswick Corp.*, 453 F. Supp. 3d 1206, 1224 (D. Minn. 2020).

*Id.* ¶ 54.  Defendants made similar representations about their treadmills on their "treadmill blog" and on the NordicTrack website, where they offered NordicTrack treadmills for sale:





*Id.* ¶¶ 48, 56.  Plaintiffs allege that Defendants included similar "CHP" representations on the treadmills themselves and in "in-store floor model displays across the country."  *Id.* ¶¶ 57–58.  Plaintiffs allege facts plausibly showing that an ordinary person would understand these representations to mean that a treadmill's in-home continuous horsepower matched the "CHP" value Defendants advertised.  Plaintiffs allege that they understood the Defendants' representations this way.  *Id.* ¶¶ 7–10, 17, 20, 23, 46.  And Plaintiffs allege that several retailers and industry bloggers shared their understanding of continuous horsepower.  For example, Dick's Sporting Goods and a "Treadmill Reviews" website explained that "CHP measures how much power the motor maintains throughout the workout" and "shows that the motor can maintain the power it is rated for without lagging or slowing down under strain."  *Id.* ¶¶ 40–41, 43.  A fitness blog described CHP as "the

minimum horsepower delivered at all points during a workout," *id.* ¶ 41, and a "Treadmill Ratings & Reviews" website described it as a "measure of sustained power during regular use," *id.* ¶ 42.[8]  Plaintiffs also allege that Defendants advertised their treadmill motors' CHP ratings as a key feature.  For instance, Defendants advertised that a treadmill "works as hard as you with up to an incredible 4.25 CHP DurX™ Commercial Plus motor, powering your calorie-torching iFit workout."  *Id.* ¶¶ 50–51.  Plaintiffs allege facts plausibly showing a breach of this warranty, *id.* ¶¶ 7, 9, 16, 18, 19, 21, 22, 24, 60, and that the breach caused them damages, *id.* ¶¶ 11–13, 17–18, 20–21, 23–24.

Defendants dispute the plausibility of Plaintiffs' alleged understanding of Defendants' continuous-horsepower representations, but Defendants' arguments are not persuasive.  Defendants acknowledge that their "numerical CHP representations" are "objective in nature, and thus may constitute warranties," but Defendants argue that they never "affirm[ed] that the treadmills would 'achieve' the stated CHP, or any horsepower output, during household use"; they "simply affirmed that a [certain] motor would be incorporated" into their treadmills.  Defs.' Mem. in Supp. at 14–15.  Defendants suggest that Plaintiffs "tacitly admit that, with sufficient electrical power, the motors do reach the stated horsepower."  *Id*. at 15.

---

[8]     Defendants argue that the existence of a warranty turns on "the actual language and images set forth [in the product descriptions]," and that third-party statements "cannot support Plaintiffs' claims."  Mem. in Supp. at 15–16 (quoting *Boud*, 54 P.3d at 1135).  The rule that third-party statements cannot establish the basis of the bargain or constitute an actionable warranty does not mean that such statements are always irrelevant.  Here, Plaintiffs rely on the statements for a different and proper purpose: to show the reasonableness (and therefore the plausibility) of their understanding of Defendants' continuous-horsepower representations.

Defendants' arguments concerning the meaning of their continuous-horsepower representations mirror those rejected in an analogous case, *Date v. Sony Electronics, Inc.*, No. 07-cv-15474, 2010 WL 3702599 (E.D. Mich. Sept. 16, 2010). In *Date*, plaintiffs alleged that advertisements for a "1080p" television created an express warranty that a television could "accept 1080p signal natively through all of its inputs, not just via . . . antenna." *Id.* at *9. In moving to dismiss, the defendants argued no such warranty was created because they never expressly represented that the televisions would accept 1080p signal via "all inputs" and because the plaintiffs possessed an "erroneous understanding" of the televisions' input capabilities. *Id.* at *9–10. The court denied the motion, noting that the defendants' arguments ignored the plaintiffs' "claim that the phrase 1080p, standing alone, implie[d] the ability of the television to accept 1080p through all of its inputs," and that the plaintiffs had supported this understanding with allegations from industry sources and the defendants' own advertisements. *Id.*; *see also In re Shop-Vac Mktg. & Sales Pracs. Litig.*, 2014 WL 3557189, at *6–7 (denying motion to dismiss and rejecting defendants' contention that "peak horsepower" is "a term of art that only refers to horsepower levels reached for a brief time in laboratory conditions, not during actual consumer use" so that "use of the term on the packaging [was] therefore true and standard in the industry"). These cases are persuasive and help to confirm that Defendants' interpretation of their continuous-horsepower representations (even if reasonable) does not establish the implausibility of Plaintiffs' alleged understanding.

