UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Teeda Barclay, Jay Ovsak, and Nicole Nordick, *individually*, *and on behalf of others similarly situated*,

        Plaintiffs,

v.

iFIT Health & Fitness, Inc. *f/k/a* Icon Health & Fitness, Inc., and NordicTrack, Inc.,

        Defendants.

File No. 19-cv-2970 (ECT/DJF)

**OPINION AND ORDER**

---

Christopher P. Renz, Karl L. Cambronne, Bryan L. Bleichner, Jeffrey D. Bores, Chestnut Cambronne PA, Minneapolis, MN; Nathan D. Prosser, Hellmuth & Johnson, PLLC, Edina, MN; Wilbert B. Markovits, Terence Coates, Justin C. Walker, Dylan J. Gould, Markovits, Stock & DeMarco, LLC, Cincinnati, OH, for Plaintiffs Teeda Barclay, Jay Ovsak, and Nicole Nordick.

Amanda M. Cialkowski, Courtney E. Ward-Reichard, Cortney G. Sylvester, Nilan Johnson Lewis, PA, Minneapolis, MN; Andrew Collins, Austin James Riter, Bryan Johansen, Kade N. Olsen, Terry Eugene Welch, Parr Brown Gee & Loveless, Salt Lake City, UT, for Defendants iFit Health & Fitness, Inc. and NordicTrack, Inc.

---

        Plaintiffs allege that the NordicTrack treadmills each of them purchased cannot achieve or maintain the continuous horsepower Defendants represented the treadmills were capable of. After several years of hard-fought litigation, the parties reached a settlement. The settlement was preliminarily approved in September 2024. Plaintiffs now move for final approval along with attorneys' fees, expenses, and service awards. The motions will be granted. In this case's unique circumstances, Plaintiffs have shown that certification is

appropriate, that the settlement agreement is fair, reasonable, and adequate, and that the requested fee and service awards are reasonable.

I

In this action, originally filed in November 2019, Plaintiffs Teeda Barclay, Jay Ovsak, and Nicole Nordick allege that NordicTrack and its parent company, iFit Health,[1] made misleading representations about their treadmills' continuous horsepower ("CHP"). Fourth Am. Compl. [ECF No. 145] ¶¶ 1–3. CHP is "a measurement of the motor's ability to maintain and continuously produce power over an extended period of time without exceeding the current rating of the motor." *Id.* ¶ 38. Defendants stated on their packaging, websites, and point-of-sale materials that the treadmills "operate at a continuous horsepower of between 2.6 CHP and 4.25 CHP, depending on the specific treadmill model." *Id.* ¶¶ 7, 90. Because of their high CHP, the treadmills could "hold up to heavy or frequent use with ease" and "power your toughest, fastest workouts," according to Defendants' advertising. *Id.* ¶¶ 49, 56. Defendants claimed the power and durability of the motors made them good for "running, jogging, and walking in the comfort of your home." *Id.* ¶ 54. According to Plaintiffs, these representations were false or misleading: The treadmills could not operate with that much horsepower "when drawing electrical power from the standard 120-volt, 15-amp outlet found in residential homes in the United States for which the Treadmills are designed." *Id.* ¶ 9; *see id.* ¶ 31 ("Most electrical outlets

---

[1]    iFit Health was then known as ICON Health & Fitness, Inc. Compl. [ECF No. 1] ¶ 1; ECF No. 132 at 1. iFit Health owns and manages NordicTrack. Fourth Am. Compl. [ECF No. 145] ¶¶ 25–26.

in American homes are equipped with the standard 15-amps, with two slots and a U-shaped grounding third hole and have an accompanying 120-volt circuit.").  Plaintiffs claimed they reviewed these statements and relied on them when purchasing NordicTrack treadmills, and Plaintiffs "would not have purchased . . . or would have paid considerably less" had they known that the treadmills could not operate at the high CHP levels advertised when plugged into a standard outlet.  *Id.* ¶¶ 17, 20, 23.

Plaintiffs brought this case, and over the next few years, the parties engaged in extensive arbitration, litigation, and mediation.  After Plaintiffs filed their Second Amended Complaint, ECF No. 22, Defendants moved to dismiss, *see* ECF No. 23, and to compel arbitration, *see* ECF No. 28.  Those motions were granted in part and denied in part; relevant here, the damages claims survived, and Plaintiffs Teeda Barclay and Nicole Nordick were required to submit their claims to arbitration.  ECF No. 53 at 39–40.  The arbitrators determined that Ms. Barclay and Ms. Nordick's claims were outside the scope of the arbitration agreement.  *See* ECF No. 109-1 (Barclay arbitration order); ECF No. 115 (Nordick arbitration order).  Plaintiffs filed their Third Amended Complaint.  ECF No. 80.  After another motion to dismiss was granted in part, Plaintiffs filed the operative Fourth Amended Complaint.  *See* ECF Nos. 116, 133, Fourth Am. Compl.  The Fourth Amended Complaint asserts a breach-of-express-warranty claim on behalf of a nationwide class.[2]

---

[2]    The Fourth Amended Complaint alleges nine other claims that Plaintiffs wish to preserve, depending on where the case goes from here.  These are: Breach of Express Warranty under the Magnuson-Moss Warranty Act (Count 2) and under Minnesota Statutes § 336.2-313 (Count 3); Breach of Implied Warranty (Count 4); Breach of Warranty under the Magnuson-Moss Warranty Act (Count 5); Violation of Minnesota Uniform Deceptive

Fourth Am. Compl. ¶¶ 88–99.  In July 2022, the parties began extensive discovery.  *See*

ECF No. 146 (scheduling order).  During that period, they unsuccessfully attempted

mediation before United States Magistrate Judge Morton Denlow (ret.), a JAMS Mediator.

ECF No. 256 ¶ 3; ECF No. 256-1 ¶ 5.  In December 2023, Plaintiffs moved to certify a

multistate express-warranty class and a Minnesota class.  ECF No. 195.  Defendants

opposed class certification, *see* ECF No. 212, and moved for summary judgment, *see* ECF

No. 216.  However, in May 2024, before those motions were fully briefed, the parties again

mediated before Judge Denlow and reached a settlement in principle.  ECF No. 251; ECF

No. 256 ¶ 4.

In July 2024, the parties executed a class settlement agreement.  *See* ECF No. 256

¶ 4.  The proposed settlement class is

> all persons in the United States and its territories who
> purchased as an original purchaser a NordicTrack treadmill or
> a ProForm treadmill, from November 22, 2015, through
> January 15, 2020, primarily for personal, family, or household
> purposes, and not for resale.  Excluded from the Class are:
> Defendants and their officers, directors and lawyers; Proposed
> Class Counsel and their partners, associates, and lawyers; and
> judicial officers and their immediate family members and
> associated Court staff assigned to this case.

ECF No. 256-1 ¶ 23.  This class definition is geographically broader than the one proposed

in December 2023—it would encompass a nationwide class rather than a six-state class.

---

Trade Practices Act (Count 6); Violation of Minnesota Prevention of Consumer Fraud Act
(Count 7); Violation of Minnesota False Statement in Advertising Act (Count 8);
Violations of Minnesota Unlawful Trade Practices Act (Count 9); and Fraud (Count 10).
Fourth Am. Compl. ¶¶ 100–206.  Count 2 is brought on behalf of the nationwide class; the
remaining causes of action are brought on behalf of the Minnesota subclass.  *Id.*

*See* ECF No. 292 at 6 n.3.[3]  The proposed class is estimated to contain about 1.54 million members.  *See* ECF No. 289 ¶ 5.  Under the settlement agreement, class members who timely file valid claims are eligible for the following benefits:

a.  A choice of the following two products: (i) a treadmill maintenance kit (retail value $30), or (ii) a treadmill mat (retail value $69).

b.  As an alternative (not in addition) to the [two product options described above], Class Members may choose one of the following as applicable to each Class Member individually:

(i)  Three full months of iFIT's highest tier of membership subscription for new subscribers (retail $39/month); or

(ii)  Two full months of iFIT's highest tier of membership subscription for current subscribers (retail $39/month); or

(iii)  Four full months of iFIT's Train membership subscription for class members who are current subscribers owning treadmills that do not include an integrated tablet/controller ($15/month); or

(iv)  Five full months of iFIT's Train membership subscription for class members who are new subscribers owning treadmills that do not include an integrated tablet/controller ($15/month).