The same is true for the third-party evidence Defendants cite. To show that Plaintiffs' understanding is implausible, Defendants cite statements reflecting that third

parties shared Defendants' interpretation that "continuous horsepower" does not refer to a treadmill's capabilities during home use. Defendants cite a "2020 Treadmill Buying Guide" published online by "treadmillreviews.com"—one of several industry sources Plaintiffs cite in their complaint. Defs.' Reply Mem. at 6–7 [ECF No. 125]; *see* Third Am. Compl. ¶ 43 n.10. According to Defendants, the author of that guide has—since Plaintiffs filed this lawsuit—inserted a disclaimer that "CHP motor ratings refer to the motor power achieved in a testing facility. You are not going to achieve this same amount of power when using the treadmill in your home due to the smaller wattage limitations of [a] residential home or apartment." Zhao Decl., Ex. G at 10 [ECF No. 126-5]. One can hypothesize various reasons why the author might have elected to add this disclaimer after the commencement of this case and others like it. *See Bechtel*, 2021 WL 4147766; *Walker v. Nautilus, Inc.*, No. 2:20-cv-3414, 2020 WL 7342925 (S.D. Ohio Dec. 13, 2020). Regardless, this evidence does not establish that an ordinary person could not plausibly have shared Plaintiffs' understanding of Defendants' continuous-horsepower representations at the time Plaintiffs relied on them.

Defendants dispute whether Plaintiffs have plausibly alleged causation, arguing that "Plaintiffs never allege that they ever viewed any of the specific descriptions in their complaint." Defs.' Mem. in Supp. at 14. This is not correct. Barclay, Nordick, and Ovsak each alleges to have viewed NordicTrack's website and to have relied on statements that the treadmill each of them purchased was "capable of providing" or "producing" a specific level of "CHP." Third Am. Compl. ¶¶ 17, 20, 23. Defendants cite no authority requiring more than that.

C

Defendants also argue that Plaintiffs' state-law warranty claims should be dismissed because Plaintiffs do not allege facts plausibly showing they gave pre-suit notice. Defendants are correct that pre-suit notice is a prerequisite to suit. To sue for breach-of-warranty, a buyer "must within a reasonable time after [they] discover[] or should have discovered any breach notify the seller of [the] breach or be barred from any remedy." Minn. Stat. § 336.2-607(3)(a); Utah Code § 70A-2-607(3)(a). Notice must be pleaded. *Dolan v. Bos. Sci. Corp.*, No. 20-cv-1827 (NEB/LIB), 2021 WL 698777, at *3 (D. Minn. Feb. 23, 2021) (collecting cases); *Johnson v. Blendtec, Inc.*, 500 F. Supp. 3d 1271, 1290–91 (D. Utah 2020) (analyzing complaint and document embraced by the pleadings to determine adequacy of pre-suit notice). The "reasonableness or the unreasonableness of the delay must be determined" by measuring from "[t]he date when the buyer becomes aware or should have become aware of the claimed defect." *Truesdale v. Friedman*, 132 N.W.2d 854, 862 (Minn. 1965); *see also Blendtec, Inc.*, 500 F. Supp. 3d at 1290. Generally, "[w]hat constitutes a 'reasonable time' is a jury question and depends on the facts and circumstances of the case." *Willmar Cookie Co. v. Pippin Pecan Co.*, 357 N.W.2d 111, 115 (Minn. Ct. App. 1984); *Blendtec, Inc.*, 500 F. Supp. 3d at 1290 (quoting *Christopher v. Larson Ford Sales, Inc.*, 557 P.2d 1009, 1012 (Utah 1976)). Courts apply the pre-suit notice requirement more leniently in consumer actions, reasoning that strict enforcement would defeat the Uniform Commercial Code's purpose of "allowing good faith consumers to pursue relief in courts." *George v. Uponor Corp.*, 988 F. Supp. 2d 1056, 1071 (D. Minn. 2013) (citing *Church of the Nativity of Our Lord v. WatPro, Inc.*, 491

19

N.W.2d 1, 5 (Minn. 1992), *overruled on other grounds*, *Ly v. Nystrom*, 615 N.W.2d 302 (Minn. 2000)); *see Blendtec, Inc.*, 500 F. Supp. 3d at 1290. "The bar for sufficiency is low, but notice is nevertheless important because it 'informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation.'" *Drobnak v. Andersen Corp.*, 561 F.3d 778, 784 (8th Cir. 2009) (citation omitted). A delay in notice can become unreasonable as a matter of law when a buyer has known, or should have known, of the alleged breach. *Truesdale*, 132 N.W.2d at 121; *Blendtec, Inc.*, 500 F. Supp. 3d at 1290.