ECF No. 256-1 ¶ 80. Further, Defendants agree to place a prominent disclaimer about their treadmills' CHP on their website, marketing, manual, and product packaging, and Defendants further agree to ask their retailers to feature the disclaimer in connection with their treadmill advertising.  *Id.* ¶ 82(a)–(b).  "Defendants do not admit any wrongdoing, fault, liability, or damage to Plaintiffs or Class Members."  *Id.* ¶ 11. Class Members agree to release all claims "that have been or could have been asserted in the Lawsuit" against

---

[3]    Citations are to pagination assigned by CM/ECF appearing in a document's upper right corner, not to a document's original pagination.

Defendants." *Id.* ¶ 114.  The settlement agreement included a detailed notice plan.  *See id.* ¶¶ 41, 83–95.

On September 17, 2024, the class-action settlement and notice plan were preliminarily approved following a hearing.  ECF No. 263.  The preliminary approval order: (a) conditionally certified this matter as a class action, including defining the class, *id.* ¶ 1; (b) appointed Teeda Barclay, Jay Ovsak, and Nicole Nordick as settlement class representatives, *id.* ¶ 3; (c) appointed as class counsel Karl Cambronne, Bryan Bleichner, and Christopher Renz of Chestnut Cambronne PA; Nathan Prosser of Hellmuth & Johnson, PLLC; and Wilbert Markovits, Terence Coates, Justin Walker, and Dylan Gould of Markovits, Stock & DeMarco, LLC, *id.* ¶ 4; (d) approved the form and manner of notice to the settlement class, *id.* ¶ 11; (e) set deadlines for opt-outs and objections, *id.* ¶ 26; (f) approved and appointed the settlement administrator, *id.* ¶ 9; and (g) set the date for the final fairness hearing, *id.* ¶ 6.

Between March 12 and 14, 2025, pursuant to the notice requirements set forth in the settlement agreement, the September 17 preliminary approval order, and the orders amending deadlines, *see* ECF No. 271, 274, the conditionally certified class was notified by email of the terms of the proposed settlement agreement, of the right of settlement class members to opt out, and the right of settlement class members to object to the settlement agreement and to be heard at the final fairness hearing.  ECF No. 289 ¶ 6; ECF No. 288 ¶¶ 5–6.  In the month following, settlement notice was also sent by mail to class members whose records included mailing addresses and whose email addresses were invalid, incomplete, or otherwise failed receive the first notice.  ECF No. 289 ¶ 7.  In April 2025,

the administrator also published settlement advertisements on Facebook. *Id.* ¶ 10. On May 13, 2025, the administrator sent a reminder email to class members with valid email addresses who had not yet submitted claim forms. *Id.* ¶ 11. Between the notice date and the final fairness hearing, three provisional class members filed objections, none of whom appeared at the hearing. *See* ECF No. 276, 278, 287.

The final fairness hearing was held on August 25, 2025, to determine, among other matters: (1) whether the conditionally certified settlement class should be certified; (2) whether the terms of the settlement agreement are fair, reasonable, and adequate for the release of the claims contemplated by the settlement agreement; (3) whether the requested attorneys' fees and class-representative payment are reasonable; and (4) whether judgment should be entered dismissing this action with prejudice.

> The threshold issue is whether the settlement class satisfies the requirements of Federal Rule of Civil Procedure 23(a) and at least one prong of Rule 23(b). Upon determining that the class satisfies Rule 23, the Court will then analyze the Settlement itself, as well as any relevant objections. Finally, the Court will address the award of payments to class representatives and attorneys' fees.

*In re Uponor, Inc., F1807 Plumbing Fittings Prod. Liab. Litig.*, No. 11-md-2247 (ADM/JJK), 2012 WL 2512750, at *3 (D. Minn. June 29, 2012), *aff'd*, 716 F.3d 1057 (8th Cir. 2013).

## II

As our Eighth Circuit Court of Appeals has explained:

> A district court may not certify a class until it "is satisfied, after a rigorous analysis," that Rule 23(a)'s certification prerequisites are met. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S.

338, 351 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)) (internal quotation marks omitted). Consistent with the Supreme Court's premise that "actual, not presumed, conformance with Rule 23(a) remains . . . indispensable," *Falcon*, 457 U.S. at 160, after initial certification, the duty remains with the district court to assure that the class continues to be certifiable throughout the litigation, *Petrovic* [*v. Amoco Oil Co.*], 200 F.3d [1140,] 1145 [(8th Cir. 1999)]. *See also Barney v. Holzer Clinic, Ltd.*, 110 F.3d 1207, 1214 (6th Cir. 1997) ("The district court's duty to assay whether the named plaintiffs are adequately representing the broader class does not end with the initial certification . . . .").

. . .

Though the Supreme Court has not articulated what, specifically, a "rigorous analysis" of class certification prerequisites entails, at a minimum the rule requires a district court to state its reasons for certification in terms specific enough for meaningful appellate review. "[S]omething more than mere repetition of [Rule 23(a)'s] language [is required]; there must be an adequate statement of the basic facts to indicate that each requirement of the rule is fulfilled." *Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*, 654 F.3d 618, 629 (6th Cir. 2011) (internal quotation marks omitted) (alteration omitted); *accord Vizena v. Union Pac. R.R. Co.*, 360 F.3d 496, 503 (5th Cir. 2004) (per curiam) ("[W]hen certifying a class a district court must detail with sufficient specificity how the plaintiff has met the requirements of Rule 23.").

*In re Target Corp. Customer Data Sec. Breach Litig.*, 847 F.3d 608, 612 (8th Cir. 2017).

The plaintiff bears the burden to show that the Rule 23 requirements are met. *Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 477 (8th Cir. 2016) (citing *Luiken v. Domino's Pizza, LLC*, 705 F.3d 370, 372 (8th Cir. 2013)). Rigorous application of Rule 23 "includes that a class must be adequately defined and clearly ascertainable." *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 996 (8th Cir. 2016) (quotation omitted).

The Rule 23(a) and (b) requirements remain mandatory in the settlement context. *See Kruger v. Lely N. Am., Inc.*, No. 20-cv-629 (KMM/DTS), 2023 WL 5665215, at *2 (D. Minn. Sep. 1, 2023) ("To certify a Settlement Class for the purpose of settlement the Court must conclude that the four prerequisites of Rule 23(a) and at least one of the provisions of Rule 23(b) are satisfied." (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013))); *see also In re Pork Antitrust Litig.*, No. 18-cv-1776 (JRT/JFD), 2022 WL 4238416, at *3 (D. Minn. Sep. 14, 2022) ("Before granting final approval to a class settlement, the Court must ensure that the class proposed by the settlement meets the Rule 23 requirements to proceed as a class."). However, while "[s]ettlement is relevant to a class certification," a district court analyzes a proposed settlement class in essentially the same way it analyzes a proposed class heading to trial, except that it "need not inquire whether the case, if tried, would present intractable management problems." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 619–20 (1997) (citing Fed. R. Civ. P. 23(b)(3)(D)); *see* Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil* § 1797.2 (3d ed. & Apr. 2025 update) (explaining that *Amchem Products* resolved the application of Rule 23(a) and (b)(3) to settlement classes).