Here, Plaintiffs have not alleged facts plausibly showing that they gave Defendants timely pre-suit notice. Plaintiffs allege when they purchased their treadmills. Barclay purchased her treadmill in June 2019. Third Am. Compl. ¶ 16. Ovsak purchased his treadmill in February 2016. *Id.* ¶ 19. And Nordick purchased hers in January 2019. *Id.* ¶ 22. Plaintiffs also allege when they gave written notice to Defendants. Barclay mailed written notice on October 10, 2019. *Id.* ¶¶ 84–85. And Ovsak and Nordick did so on February 3, 2020. *Id.* ¶ 86. Plaintiffs don't, however, allege when each of them discovered the alleged breach. Plaintiffs allege only that they gave notice "within a reasonable time" after they discovered or reasonably should have discovered the continuous horsepower discrepancy, but they do not plead a discovery date. *Id.* ¶¶ 84, 86.

Defendants don't dispute specific dates or challenge the content of Plaintiffs' pre-suit notices. They contend that, by not alleging when they discovered the alleged breach, Plaintiffs have not alleged sufficient facts to show their notice was timely. Defs.' Reply Mem. at 9 n.8. This is persuasive. As noted, in Minnesota and Utah, the timeliness of pre-

suit notice is determined by the gap between "[t]he date when the buyer becomes aware or should have become aware of the claimed defect" and the provision of notice. *Truesdale*, 132 N.W.2d at 862; *see Blendtec, Inc.*, 500 F. Supp. 3d at 1290. That determination can't be made without knowing when the buyer became aware of the defect. And alleging, as Plaintiffs do here, that notice was given "within a reasonable time" seems the same thing as pleading an unhelpful legal conclusion. *See* Fed. R. Civ. P. 8(a); *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Though Plaintiffs' failure to allege a discovery date means they have not alleged pre-suit notice to support their state-law breach of warranty claims, this sort of technical pleading defect ordinarily may be "easily cured" through amendment. *Nathan v. Whirlpool Corp.*, 492 F. Supp. 3d 747, 756 (S.D. Ohio 2020); *accord Tyman v. Pfizer, Inc.*, 16-CV-06941 (LTS) (BCM), 2017 WL 6988936, at *22–23 (S.D.N.Y. Dec. 27, 2017), *report and recommendation adopted*, 2018 WL 481890 (S.D.N.Y. Jan. 18, 2018). The state-law warranty claims in Counts 1, 3, and 4 will therefore be dismissed without prejudice, and Plaintiffs will be granted leave to file a fourth amended complaint addressing this deficiency.

V

A

Defendants argue that a Utah choice-of-law clause in Terms of Use to which Barclay and Nordick assented prevents them from asserting certain Minnesota statutory claims—specifically, claims under the MDTPA (Count 6), the Consumer Fraud Act, Minn. Stat. §§ 325F.68–.70 (Count 7), the False Statement in Advertisement Act, Minn. Stat. § 325F.67 (Count 8), and the Unlawful Trade Practices Act, Minn. Stat. § 325D.13 (Count 9). Defs.'

21

Mem. in Supp. at 23.[9]  The dismissal of Plaintiffs' MDTPA claim in Part I, above, leaves

Counts 7 through 9 as the targets of this aspect of Defendants' motion.  The Parties seem

to agree that this choice-of-law question matters.  Defendants have identified material

conflicts between Utah and Minnesota consumer-protection statutes, *id.* at 23–24, and

Plaintiffs do not dispute that these conflicts exist, *see* Pls.' Mem. in Opp'n at 18–20.

Not long after each of them purchased a NordicTrack treadmill, Barclay and

Nordick signed up as members of ICON's iFit service.  *See Barclay I*, 2020 WL 6083704,

at *1 (describing treadmill purchases), *3 (describing iFit enrollment).  When they signed

up for the iFit service, Barclay and Nordick agreed to the iFit "Terms of Use."  *Id.* at *3.

Among other provisions, the Terms of Use included a Utah choice-of-law clause:

> **GOVERNING LAW.**
>
> The ICON Sites (excluding any linked sites) and ICON
> Services are controlled by us from our offices within the
> State of Utah, United States of America.  The ICON Sites
> and ICON Services can be accessed from all fifty (50)
> states, as well as from other countries around the world.  As
> each of these places has laws that may differ from those of
> Utah, by accessing the ICON Sites or ICON Services, both
> of us agree that the statutes and laws of the State of Utah,
> without regard to the conflicts of laws principles thereof,
> will apply to all matters relating to the use of the ICON Sites
> and the purchase of ICON Services available through the
> ICON Sites.

---

[9]     Defendants do not seek dismissal of Ovsak's Minnesota claims on this basis.
Defendants acknowledge that Ovsak assented to an earlier version of the Terms of Use
than did Barclay and Nordick, and that the choice-of-law clause in that earlier version was
narrower.  *See* Defs.' Mem. in Supp. at 26 n.12.