(1) *Numerosity.* A class cannot be certified unless it "is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "No specific rules govern the required size of a class, and what constitutes impracticability depends upon the facts of each case." *Portz v. St. Cloud State Univ.*, 297 F. Supp. 3d 929, 944 (D. Minn. 2018) (citation modified); *see Paxton v. Union Nat'l Bank*, 688 F.2d 552, 559 (8th Cir. 1982) ("No arbitrary rules regarding the necessary size of classes have been established."). "The

most obvious factor, of course, is the number of potential class members," and "[o]ther relevant factors include the nature of the action, the size of individual claims, the inconvenience of trying individual suits, and any other factor that sheds light on the practicability of joining all putative class members." *Alberts v. Nash Finch Co.*, 245 F.R.D. 399, 409 (D. Minn. 2007) (citing *Paxton*, 688 F.2d at 559–60); *see Portz*, 297 F. Supp. 3d at 944 ("Practicality of joinder depends on such factors as the size of the class, the ease of identifying its members and determining their addresses, the facility of making service on them if joined, their geographic dispersion and whether the size of the individual claims is so small as to inhibit individuals from separately pursuing their own claims." (quoting *Glenn v. Daddy Rocks, Inc.*, 203 F.R.D. 425, 429 (D. Minn. 2001))). Courts in the Eighth Circuit have routinely found classes smaller than this one meet the numerosity requirement of Rule 23(a)(1). *See, e.g.*, *Murphy v. Piper*, No. 16-cv-2623 (DWF/BRT), 2017 WL 4355970, at *3–5 (D. Minn. Sep. 29, 2017).

Here, the settlement administrator determined the class contains 1,549,791 members. ECF No. 289 ¶ 5. About 2.49% of class members filed claims—around 38,000. *Id.* ¶ 22. The class easily satisfies the numerosity requirement of Rule 23(a)(1).

(2) *Commonality.* The second prerequisite for class certification is that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Commonality requires a showing that class members 'have suffered the same injury.'" *Powers v. Credit Mgmt. Servs., Inc.*, 776 F.3d 567, 571 (8th Cir. 2015) (quoting *Falcon*, 457 U.S. at 157). To satisfy commonality, the class members' "claims must depend upon a common contention" that is "capable of classwide resolution—which means that determination of

10

its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. "Even a single common question will do." *Id.* at 359 (citation modified). "Commonality is subsumed within the predominance requirement" of Rule 23(b)(3), "which requires [a court] to ask 'whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Cody v. City of St. Louis ex rel. Medium Sec. Inst.*, 103 F.4th 523, 530 (8th Cir. 2024) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)).

Plaintiffs have shown several common questions of fact or law: whether Defendants made false or misleading representations about their treadmills' CHP, whether those representations were material, and whether the class members paid more for the treadmills because of the representations. ECF No. 255 at 22–23. And Plaintiffs are correct that class members have suffered the same injury. *See* ECF No. 292 at 12; *Powers*, 776 F.3d at 571. Rule 23(a)(2) is met.

(3) *Typicality.* Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." The Rule "requires a demonstration that there are other members of the class who have the same or similar grievances as the plaintiff." *Paxton*, 688 F.2d at 562 (quoting *Donaldson v. Pillsbury Co.*, 554 F.2d 825, 830 (8th Cir. 1977)). Typicality is "fairly easily met so long as other class members have claims similar to the named plaintiff." *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995). "Factual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of

11

conduct as the class claims, and gives rise to the same legal or remedial theory." *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996).

Here, typicality is met. Class representatives Ms. Barclay, Mr. Ovsak, and Ms. Nordick bring in essence the same claims as the rest of the class. They allege that they each purchased a NordicTrack treadmill "for its ordinary intended use within [their] home[s] and [have] not receive the CHP that NordicTrack represented." Fourth Am. Compl. ¶¶ 16, 19, 22. Class members did the same. *See* ECF No. 256-1 ¶ 23.

(4) *Adequacy.* A class representative must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The party moving for certification bears the burden to prove that [they] will adequately represent the class," and "[t]he district court must decide whether Rule 23(a)(4) is satisfied through balancing the convenience of maintaining a class action and the need to guarantee adequate representation to the class members." *Rattray v. Woodbury County*, 614 F.3d 831, 835 (8th Cir. 2010) (citation modified). To demonstrate adequacy of representation, a plaintiff must show that "(1) the representative and its attorneys are able and willing to prosecute the action competently and vigorously; and (2) the representative's interests are sufficiently similar to those of the class that it is unlikely that their goals and viewpoints will diverge." *City of Farmington Hills Emps. Ret. Sys. v. Wells Fargo Bank, N.A.*, 281 F.R.D. 347, 353 (D. Minn. 2012). "This inquiry requires the Court to evaluate the adequacy of both the proposed class representatives and the proposed class counsel." *Taqueria El Primo LLC v. Ill. Farmers Ins. Co.*, 577 F. Supp. 3d 970, 993 (D. Minn. 2021).

12

Plaintiffs have shown adequacy of representation.  Their prosecution of this case has been vigorous.  Ms. Barclay has been a named plaintiff from the start.  Compl. ¶¶ 16–18.  Ms. Nordick joined on the Second Amended Complaint, filed in March 2020.  Second Am. Compl. [ECF No. 22] ¶¶ 22–24.  Mr. Ovsak joined in March 2021 on the Third Amended Complaint, replacing his wife as a named plaintiff.  *See* Third Am. Compl. [ECF No. 80] ¶¶ 19–21; ECF No. 84 at 10.  All have had their depositions taken, twice for Mr. Ovsak.  ECF No. 256 ¶ 9.  There is no information in the record suggesting Plaintiffs' interests diverge from those of other class members.  Class counsel's representation has been adequate as well.  The attorneys are experienced class action litigators and have competently and vigorously prosecuted this action through protracted litigation.  *See* ECF No. 282 ¶¶ 2–16; ECF No. 283 ¶¶ 3–9; ECF No. 284 ¶¶ 3–8.  Class counsel are experienced in class action litigation generally and horsepower-representation cases in particular.  *See* ECF No. 282 ¶ 4 (noting attorney W.B. Markovits was lead counsel in three other treadmill horsepower class actions, *Prince*, *Walker*, and *Bechtel*); ECF No. 283 ¶ 8 (noting attorney Christopher P. Renz served as class counsel in seventeen cases); ECF No. 284 ¶¶ 6–7 (noting attorney Nathan D. Prosser has litigated class action suits for two decades, including *Walker* and *Bechtel*).  Having had a firsthand view of this litigation from start to finish, I can confirm that counsel have been diligent and proficient.

(5) *Predominance and superiority.*  Plaintiffs attempt to certify a Rule 23(b)(3) class, which requires that "the court find[] that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the

controversy." Fed. R. Civ. P. 23(b)(3). The "pertinent" matters include, but are not limited to:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

*Id.*; *see Amchem Prods.*, 521 U.S. at 615 (calling these factors "nonexhaustive"). As noted above, courts should not consider the last factor—manageability—when deciding whether to certify a settlement class. *See Amchem Prods.*, 521 U.S. at 620. The Supreme Court has warned, however, that "other specifications of the Rule—those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context." *Id.*

The predominance inquiry "necessarily requires an examination of the underlying elements necessary to establish liability for plaintiffs' claims." *Blades v. Monsanto Co.*, 400 F.3d 562, 569 (8th Cir. 2005) (citing *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 172 (3d Cir. 2001)). The Supreme Court has explained, however, that Rule 23(b)(3) "does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." *Amgen Inc. v. Conn. Retirement Plans & Tr. Funds*, 568 U.S. 455, 469 (2013) (citation modified). The question is whether common issues predominate—in other words, "whether proposed classes are sufficiently

cohesive to warrant adjudication by representation." *Amchem Prods.*, 521 U.S. at 623. Consumer fraud cases "readily" meet that requirement. *Id.* at 625.

When plaintiffs attempt to certify a nationwide class under state-law claims, the district court must determine which law applies (or which laws apply) to the putative class's claims. *See Hale v. Emerson Elec. Co.*, 942 F.3d 401, 404 (8th Cir. 2019). "[F]or a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that the choice of its law is neither arbitrary nor fundamentally unfair." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 818 (1985) (quoting *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312–13 (1981)). In their earlier class certification motion, Plaintiffs argued that "[f]or the proposed Multistate Express Warranty Class, the law would either be the express warranty law of a class member's home state or the forum state [Minnesota] or Utah." ECF No. 197 at 22.