Am. Brammer Decl. Ex. 7 [ECF No. 45-7 at 10]. The Terms of Use defined "ICON" broadly to include "its[] affiliates, partners, licensors, subsidiaries, and/or related companies." *Id.* at 2. From this broad definition, *Barclay I* concluded that "the Terms of Use governed, not merely Barclay and Nordick's relationship with ICON resulting from their iFit registration, but also NordicTrack." 2020 WL 6083704, at *10 n.6.

Framed in the choice-of-law clause's terms, the fighting issue is whether Barclay and Nordick's claims are "matters relating to the use of the ICON Sites." Defendants argue they are because Barclay and Nordick allege in support of the at-issue claims that they read and relied on continuous horsepower representations on the NordicTrack website. Defs.' Mem. in Supp. at 25–26. In taking the opposite position, Barclay and Nordick rely exclusively on arbitrators' orders dismissing their arbitration claims as not arbitrable. Pls.' Mem. in Opp'n at 18–20. Barclay and Nordick do not argue that the choice-of-law clause is invalid. Nor do they dispute that "ICON" as used in the choice-of-law clause includes NordicTrack.

The Parties don't identify what law applies to interpret and apply the choice-of-law clause here, but the answer appears to be Minnesota law. *See Am. Online, Inc. v. Nat'l Health Care Discount, Inc.*, 121 F. Supp. 2d 1255, 1268 (N.D. Iowa 2000) ("A federal court exercising supplemental jurisdiction over state-law claims in a federal-question lawsuit must follow the choice-of-law rules of the forum state." (collecting cases)); *see also Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1164 (9th Cir. 1996) ("The first step in interpreting the [choice-of-law] clause is to apply the correct choice-of-law rules. In a federal question action where the federal court is exercising supplemental

jurisdiction over state claims, the federal court applies the choice-of-law rules of the forum state—in this case, California."); *CPI Card Grp., Inc. v. Dwyer*, 294 F. Supp. 3d 791, 813 (D. Minn. 2018).[10]

Minnesota courts apply ordinary principles of contract interpretation to choice-of-law clauses. *Katch, LLC v. Sweetser*, 143 F. Supp. 3d 854, 866 (D. Minn. 2015); *see White v. Catheter Robotics, Inc.*, Nos. A13-1401, A13-2159, 2014 WL 2921873, at *5–6 (Minn. Ct. App. June 30, 2014); *Perry v. Zurich N. Am., Inc.*, No. A10-608, 2011 WL 68525, at *3 (Minn. Ct. App. Jan. 11, 2011). "Whether a choice-of-law clause governs a non-contractual claim is a context-specific question that depends on both the language of the clause and the nature of the claim asserted." *Syngenta Seeds, LLC v. Warner*, No. 20-cv-1428 (ECT/BRT), 2021 WL 679289, at *8 (D. Minn. Feb. 22, 2021).

Here, in view of the Parties' arguments, the better answer is that the Utah choice-of-law clause applies and precludes Barclay and Nordick from asserting the challenged Minnesota statutory claims. The choice-of-law clause is expansive. Relevant here, it says that Utah law "will apply to all matters relating to the use of the ICON Sites." Am. Brammer Decl. Ex. 7 at 10. The ordinary meaning of the phrase "relating to" is broad. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, (1992) ("The ordinary meaning of these words is a broad one—'to stand in some relation; to have bearing or concern; to

---

[10]     In *Northwest Airlines, Inc. v. Astraea Aviation Services, Inc.*, a diversity case, the Eighth Circuit seems to have applied Minnesota law to determine whether a contractual Minnesota choice-of-law clause required tort claims to be governed by Minnesota law. 111 F.3d 1386, 1392 (8th Cir. 1997). But it is not clear whether the court applied Minnesota law because Minnesota was the forum state or because the clause chose Minnesota law. *See id.*

pertain; refer; to bring into association with or connection with[.]'" (quoting *Black's Law Dictionary* 1158 (5th ed. 1979))).   And there is no question that Barclay and Nordick's misrepresentation-based claims don't just "stand in some relation to" their use of the ICON sites—they *depend* on their "use of" the NordicTrack website.   That is where Barclay and Nordick allege to have reviewed and relied on NordicTrack's representations regarding its treadmills' continuous horsepower ratings.   Third Am. Compl. ¶ 17 (Barclay), ¶ 23 (Nordick).   And these allegations are central to their claims in Counts 7 through 9.   *Id.* ¶¶ 172, 179, 189–90.

Barclay and Nordick's exclusive reliance on the arbitrators' orders of dismissal is not persuasive.[11]   No authority is cited to support the proposition that the arbitrators' orders are binding here.   Neither arbitrator considered the choice-of-law clause.   *See* Notice of Arb. Order, Ex. A (Barclay) [ECF No. 109-1] ("Arb. Order"); Notice of Arb. Order, Ex. A (Nordick) [ECF No. 115 at 4].   Their task was to determine arbitrability.