"According to long-settled precedent, a federal court sitting in diversity borrows the forum State's choice-of-law rule." *C.H. Robinson Worldwide, Inc. v. Traffic Tech, Inc.*, 60 F.4th 1144, 1148 (8th Cir. 2023) (quoting *Cassirer v. Thyssen-Bornemisza Collection Found.*, 596 U.S. 107, 115 (2022)). Minnesota answers choice-of-law questions in three steps. "[T]he first consideration is whether the choice of one state's law over another's creates an actual conflict." *Jepson v. Gen. Cas. Co. of Wis.*, 513 N.W.2d 467, 469 (Minn. 1994) (citation omitted). If a conflict exists, the next question is "whether the law of both states can be constitutionally applied"—*i.e.*, whether each state has "a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is

neither arbitrary nor fundamentally unfair." *Id.* at 469–70 (quoting *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 313 (1981)).  If the answer to both threshold questions is "yes," then the court applies five "choice influencing factors" to determine which state's law should apply: "(1) predictability of result; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interest; and (5) application of the better rule of law." *Id.* at 470 (citing *Milkovich v. Saari*, 203 N.W.2d 408, 412 (Minn. 1973)).  If the answer is no, then application of extraterritorial law is not constitutionally permissible.  *See Johannessohn v. Polaris Indus., Inc.*, 450 F. Supp. 3d 931, 962–63 (D. Minn. 2020) (concluding that, though company was headquartered in Minnesota, it was unfair to apply Minnesota statute to commercial transactions in other states because there were insufficient contacts to create a state interest).

Here, the laws of the fifty states are in conflict.  For example, take the six states proposed in the earlier motion to certify a multistate class: California, Minnesota, New Jersey, Ohio, Utah, and Virginia.[4]  *See* ECF No. 195 at 1.  At that time, Plaintiffs argued that "for express warranty it does not matter [which law applies] because the laws of each of the proposed states does [sic] not materially differ." ECF No. 197 at 22.  That's because,

---

[4]    Each of these states has adopted the Uniform Commercial Code definition of express warranty.  *See* Cal. Com. Code § 2313; Minn. Stat. § 336.2-313; N.J. Stat. Ann. § 12A:2-313; Ohio Rev. Code Ann. § 1302.26; Utah Code Ann. § 70A-2-313; Va. Code Ann. § 8.2-313.  The differences lie in the states' framing of the claims' elements.  *Cf. Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1016 (D.C. Cir. 1986) (Edwards & Ginsburg, JJ.) ("The Uniform Commercial Code is not uniform." (quotation omitted)).

they claimed, "none of the proposed states require reliance, none require privity (except California with respect to indirect purchasers), and all have a four-year statute of limitation." *Id.* at 22 n.21. This is imprecise. All the state statutes require a representation that is part of the basis of the bargain, and California requires a heightened showing that the plaintiff relied on the representation. *See, e.g.*, *Minkler v. Apple, Inc.*, 65 F. Supp. 3d 810, 817 (N.D. Cal. 2014) (noting that, under California law, "a plaintiff must allege (1) the exact terms of the warranty; (2) reasonable reliance thereon; and (3) a breach of warranty which proximately caused plaintiff's injury") (citing *Williams v. Beechnut Nutrition Corp.*, 229 Cal. Rptr. 605, 608 (Cal. Ct. App. 1986)). Some courts are skeptical there is much difference between "reliance" and "basis of the bargain," *see Hendricks v. Callahan,* 972 F.2d 190, 193–94 (8th Cir. 1992) (applying Minnesota law), and other states reject a reliance requirement outright, *see CBS Inc. v. Ziff-Davis Publ'g Co.*, 553 N.E.2d 997, 1000–01 (N.Y. 1990) (applying New York law). Further, some states require causation to prove breach, *see Cleveland v. Whirlpool Corp.*, 550 F. Supp. 3d 660, 668–69 (D. Minn. 2021) (applying Minnesota law), while others do not, *see Kruglyak v. Home Depot U.S.A., Inc.*, 750 F. Supp. 3d 644, 661 (W.D. Va. 2024) (applying Virginia law). Some states require that the plaintiff could have reasonably been expected to use the product. *Glob. Recycling, SA v. Montclair Tech., LLC*, No. 2:16-CV-1038, 2017 WL 6512238, at *6 (D. Utah Dec. 19, 2017) (applying Utah law). And some states require the buyer to afford the seller an opportunity to cure any defects. *Grover v. BMW of N. Am., LLC*, 581 F. Supp. 3d 930, 936 (N.D. Ohio 2022) (applying Ohio law).

In step two of the Minnesota choice-of-law analysis, the record suggests there is no single state whose laws can be constitutionally applied to the nationwide class. The Fourth Amended Complaint alleged that Defendants sold the treadmills online through their own website and Amazon.com, and through brick-and-mortar stores like Sears and Dick's. Fourth Am. Compl. ¶ 6. Dick's has locations in forty-seven states. *Id.* The only reasonable inference is that the 1.54 million purchasers were spread throughout the country and made their transactions in many states. There is nothing to suggest that Minnesota or any other state has significant contacts or aggregation of contacts such that applying that law to all those transactions would be nonarbitrary or fair. *See Shutts*, 472 U.S. at 815, 823 (holding that the Due Process Clause did not permit applying Kansas law class-wide where "over 99% of the gas leases and some 97% of the plaintiffs in this case had no apparent connection to the State of Kansas except for this lawsuit"). So, the law of each class member's home state applies to their claims. *See Hale*, 942 F.3d at 404.

These variations matter less to the predominance inquiry in a class settlement context. The Third Circuit's *Sullivan* case is the most comprehensive and reasoned opinion holding that "variations [in state laws] are irrelevant to certification of a settlement class." *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 303 (3d Cir. 2011) (en banc) (quoting *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 529 (3d Cir. 2004)). *Sullivan* explained that the overwhelming concern with state-law variation was manageability, such as "instructing a jury on varied state laws." *Id.* at 304. The Seventh and Ninth Circuits reached the same conclusion with less discussion. *See In re Mex. Money Transfer Litig.*, 267 F.3d 743, 747 (7th Cir. 2001) (Easterbrook, J.) ("Given the [class] settlement, no one

need draw fine lines among state-law theories of relief."); *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 563 (9th Cir. 2019) (en banc) (affirming certification of a settlement class "where the class claims turn on the [defendants'] common course of conduct," so "idiosyncratic differences between state consumer protection laws" did not defeat predominance (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022–23 (9th Cir. 1998), *overruled on other grounds by*, *Wal-Mart*, 564 U.S. 338)). The Seventh Circuit also noted that the plaintiffs "confined their theories to federal law plus aspects of state law that are uniform," *In re Mex. Money Transfer Litig.*, 267 F.3d at 747, and the Ninth Circuit explained that "no objector established that the law of any other states applied," *In re Hyundai*, 926 F.3d at 563–64.