The arbitrators' dismissals were based on three independent conclusions concerning arbitrability, none of which controls the choice-of-law question here.   The first two of these are clearly distinguishable from the choice-of-law question.   To start, the arbitrators determined that Barclay and Nordick's claims did not "aris[e] from the use of . . . the ICON Sites."   Arb. Order at 5–9.   In reaching this conclusion, the arbitrator observed:

> The operative words here are not merely "arising from" but "dispute arising from the use"—requiring a clear, direct, and active connection between the "dispute" and "use."   Moreover, the similar words "arising out of" have been held to be

---

[11]   Though two arbitrators issued dismissal orders, the arbitrator who issued the second dismissal order "adopt[ed] and incorporate[ed] by reference the reasoning of" the first and issued no separate, explanatory memorandum.   Notice of Arb. Order, Ex. A (Nordick).

> "relatively narrow as arbitration clauses go . . . and 'understood
> to mean originating from, having its origin in, growing out of
> or flowing from,'" *United States ex rel. Welch v. My Left Foot
> Children's Therapy, LLC*, 871 F. 3d 791, 798 (9th Cir. 2017).

*Id.* at 8. The "'relatively narrow'" character of the arbitration clause in this respect contrasts with the breadth of the choice-of-law clause. Second, the arbitrators noted that broader language defining the arbitration clause's reach "logically refers to the Terms of Use, not the ICON sites." *Id.* at 9. Here, by contrast, there is no question the choice-of-law clause's broad phrase "relating to" refers "to the use of the ICON Sites." Am. Brammer Decl. Ex. 7 at 10.

The arbitrators' final ground for determining that Barclay and Nordick's claims were not arbitrable was that the arbitration clause did not apply retroactively. Arb. Order at 9–10. If the arbitration clause isn't retroactive, the argument goes, neither is the Utah choice-of-law clause, leaving Barclay and Nordick free to assert their Minnesota statutory claims. The retroactivity question is somewhat murky. Apart from what's in the arbitrators' order, nothing in the Parties' briefing or the record addresses this issue, and a search of Minnesota law has identified no cases or rules that might control or directly answer the question. Regardless, the better answer is that the choice-of-law clause applies retroactively. The contract's text supports this conclusion more than not. The Terms of Use include a clause addressing modifications that reads, in part: "no revisions to these Terms of Use will apply to any dispute between you and ICON that arose prior to the effective date of those revisions." Am. Brammer Decl. Ex. 7 at 2. But no clause similarly limits the reach of the then-in-effect (and applicable here) Terms of Use. Also, as discussed, the choice-of-law clause specifically is quite broad, reaching "all matters

relating to the use of the ICON sites" without any temporal limitation.  *Id.* at 10.  Cases provide persuasive support for the conclusion that the choice-of-law clause applies retroactively.  In *TradeComet.com LLC v. Google, Inc.*, for example, the Second Circuit determined that a forum-selection clause applied retroactively, observing along the way that "courts have found claims arising from or related to conduct occurring before the effective date of an arbitration clause to be *within* the scope of a clause that 'is not limited to claims arising under the agreement itself.'"  435 Fed. App'x 31, 34 (2d Cir. 2011) (quoting *In re Verisign, Inc. Derivative Litig.*, 531 F. Supp. 2d 1173, 1224 (N.D. Cal. 2007)).  Here, as in *TradeComet.com LLC*, the choice-of-law clause is not limited to claims arising under the Terms of Use.  *See also Warwick v. Schneider Nat'l, Inc.*, No. 20 C 1995, 2020 WL 5891407, at *2–4 (N.D. Ill. Oct. 5, 2020) (applying forum-selection clause retroactively because, among other reasons, clause applied to "any dispute" not subject to arbitration provision and did "not limit coverage temporally, to the agreement, or otherwise").

For all these reasons, then, the Utah choice-of-law clause precludes Barclay and Nordick from asserting the challenged Minnesota statutory claims.  It appears that the usual next step in this situation is to dismiss those claims.  *See, e.g.*, *Nw. Airlines, Inc.*, 111 F. 3d at 1392 n.4; *Buche v. Liventa Bioscience, Inc.*, 112 F. Supp. 3d 883, 888 (D. Minn. 2015). Citing these authorities, Defendants argue that dismissal is appropriate.  Defs.' Mem. in Supp. at 27.  Plaintiffs do not oppose this argument or suggest an alternative course in their brief.  *See* Pls.' Mem. in Opp'n at 18–20.  Therefore, the challenged Minnesota statutory

claims in Counts 7 through 9 of the Third Amended Complaint will be dismissed as to Barclay and Nordick on this basis.