The Eighth Circuit has adopted this rule as well, at least with respect to state-law variation in damages. *See Rawa v. Monsanto Co.*, 934 F.3d 862, 869 (8th Cir. 2019) ("A nationwide settlement need not account for differences in state laws." (citing *Keil v. Lopez*, 862 F.3d 685, 700 (8th Cir. 2017)). In *Rawa*, the district court consolidated a Missouri class and California class (that pleaded California claims) and certified a nationwide class under Missouri and federal law—the Magnuson-Moss Warranty Act, or "MMWA." *Rawa v. Monsanto Co.*, No. 4:17CV01252 AGF, 2018 WL 2389040, at *1–2 (E.D. Mo. May 25, 2018). On appeal, an objector from the California argued that he could have received punitive damages under California law, but not under federal or Missouri law, so consolidation of a nationwide class in Missouri "diluted California class members' claims." *Rawa*, 934 F.3d at 869. The Eighth Circuit rejected this argument, reasoning that he had been made whole by compensatory damages, and the district court was not required to

account for differences in state laws. *Id.* Similarly, in *Keil*, the Eighth Circuit affirmed a multistate class settlement in which some state laws provided for treble damages and other state laws did not, and held the district court was within its discretion not to take those differences into account. 862 F.3d at 699–700. That case also involved federal claims common to the entire class, and the "state-law claims were only a fraction of the overall case." *See id.* at 700. Same for the other case plaintiffs cite, *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, No. MDL 1559 4:03-MD-015, 2004 WL 3671053, at *15 (W.D. Mo. Apr. 20, 2004). The district court certified a nationwide class seeking relief under federal statute, overruling the objection that "New York law prevents settlements under New York law when the action is based on conduct occurring out of state, *i.e.*, Missouri, on behalf of New York residents." *Id.* (quotation omitted). The court reasoned that his theory "would defeat all nationwide class settlements" because state-law claims vary from state to state. *Id.* The Eighth Circuit found that this issue was waived on appeal, but noted that "when recovery depends on various forms of state law, class treatment may be inappropriate." *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 932 (8th Cir. 2005) (citing *In re Mex. Money Transfer Litig.*, 267 F.3d 743). Lastly, district courts in this Circuit have applied the *Sullivan* rule to variations beyond damages. *See Pollard v. Remington Arms Co.*, 320 F.R.D. 198, 217 (W.D. Mo. 2017); *In re CenturyLink Sales Pracs. & Sec. Litig.*, MDL No. 17-2795 (MJD/KMM), 2020 WL 7133805, at *15–16 (D. Minn. Dec. 4, 2020); *Heldt v. Payday Fin., LLC*, No. 3:13-CV-03023-RAL, 2016 WL 96156, at *11–12 (D.S.D. Jan. 8, 2016) ("The general rule that variations in state law destroy predominance in multistate actions is relaxed when the class is being certified for settlement.").

20

Plaintiffs also note that three courts have certified breach-of-warranty settlement classes over treadmills with exaggerated CHP representations. ECF No. 297 at 2–3 (first citing Final Approval Order and Judgment, *Prince v. Johnson Health Tech Trading*, *Inc.*, No. 5:22-CV-00035-EKD-JCH (W.D. Va. July 14, 2025), ECF No. 90; then citing Order Granting Plaintiffs' Unopposed Motions for Final Approval, Attorney Fees, Expenses, and Service Awards, *Bechtel v. Fitness Equip. Servs., LLC*, No. 1:19-cv-726-KLL (S.D. Ohio Sep. 29, 2022), ECF No. 73; and then citing Order Granting Final Approval of Class Action Settlement, *Walker v. Nautilus, Inc.*, No. 2:20-cv-3414-EAS-EPD (S.D. Ohio June 27, 2022), ECF No. 55). These cases all raised federal causes of action for breach of warranty under the MMWA. *See* First Amended Complaint ¶¶ 94–113, 138–48 *Prince*, ECF No. 7; Amended Complaint ¶¶ 84–102, 114–25, 153–64, *Bechtel*, ECF No. 31; Complaint ¶¶ 91–109, 131–41, *Walker*, ECF No. 1. That's unlike here, where the MMWA claims have been dismissed. *See* ECF No. 133 at 10–11, 35. However, though a federal claim, the MMWA hinges on the success of the state-law claim. *See* 15 U.S.C. § 2310(d); *Sipe v. Workhorse Custom Chassis, LLC*, 572 F.3d 525, 530 (8th Cir. 2009) ("The MMWA grants the holder of a limited warranty a federal cause of action for a breach of warranty under the applicable state law."); *Bechtel v. Fitness Equip. Servs., LLC*, 339 F.R.D. 462, 481 (S.D. Ohio 2021) ("[The MMWA] is directly dependent on the viability of an actionable warranty claim under state law." (quoting *Nathan v. Whirlpool Corp.*, 492 F. Supp. 3d 747, 759 (S.D. Ohio 2020))). Thus there is strong precedent in other district courts that nationwide classes asserting breach-of-warranty claims over treadmill CHP misrepresentations may be certified even though the individual elements of each states' cause of action differed.

21

Here, the relevant state-law differences do not defeat predominance. *Rawa* and *Keil* do not expressly limit their holding that "[a] nationwide settlement need not account for difference in state laws" to available relief. *Rawa*, 934 F.3d at 869. And there is ample persuasive authority for setting aside state-law variation in consumer protection settlement classes. *See, e.g.*, *Sullivan*, 667 F.3d at 304; *In re Hyundai*, 926 F.3d at 563. Mindful of the *Amchem Products* instruction to give "heightened[] attention" to the Rules' protections against "unwarranted or overbroad class definitions," 521 U.S. at 620, this class is not overbroad because all the members have suffered an injury—they have all paid a price premium for their treadmills. *See Friedman v. Dollar Thrifty Auto. Grp.*, 304 F.R.D. 601, 606 (D. Colo. 2015) ("A class is overbroad, and should not be certified, it if includes 'a great number of members who could not have been harmed by the defendant's allegedly unlawful conduct.'" (quoting *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 824 (7th Cir. 2012))); *accord Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 n.14 (9th Cir. 2022). Criticism of a class's overbreadth centers on lack of injury. *See Sullivan*, 667 F.3d at 348–50 (Jordan, J., dissenting) (objecting to majority opinion on grounds that some class members lacked statutory standing under their state's law). Lastly, Rule 23(b) asks for predominance of common questions, not unanimity. The common questions here concern Defendants' conduct: "whether Defendants misrepresented that the represented continuous horsepower for the Treadmills could be achieved in household use, and whether Class Members overpaid as a result." ECF No. 292 at 13.

Rule 23(b)(3) also requires a class action to be superior to other available methods of adjudication. Here, superiority is easily met. The individual injuries are small, *see* ECF No. 282 ¶ 12, so class members would not likely litigate them outside a class context. *See In re Pork Antitrust Litig.*, 665 F. Supp. 3d 967, 1009 (D. Minn. Mar. 29, 2023) (citing *Shutts*, 472 U.S. at 809).

III

"The Court must determine whether the settlement agreement is 'fair, reasonable, and adequate.'" *Huyer*, 314 F.R.D. at 626 (quoting Fed. R. Civ. P. 23(e)(2)). Courts must consider whether "(A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate . . . ; and (D) the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2). "Settlement agreements are generally encouraged, and are presumptively valid." *Huyer*, 314 F.R.D. at 626 (citing *In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*, 716 F.3d 1057, 1063 (8th Cir. 2013)). "In making that determination a district court should consider (1) 'the merits of the plaintiff's case[] weighed against the terms of the settlement,' (2) 'the defendant's financial condition,' (3) 'the complexity and expense of further litigation,' and (4) 'the amount of opposition to the settlement.'" *In re Uponor*, 716 F.3d at 1063 (quoting *Van Horn v. Trickey*, 840 F.2d 604, 607 (8th Cir. 1988)). "Although in approving a settlement the district court need not undertake the type of detailed investigation that trying the case would involve, it must nevertheless provide the appellate court with a basis for determining

that its decision rests on well-reasoned conclusions and not mere boilerplate." *Van Horn*, 840 F.2d at 607 (citation modified).

A

The most important factor, the merits of Plaintiffs' case against terms of settlement, *id.*, favors approving the settlement. This factor requires consideration of Plaintiffs' likelihood of success in litigation, the range of successful outcomes, and the value of non-cash awards to class members. *See Huyer v. Njema*, 847 F.3d 934, 939 (8th Cir. 2017); *Keil*, 862 F.3d at 696; *Marshall v. Nat'l Football League*, 787 F.3d 502, 509–10 (8th Cir. 2015).