B

Defendants argue that these same Minnesota statutory claims must be dismissed on their merits, now with respect to just Ovsak. Defendants argue that Ovsak has not alleged a false or misleading representation, reliance, or causation, essential elements of each of these claims. Defs.' Mem. in Supp. at 19–22; Defs.' Reply Mem. at 5–8.

In addition to Rule 12(b)(6)'s familiar standards, Defendants' challenge to the factual sufficiency of these claims implicates the particularity-in-pleading requirement of Rule 9(b). *See Nunez v. Best Buy Co.*, 315 F.R.D. 245, 248 (D. Minn. 2016). "To satisfy the particularity requirement of Rule 9(b), the complaint must plead such facts as the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result." *U.S. ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006). "The claim must identify who, what, where, when, and how." *U.S. ex rel. Costner v. United States*, 317 F.3d 883, 888 (8th Cir. 2003). While Rule 9(b) requires particularity in pleading, "a complaint need not be filled with precise detail." *Moua v. Jani-King of Minn., Inc.*, 613 F. Supp. 2d 1103, 1110 (D. Minn. 2009). Rather, "Rule 9(b) is to be read in the context of the general principles of the Federal Rules, the purpose of which is to simplify pleading. Thus, the particularity required by Rule 9(b) is intended to enable the defendant to respond specifically and quickly to the potentially damaging allegations." *Costner*, 317 F.3d at 888. "The level of particularity required

28

depends on the nature of a case," *E-Shops Corp. v. U.S. Bank Nat'l Ass'n*, 678 F.3d 659, 663 (8th Cir. 2012), and to determine whether a party has satisfied Rule 9(b), courts look to "the complexity or simplicity of the transaction or occurrence, the relationship of the parties and the determination of how much circumstantial detail is necessary to give notice to the adverse party and enable him to prepare a responsive pleading," *Payne v. United States*, 247 F.2d 481, 486 (8th Cir. 1957) (citation omitted).

Ovsak alleges facts plausibly showing a false or misleading representation, reliance (assuming it is required),[12] and causation, and he has done so with the particularity required by Rule 9(b). The Third Amended Complaint's allegations showing the false or misleading character of Defendants' continuous-horsepower representations are extensive and particular. *See* Third Am. Compl. ¶¶ 8–11, 20, 31–58. Defendants' argument that Plaintiffs have not alleged a false or misleading statement, Defs.' Mem. in Supp. at 21, mirrors their argument that Plaintiffs failed to allege the breach of an objective warranty, and it is not persuasive for the same reasons discussed in that context. Ovsak alleges specifically that he relied on just such a false or misleading representation in purchasing his NordicTrack treadmill. Third Am. Compl. ¶ 20. Defendants' contention that Plaintiffs

---

[12]    Ovsak's Minnesota statutory consumer-protection claims do not require the level of reliance required for claims of common law fraud under Minnesota law—"only . . . that the defendant engaged in conduct prohibited by the statutes and that the plaintiff was damaged thereby." *Grp. Health Plan, Inc. v. Philip Morris Inc.*, 621 N.W.2d 2, 12–13 (Minn. 2001) (discussing claims under Minn. Stat. § 325F.69, subd. 1, § 325F.67, and § 325D.13); *but see Weigand v. Walser Auto. Grps., Inc.*, 683 N.W.2d 807, 812–13 (Minn. 2004) (explaining that, under *Group Health*, "reliance is [still] a component of the causal nexus requirement for a private consumer fraud class action under Minn. Stat. § 8.31, subd. 3a," but that the "justifiable reliance standard of common law fraud" is "not necessarily require[d]").

"fail to plead that they actually viewed any of the allegedly misleading representations that they cite" is not persuasive. Defs.' Mem. in Supp. at 20–21. Again, as discussed earlier, Plaintiffs have alleged many particular examples of misrepresentations Defendants made online, in store displays, and on the treadmills themselves. *See* Third Am. Compl. ¶¶ 47–58. Plaintiffs do not allege they viewed and relied on all of these examples. No authority is cited suggesting they must.[13] Paired with Ovsak's allegations regarding the particular misrepresentation on which he relied, *id.* ¶¶ 19–20, these allegations are sufficient. Ovsak also alleges causation. In particular, Ovsak alleges that Defendants' continuous-horsepower representations were a "material factor" in his decision to purchase the treadmill and that he "would not have purchased his NordicTrack Commercial 2950 treadmill or would have paid considerably less if he had known the true horsepower capabilities." *Id.* Ovsak alleges that he used the treadmill in his residence (until it "stopped working" for reasons unconnected to Ovsak's claims here) and that he "has not received the CHP that Defendants represented." *Id.* ¶ 21.