Plaintiffs' likelihood of ultimate success at trial was iffy. *See Huyer*, 847 F.3d at 939. Certification of a litigated class was by no means certain. *See* ECF No. 197 at 22 & n.21 (noting that the six states' express-warranty law did not differ); *id.* at 33 ("Nationwide express warranty classes have failed certification at times, primarily because of the differing state laws regarding issues of reliance, privity, and statutes of limitation."). Certification of subclasses would avoid some of those obstacles but would be risky, as reliance and causation might not be resolvable with class-wide evidence, and predominance could be lacking. *See Avritt*, 615 F.3d at 1034–35. Since this negative-value suit is worth undertaking only as a class action, denial of class certification would be effectively dispositive. Outside certification, Plaintiffs have made some progress in litigation—they alleged sufficient facts to survive a motion to dismiss on their breach-of-warranty claim. *See* ECF No. 133 at 13–21 (finding that Plaintiffs properly pleaded a Minnesota or Utah breach-of-warranty claim in their Third Amended Complaint, except

24

that they did not allege pre-suit notice, and giving leave to refile).   At the same time, Plaintiffs recognize "significant hurdles" to continued litigation, including "surviving summary judgment; surviving possible *Daubert* motions; and convincing a jury that Class Members have been injured in the face of possible confusion given that the Treadmills are not operationally 'defective.'"   ECF No. 292 at 15.   Judgment in their favor would be subject to appeal, further delaying and jeopardizing recovery.   *See* Fed. R. Civ. P. 23(e)(2)(C)(i) (instructing courts to consider "the costs, risks, and delay of trial and appeal").

Should Plaintiffs prevail at trial, even the most successful outcome would not provide substantial compensation for class members.   Plaintiffs' case advances on a price-premium damages theory.   *See* Fourth Am. Compl. ¶¶ 3, 8.   That "quantum of damages" may be difficult to determine.   *Id.* (citing ECF No. 256 ¶ 13 (noting that Plaintiffs' expert determined price-premium damages were roughly 2–8%)).   Plaintiffs note that those damages are smaller than expected, so at the low end, an $800 treadmill at a 2% premium would only produce $16 in damages.   ECF No. 282 ¶ 16.   At the high end, an 8% premium for a treadmill costing $2,000 would make $160 in damages.   Fourth Am. Compl. ¶ 21 (noting that Mr. Ovsak paid over $2,000 for his treadmill); *see* ECF No. 256 ¶ 13 (noting average price for the proposed class in this period was $1,500).   Even the most expensive treadmill at the highest price premium would not result in an amount that comes close to justifying individual litigation.   On the merits, then, Plaintiffs have a triable case but face significant obstacles.

25

The value of the settlement is non-monetary but still meaningful.[5]  Class members who submit a valid claim are eligible to receive (1) a treadmill maintenance kit or a treadmill mat, or (2) one of several membership subscriptions to iFit's services.  ECF No. 256-1 ¶ 80.  Non-monetary awards such as "coupons" and "in-kind compensation" are generally disfavored.  *See Keil*, 862 F.3d at 696 (noting that coupons "are not worth their face value to the recipients"); *Fouks v. Red Wing Hotel Corp.*, No. 12-cv-2160 (JNE/FLN), 2013 WL 6169209, at *7 (D. Minn. Nov. 21, 2013) ("Compensation in kind is worth less than cash of the same nominal value." (citation modified) (quoting *True v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052, 1075 (C.D. Cal. 2010))); Fed. R. Civ. P. 23(h) advisory committee's note to 2003 amendment ("Settlements involving nonmonetary provisions for class members also deserve careful scrutiny to ensure that these provisions have actual value to the class.").  Still, the Eighth Circuit has approved settlements where awards of that nature were forewarned, optional, and affected a small subclass.  *See In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 933–34 (8th Cir. 2005) (awarding people who terminated service with defendant wireless service provider a credit for resubscribing, cash reimbursement, or a phone card).  The Eighth Circuit has approved an award for non-monetary relief when it "likely offers the plaintiffs 'the only conceivable remedies they could expect.'"  *In re Target Corp. Customer Data Sec. Breach Litig.*, 892 F.3d 968, 978 (8th Cir. 2018) (quoting *In re Uponor*, 716 F.3d at 1063).  It has also

---

[5]    Additionally, all class members benefit from injunctive relief—here, that Defendants no longer market their treadmills with misleading representations.  *See In re Target Corp. Customer Data Sec. Breach Litig.*, 892 F.3d 968, 974 n.6 (8th Cir. 2018).

approved awards that were not direct monetary distributions to class members but were clearly monetary in nature or directly valuable. *See Marshall*, 787 F.3d at 505–07 (approving award establishing "a licensing agency to assist former NFL players in marketing their publicity rights" and paying out $42 million to an organization providing healthcare to retired players). When non-monetary awards have been meaningful, they have often been accompanied by significant monetary awards. *See In re Xcel Energy, Inc. Sec., Derivative & "ERISA" Litig.*, 364 F. Supp. 2d 980, 1001 (D. Minn. 2005); *In re CenturyLink Sales Pracs. & Sec. Litig.*, MDL No. 17-2795 (MJD/KMM), 2020 WL 7133805, at *7 (D. Minn. Dec. 4, 2020). Ultimately, whether the award is monetary or non-monetary, the focus is on its value to the class. *See* Fed. R. Civ. P. 23(e)(2)(C) (requiring the court to consider whether "the relief provided for the class is adequate").

There is a line of cases that warn against settlements in which the class receives entirely nonmonetary awards while class counsel are paid in cash. *See Crawford v. Equifax Payment Servs., Inc.*, 201 F.3d 877, 882 (7th Cir. 2000) (Easterbrook, J.) (finding the settlement "substantively troubling" where the class representative and counsel "were paid handsomely to go away" and "the other class members received nothing"); *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011) (warning of collusion when "when the class receives no monetary distribution but class counsel are amply rewarded"); *Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181, 204 (D.D.C. 2013). "These concerns warrant special attention when the record suggests that settlement is driven by fees," as there is danger of parties' collusion. *Hanlon*, 150 F.3d at 1021, 1026.

The Eighth Circuit has not provided a definition for "coupons," but other courts have provided relevant factors.  In the Second and Ninth Circuits, to determine whether an award is a coupon, courts consider "(1) whether class members have 'to hand over more of their own money before they can take advantage of' a credit, (2) whether the credit is valid only 'for select products or services,' and (3) how much flexibility the credit provides, including whether it expires or is freely transferrable."  *See Moses v. N.Y. Times Co.*, 79 F.4th 235, 248 (2d Cir. 2023) (quoting *In re Easysaver Rewards Litig.*, 906 F.3d 747, 755 (9th Cir. 2018)).  Some courts have apparently treated the first factor as decisive, explaining that a coupon provides a discount on a product or service, but does not eliminate the cost.  *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 951 (9th Cir. 2015); *Browning v. Yahoo! Inc.*, No. C04-01463 HRL, 2007 WL 4105971, at *5 (N.D. Cal. Nov. 16, 2017).

I conclude that, under these factors and on this record, the non-monetary awards are not coupons.  Class members do not have to pay to take advantage of mats or kits.  The awards are not credits and can be freely transferred.   Whether the subscription memberships are coupons is a closer call, but the better answer is they are not.  Counsel confirmed at the final fairness hearing that class members do not have to spend any money to take advantage of iFit membership and that the subscriptions would not automatically renew.  That is the key factor—subscriptions are free, not discounted.  There is no information whether the membership subscription is freely transferrable.  But the most important consideration supports the conclusion that the subscriptions are not coupons.  It's fair to call the award "in-kind" compensation.  *See In kind*, *Black's Law Dictionary* (12th

28

ed. 2024) ("In goods or services rather than money.").  Courts consider whether in-kind benefits are likely to be valuable to the class members.  *See Browning*, 2007 WL 4105971, at *5 (finding that free credit score and credit monitoring benefits would be valuable to previous purchasers of those services); *In re Trans Union Corp. Privacy Litig.*, No. 00C 4729, MDL No. 1350, 2008 WL 11358136, at *15 (N.D. Ill. Jan. 3, 2008) (concluding that free credit scores' value was undercut by their availability elsewhere in the market).