## C

Defendants argue that Ovsak's claims under the Minnesota Consumer Fraud Act, False Statement in Advertising Act, and Unlawful Trade Practices Act must be dismissed because he has not alleged a public benefit. A private party asserting claims under these

---

[13] Defendants rely on *Knotts v. Nissan North America, Inc.*, 346 F. Supp. 3d 1310 (D. Minn. 2018), but that case is distinguishable. There, a plaintiff cited a statement from the defendant's website, but did not identify "whether he viewed it, when he viewed it, and whether he viewed it in Minnesota." *Id.* at 1326. The plaintiff did "not allege that he viewed [an] advertisement, much less whether he viewed it prior to purchasing his car, and whether a causal link existed between the two." *Id.* at 1327. We don't have anything like that here.

statutes may do so only through Minnesota's Private Attorney General Statute, Minn. Stat. § 8.31, subds. 1, 3a. *See Johnson v. Bobcat Co.*, 175 F. Supp. 3d 1130, 1141–42 (D. Minn. 2016). Section 8.31 is available "only to those claimants who demonstrate that their cause of action benefits the public." *Ly v. Nystrom*, 615 N.W.2d 302, 314 (Minn. 2000). "[A] single one-on-one transaction in which the fraudulent misrepresentation, while evincing reprehensible conduct, was made only to [the plaintiff]" generally "does not advance state interests and enforcement has no public benefit." *Id.*; *see Davis v. U.S. Bancorp*, 383 F.3d 761, 767–68 (8th Cir. 2004). On the other hand, a public benefit can be shown when a defendant has made false or misleading statements to "the public at large." *Collins v. Minn. Sch. of Bus., Inc.*, 655 N.W.2d 320, 330 (Minn. 2003). In *Collins*, the Minnesota Supreme Court reviewed a state district court's denial of attorneys' fees to plaintiffs who had settled their claims against a private post-secondary school for "false, misleading, and confusing statements about its sports medicine program." *Id.* at 322. The district court denied attorneys' fees on the plaintiffs' false advertising and consumer fraud claims for lack of a public benefit, reasoning that "only a relatively small group of persons were injured." *Id.* at 330. The Minnesota Supreme Court reversed, holding that the district court had "misapplied" its precedent by "focus[ing] on the number of 'persons who were injured'" and "ignoring the fact that [the defendant] misrepresented the nature of its program to the public at large." *Id.* The Court then described different ways the defendant had "presented its program to the public at large," appearing to rest its public-benefit finding on this basis.

*Collins*, binding here, answers whether Ovsak alleges facts plausibly showing a public benefit. He does. The Third Amended Complaint includes many allegations that

Defendants directed false or misleading advertisements to the public at large.  Third Am. Compl. ¶ 3 (alleging that Defendants manufacture, market, and sell treadmills "throughout the country"); *id.* ¶¶ 4, 47–54 (alleging that Defendants have sold and falsely advertised NordicTrack treadmills online through their own websites, through major retailers, and in prominent online marketplaces, like Amazon.com); *id.* ¶¶ 6, 58 (alleging that Defendants made false misrepresentations through "in-store floor model displays across the country" at retailers like Sears, Best Buy, and "most" of 720 Dick's Sporting Goods locations, which span "47 states").  Defendants argue that Ovsak has not alleged a public benefit because he may only recover "monetary damages for past harm" and not prospective relief.  Defs.' Mem. in Supp. at 28–30.  Allegations "that ICON's advertisements are disseminated to the general public," Defendants say, are "insufficient to establish a public benefit."  *Id.* at 30. *Collins* does not support Defendants' argument.  Its focus was on whether the defendant "misrepresented the nature of its program to the public at large."  655 N.W.2d at 330.  The Minnesota Supreme Court did not focus on whether the plaintiff sought only damages or injunctive relief also.  That question seems not to have factored into the decision.

## VI

The final issue is what to do about Count 10 of the Third Amended Complaint, titled "**Negligent Misrepresentation**."  It helps to explain how this problem surfaced. Defendants reasonably understood Plaintiffs to assert a claim in Count 10 for negligent misrepresentation.  That is the Count's title, and it includes allegations that Defendants acted "negligently."  Third Am. Compl. ¶ 202.  On that understanding, Defendants argued in their opening brief that negligent misrepresentation claims are barred by Minnesota's

economic loss doctrine, codified at Minn. Stat. § 604.101, subd. 4.  Defs.' Mem. in Supp. at 31–32; *see Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 370 (Minn. 2009) ("We conclude that under Minn. Stat. § 604.101, subd. 4, a buyer of goods is barred from bringing a common-law negligent misrepresentation claim against the seller that relates to the goods sold.").  In their response brief, Plaintiffs conceded that point but argued that what they really assert in Count 10 is a fraud claim.  Pls.' Mem. in Opp'n at 27–29.  A fraud claim would solve the economic loss problem because Minnesota's economic loss statute excepts common law misrepresentation claims relating to goods sold if "the misrepresentation was made intentionally or recklessly."  Minn. Stat. § 604.101, subd. 4. Plaintiffs seek leave to amend Count 10 to "remove references to negligence."  Pls.' Mem. in Opp'n at 29 n.13.  Defendants oppose this request as "procedurally and substantively improper" and contend that Plaintiffs "do not identify any *facts* that could support an intentional (or even reckless) misrepresentation claim."  Defs.' Reply Mem. at 15–16.