The three objectors dispute the awards' value to themselves and other class members.  ECF No. 292 in 18.  Mr. Zweig objects that "the benefits available to class members have potentially no value and do not provide recompense for potential damages."  ECF No. 276 at 1.  As he sees it, a maintenance kit, mat, and subscription will be valuable only to those who still use Defendants' treadmills.  Since a treadmill's lifespan is usually eight to ten years, and the proposed class members purchased their treadmills five to nine years ago, it is likely that many treadmills are no longer working, and that many purchasers have "already moved on from that model or that brand."  *Id.*  He requests instead monetary damages for a monetary injury.  *Id.* at 2.  Mr. Howard likewise requests an award "in dollars, not denominated in maintenance kits, treadmill mats, or iFIT memberships."  ECF No. 278 at 1.  Ms. Hull makes the same objections, arguing that the "in-kind compensation" offers "$0 for most members."  ECF No. 287 at 2.  She argues that a fairer award is monetary damages in the overpaid amount.  *Id.* at 4.

I conclude the award is meaningful because these benefits are likely to be valuable to class members.  Class members have purchased a treadmill between 2015 and 2020.  It is no stretch to believe that many own a treadmill today, whether the NordicTrack model

at the subject of this suit or another. Nothing in the record suggests the mat and maintenance kit are useful only to NordicTrack treadmills, as opposed to other brands' equipment, and it would be odd if that were the case. So the objection that these benefits "are analogous to a choice today between Chrysler floor mats or a trial subscription to Chrysler's Uconnect roadside assistance service for hypothetical class members who were misled about Chrysler's advertising about the engine power" of its vehicles is unpersuasive. ECF No. 276 at 1. Class members without treadmills benefit from the subscription memberships. Though the Train membership tier is only available as an award to class members with treadmills, the highest tier of membership is open to class members without treadmills. ECF No. 256-1 ¶ 80(b). As Plaintiffs note, the subscription offers services that don't require the equipment, including "workout programs such as yoga." ECF No. 293 ¶ 4; *see also* ECF No. 293-1 at 2. Those services are likely to be valuable to former treadmill purchasers, who (it seems safe to presume) likely remain interested in fitness programs. *Cf. Browning*, 2007 WL 4105971, at *5; *In re Trans Union*, 2008 WL 11358136, at *15.

B

Defendants' financial condition favors a finding that the settlement is fair, reasonable, and adequate. Where a defendant "is in good financial standing, which would permit it to adequately pay for its settlement obligations or continue with a spirited defense in the litigation," this factor is neutral. *Marshall*, 787 F.3d at 512. On the other hand, where a defendant is in a poor financial condition, making future collection in litigation unlikely, this factor supports the settlement. *See In re Charter Commc'ns, Inc., Sec. Litig.*,

30

No. MDL 1506, 4:02-CV-1186 CAS, 2005 WL 4045741, at *9–10 (E.D. Mo. June 30, 2005). A defendant's theoretical ability to pay more, all by itself, "does not render the settlement inadequate." *Yarrington v. Solvay Pharms., Inc.*, No. 09-cv-2261 (RHK/RLE), 2010 WL 11453553, at *9 (D. Minn. Mar. 16, 2010) (quoting *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1152 (8th Cir. 1999)).

The record contains evidence that Defendants are in a weak financial condition. *See* ECF No. 282 ¶ 10 ("[A] settlement payment of even $10.00 would threaten over $15 million in payments, a risk that was untenable for iFit given its financial situation."). Plaintiffs argue that "Defendants' public layoffs and financial struggles were a factor in arriving at an appropriate settlement, but there is no indication that Defendants' current financial condition will prevent it from fulfilling its settlement obligations." ECF No. 292 at 17. That makes sense, given that the settlement provides class members with non-monetary awards: maintenance kits, mats, and membership subscriptions. ECF No. 256-1 ¶ 80. While Defendants presumably forego some revenue due to the class award, they take less of a pocketbook hit than if they provided a comparable monetary award. Because there is no dispute Defendants will be able to fulfill the terms of the settlement, and because there is reason to doubt Defendants could pay a larger sum should Plaintiffs prevail in litigation, this factor favors the settlement.

C

The complexity and expense of further litigation favors approving the settlement. Continuing litigation would be costly. *See Schmidt v. Fuller Brush Co.*, 527 F.2d 532, 535 (8th Cir. 1975) ("[C]lass actions place an enormous burden of costs and expense upon the

parties . . . .").   Plaintiffs expect to move again for class certification, and the previous round of class certification required extensive briefing—Plaintiffs produced over 300 pages in memoranda, declarations, and exhibits, and Defendants produced over 600 pages of the same.   *See* ECF Nos. 197–203, 212–14.   Defendants then moved for summary judgment, and their brief and exhibits totaled about 450 pages. *See* ECF Nos. 218–19. Litigation would be complicated.   Assuming Plaintiffs moved to certify a multistate or nationwide class, they would have the burden to show that variation in state laws do not undermine predominance, which is a time-consuming task.   The parties would likely litigate *Daubert* matters over the price-premium damages.   ECF No. 256 ¶ 13.   These significant costs favor approving the settlement.

## D

The low volume of opposition to settlement favors finding the settlement fair, reasonable, and adequate.   Courts must consider the arguments of objectors before approving a settlement.   *See Petrovic*, 200 F.3d at 1152.   Where the opposition to settlement is "minuscule," the district court should consider not only the "vocal minority" but also the "silent majority."   *In re Wireless*, 396 F.3d at 933; *see Petrovic*, 200 F.3d at 1152 (certifying class when fewer than 4% of class members objected).   Here, three individuals objected to the proposed settlement.   *See* ECF No. 276 (Jeremy Zweig's objection); ECF No. 278 (William E. Howard's objection); ECF No. 287 (Kellie Hull's objection). Plaintiffs point out that, in a class of 1.54 million members, this number is miniscule.   ECF No. 292 at 17.   And only forty-two individuals opted out of the class.   ECF No. 289 ¶ 16.

E

Additionally, the Rule 23(e)(2) factors support approval. As explained, class representatives and counsel adequately represented the class. Fed. R. Civ. P. 23(e)(2)(A). The parties reached the settlement agreement after extensive mediation before Judge Denlow, providing for arm's-length negotiation. ECF No. 256-1 ¶ 5; *see* Fed. R. Civ. P. 23(e)(2)(B). The settlement "avoids the risks, additional costs, uncertainties and delays of continued litigation." ECF No. 292 at 16 (citing *Holden v. Burlington N., Inc.*, 665 F. Supp. 1398, 1414 (D. Minn. 1987)); *see* Fed. R. Civ. P. 23(e)(2)(C)(i). The proposed method of distribution and processing claims is effective, and the notice was effectively delivered. *See* ECF No. 289 ¶¶ 5–11; Fed. R. Civ. P. 23(e)(2)(C)(ii). And the agreement treats class members equitably relative to each other. Fed. R. Civ. P. 23(e)(2)(D). The settlement is fair, reasonable, and adequate.

IV

Along with final approval, Plaintiffs seek an award of attorneys' fees and expenses in the amount of $2.4 million, and service awards to the three class representatives in the amount of $7,500 each. ECF No. 281 at 2. These awards will be granted.

In determining whether an attorneys' fee award is reasonable, district courts usually choose between the lodestar and percentage-of-the-fund method. *In re Life Time Fitness, Inc. Tel. Consumer Prot. Act (TCPA) Litig.*, 847 F.3d 619, 622 (8th Cir. 2017). The lodestar amount is calculated by "multipl[ying] the number of hours reasonable expended by reasonable hourly rates." *Bryant v. Jeffrey Sand Co.*, 919 F.3d 520, 529 (8th Cir. 2019). The percentage-of-the-fund method sets the fee "equal to some fraction of the common

fund that the attorneys were successful in gathering during the course of the litigation." *Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 244–45 (8th Cir. 1996). Whichever method is used, "the ultimate reasonableness of the award is evaluated considering relevant factors," including the benefit conferred on the class; the time and labor required; the novelty and difficulty of the questions; the experience, reputation, and ability of the attorneys; and awards in similar cases. *In re Target*, 892 F.3d at 977 & n.7 (citation modified); *see Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717–20 (5th Cir. 1974) (creating the test); *In re Xcel Energy*, 364 F. Supp. 2d at 993 ("Plainly, not all of the *Johnson* factors will apply in every case, so the court has wide discretion as to which factors to apply and the relative weight to assign to each.").