The better answer is to grant Plaintiffs leave to amend in this respect.  Federal Rule of Civil Procedure 8(a)(2) requires that pleadings contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Notice pleading serves "to give the opposing party fair notice of the nature and basis or grounds for a claim, and a general indication of the type of litigation involved."  *N. States Power Co. v. Fed. Transit Admin.*, 358 F.3d 1050, 1056–57 (8th Cir. 2004) (citation omitted).  "[T]he pleading requirements under the Federal Rules are relatively permissive, [although] they do not entitle parties to manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment."  *Id.* at 1057.

The Third Amended Complaint includes allegations plausibly showing the elements of a fraud claim under Minnesota law. Plaintiffs allege that Defendants provided false and misleading information and "knew or should have known that the[] CHP representations were false . . . or made them without knowledge of their truth or falsity." Third Am. Compl. ¶¶ 200–01. Plaintiffs also allege to have "reasonably and justifiably relied" on the misrepresentations, which they say "were intended to induce and actually induced" them to "purchase or pay a premium price" for their treadmills. *Id.* ¶ 203.[14]

As pleaded, however, Count 10 is internally inconsistent. Though Plaintiffs include allegations tracking the elements of a fraud claim under Minnesota law, *Valspar Refinish, Inc.*, 764 N.W.2d at 368, they also allege "Defendants negligently misrepresented and/or, at a minimum, negligently omitted material facts concerning the Treadmill power representations," Third Am. Compl. ¶ 202, leaving the impression that the claim is negligence-based. Granting leave to amend in this respect will not prejudice Defendants. Plaintiffs have not waited to assert a new legal theory until "the eve of summary judgment," *N. States Power Co.*, 358 F.3d at 1057, or after the close of discovery, *Howard v. Weidemann*, No. 20-cv-1004 (ECT/LIB), 2021 WL 6063630, at *6–7 (D. Minn. Dec. 22, 2021).

---

[14] Defendants point out that it is somewhat unclear whether Plaintiffs intend to assert a fraudulent omission claim but argue that, if they do, that claim should be dismissed. Defs.' Mem. in Supp. at 22 n.10. Plaintiffs have not alleged "special circumstances that trigger a duty to disclose" and are therefore not understood to assert a claim for fraudulent omission. *Graphic Commc'ns Loc. 1B Health & Welfare Fund A v. CVS Caremark Corp.*, 850 N.W.2d 682, 696 (Minn. 2014).

## ORDER

Therefore, based on all the files, records, and proceedings in the above-captioned matter, **IT IS ORDERED THAT**:

1.    Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint [ECF No. 116] is **GRANTED IN PART** and **DENIED IN PART** as follows:

   a.    Plaintiffs' claims under the Minnesota Deceptive Trade Practices Act (Count 6) are **DISMISSED without prejudice** for lack of subject-matter jurisdiction.

   b.    Plaintiffs' claims for breach of written warranty under the Magnuson-Moss Warranty Act (Count 2) are **DISMISSED with prejudice and on the merits**.

   c.    Plaintiffs' remaining breach-of-warranty claims (Counts 1, 3, 4, and 5) are **DISMISSED without prejudice**.  Plaintiffs are granted leave to amend their Third Amended Complaint to address their failure to allege facts plausibly showing adequate pre-suit notice.  Any amended complaint shall be filed on or before **March 11, 2022**.  If no amended complaint is filed by that deadline addressing this issue, then Counts 1, 3, 4, and 5 will be deemed dismissed with prejudice and on the merits.

   d.    Plaintiffs Teeda Barclay and Nicole Nordick's claims under the Minnesota Consumer Fraud Act (Count 7), the Minnesota False Statement in Advertising Act (Count 8), and the Minnesota Unlawful

Trade Practices Act (Count 9) are **DISMISSED with prejudice and on the merits**.

e.    Defendants' motion is in all other respects **DENIED**.

f.    Plaintiffs are granted leave to amend their Third Amended Complaint to clarify that Count 10 asserts a fraud claim.  Any amended complaint addressing this issue shall be filed on or before **March 11, 2022**.

2.    The Clerk of Court is directed to amend the case caption by changing the name of Defendant Icon Health & Fitness, Inc. to the following: **iFit Health & Fitness Inc., *f/k/a Icon Health & Fitness, Inc.***

Dated: February 17, 2022                    s/ Eric C. Tostrud
                                            Eric C. Tostrud
                                            United States District Court