Here, the relevant factors support approving the fee award, determined under the lodestar method, as there is no common fund.[6] First, the settlement confers a meaningful benefit on the class. Second, Plaintiffs' counsel faced significant risk in pursuing the case. They took this case on contingency and have litigated it since November 2019, without payment or guarantee of payment. *See, e.g.*, ECF No. 283 ¶ 7. Third, the time and labor

---

[6]    Because I conclude that the proposed settlement does not offer coupons, the requirements of 28 U.S.C. § 1712 do not apply. Under that statute, "[i]f a proposed settlement in a class action provides for a recovery of coupons to a class member, the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons shall be based on the value to class members of the coupons that are redeemed." 28 U.S.C. § 1712(a). Even if I'm wrong about the coupon question, this statute would be implicated only if I chose to determine attorneys' fees as a percentage of the coupon settlement. *See Galloway v. Kan. City Landsmen, LLC*, 833 F.3d 969, 974–75 (8th Cir. 2016) (recognizing district court discretion to choose between percentage and lodestar methods when class receives coupon relief). Since I've applied the lodestar method, § 1712 doesn't factor in.

required was extensive.  For comparison, this case involved 4.7 times as many hours expended as in *Walker* and 2.7 times as many as in *Bechtel*, *see* ECF No. 282 ¶ 14.  *Walker* took about 24 months from complaint to final approval.  *See* Docket, *Walker*, No. 2:20-cv-3414-EAS-EPD (S.D. Ohio), ECF Nos. 1, 55.  *Bechtel* took about 37 months.  *See* Docket, *Bechtel*, No. 1:19-cv-726-KLL (S.D. Ohio) ECF Nos. 1, 73.  This case has lasted over 70 months and featured extensive motion to practice: motions to compel arbitration, ECF Nos. 28, 82; motions to dismiss, ECF Nos. 23, 116; a motion to certify the class, ECF Nos. 195; a motion for summary judgment, ECF No. 216; and the instant motion to approve the settlement and certify the settlement class, ECF Nos. 253, 290.  Fourth, the issues were complex.  To advance their price-premium theory, counsel engaged multiple expert witnesses.  ECF No. 282 ¶ 18.  The legal questions were difficult, and counsel ably litigated those issues.

Fifth, the requested $1,946,733.97 in attorneys' fees is a negative lodestar rate of 0.51, which "strongly suggests the reasonableness of the requested fee."  ECF No. 281 at 4, 16; *In re Google LLC St. View Elec. Commc'ns Litig.*, 611 F. Supp. 3d 872, 888 (N.D. Cal. Mar. 18, 2020); *see Feldman v. Star Trib. Media Co.*, No. 22-cv-1731 (ECT/TNL), 2024 WL 3026556, at *7 (D. Minn. June 17, 2024) (collecting cases with reasonable multipliers ranging from 1.38 to 5.3).  Professionals at Chestnut Cambronne PA worked 1,286.1 hours at a rate between $450 and $1050 per hour for lawyers, and between $200 and $325 per hour for a law clerk and paralegals.  ECF No. 283 ¶ 3.  Its lodestar amount for all legal work up to April 25, 2025, was $1,129,525.50.  *Id.*  Markovits, Stock & DeMarco, LLC, produced similar figures: Its professionals worked 2,037.00 hours with an

35

hourly rate of $350 to $995 for lawyers and $190 to $250 for paralegals. ECF No. 282 ¶ 17. Its lodestar amount for all legal work up to April 25, 2025, was $1,559,064.00. *Id.* Attorneys at Hellmuth & Johnson PLLC worked 1,274.3 hours at a rate of $650 to $875 per hour, for a total lodestar amount of $1,111,920.00. ECF No. 284 ¶ 3. Given the lawyers' and other legal professionals' experience and qualifications, those rates are reasonable. *See* ECF No. 285 ¶ 6 (opinion of David W. Asp "that the rates claimed for the work on this complex consumer class action are reasonable, and within the range of what is charged by attorneys with similar skills and experience to work on these matters"); *Reynolds v. Concordia Univ.*, No. 21-cv-2560 (JWB/DTS), 2024 WL 2270585, at *1 (D. Minn. May 20, 2024) (awarding fee request); Declaration of Terence R. Coates ¶ 5, *Reynolds*, No. 21-cv-2560 (JWB/DTS) (D. Minn. Mar. 1, 2024), ECF No. 77 (setting out similar rates for Markovits, Stock & DeMarco); Declaration of Bryan L. Bleichner ¶ 21, *Reynolds*, No. 21-cv-2560 (JWB/DTS) (D. Minn. Mar. 1, 2024), ECF No. 79 (setting out similar rates for Chestnut Cambronne). Adding the three firms' lodestar amounts produces $3,800,509.50—nearly twice the fee request. The costs amount to $453,266.03, and those are documented and reasonable. ECF No. 282 ¶ 21 (Markovits, Stock & DeMarco costs totaling $234,357.16); ECF No. 283 ¶ 5 (Chestnut Cambronne costs totaling $121,557.01); ECF No. 284 ¶ 5 (Hellmuth & Johnson costs totaling $97,351.86).

The objectors dispute the reasonableness of the requested fee award, but their arguments are unpersuasive. *See* ECF No. 276 at 2; ECF No. 278 at 1; ECF No. 287 at 2. The objectors argue counsel's fee award is "egregious and inequitable" considering the class was not provided a monetary award. ECF No. 276 at 2; *see* ECF No. 287 at 2 ("Class

Counsel and Defendants have colluded to benefit themselves at the Class's expense.").
Courts should apply "heightened judicially scrutiny" where "counsel are awarded large
fees, while leaving class members with coupons or other awards of little or no value."
*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 654 (7th Cir. 2006) (citation
omitted).  That's not what's happening here.  The fee award is a significant reduction in
counsel's lodestar rates.  And the offerings to class members in mats, kits, and subscriptions
represent a meaningful benefit to treadmill purchasers.  One objector also claims that class
benefits "were not pursued with structure or vigor."  ECF No. 276 at 2.  I have presided
over this case for almost six years, and I know it well.  Counsel pursued this case at a
significant opportunity cost and remained diligent throughout the lengthy proceedings.
The objector's claim is simply not accurate.

Lastly, the service awards of $7,500 for each class representative are reasonable.
*See Caligiuri v. Symantec Corp.*, 855 F.3d 860, 867 (8th Cir. 2017) ("[C]ourts in this circuit
regularly grant service awards of $10,000 or greater.").  The class representatives'
participation merits the requested award.

## ORDER

Based on the foregoing, and all the file, records, and proceedings herein, **IT IS
ORDERED THAT**:

1.    Plaintiffs' Motion for Final Approval of Class Action Settlement
[ECF No. 290] is **GRANTED**.

2.    Final certification of the Settlement Class is **GRANTED**.

3.      Plaintiffs' Motion for an Award of Attorneys' Fees, Expenses, and Class Representative Service Awards [ECF No. 279] is **GRANTED**.

4.      Class counsel is awarded $1,946,733.97 in attorneys' fees.

5.      Class counsel is awarded $453,266.03 in reasonable litigation costs and expenses.

6.       Class representatives Teeda Barclay, Jay Ovsak, and Nicole Nordick are awarded a service award of $7,500.00 each for their service to the Settlement Class.

7.      Final approval of the methods and forms of notice provided to Class Members is **GRANTED**.

8.      This action is **DISMISSED with prejudice**.

9.      The Court shall retain jurisdiction over the subject matter and the parties with respect to the interpretation and implementation of the Settlement Agreement for all purposes.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  October 27, 2025                              s/ Eric C. Tostrud
                                                     Eric C. Tostrud
                                                     United States District Court

38